**IN THE CIRCUIT COURT FOR BALTIMORE CITY**

|  |  |  |
|---|---|---|
| | : | |
| STANCIL McNAIR | : | |
| 130 S. Loudon Avenue | : | |
| Baltimore, Maryland 21229 | : | |
| | : | |
| THERESA BLOW | : | |
| 818 E. Preston Street | : | |
| Baltimore, Maryland 21202 | : | |
| | : | |
| TIMMEEKA PETTUS | : | **Case No.** |
| 705 Cumberland Street | : | |
| Baltimore, Maryland 21218 | : | |
| | : | |
| CRYSTAL BOSWELL | : | |
| 1924 Oak Hill Avenue | : | |
| Baltimore, Maryland 21218 | : | |
| | : | |
| RICARDO WARD | : | |
| 5526 Frederick Avenue | : | |
| Baltimore, Maryland 21228 | : | |
| | : | |
| MITCHELL DEAN, Sr | : | |
| 4718 Duncrest Avenue | : | |
| Baltimore, Maryland 21206 | : | |
| | : | |
| PLAINTIFFS | : | |
| | : | |
| v. | : | |
| | : | |
| LOCAL 44 ELECTION COMMITTEE, | : | |
| American Federation of State, County | : | |
| & Municipal Employees (AFSCME) | : | |
| 1410 Bush Street, Suite A | : | |
| Baltimore, Maryland 21230 | : | |
| | : | |
| JAMIALA AUSTIN | : | |
| In her official capacity as a Member of | : | |
| Local 44 Election Committee | : | |
| 2715 Jenner Drive, Apt C | : | |
| Baltimore, Maryland 21209 | : | |
| | : | |
| NATHANIEL JOHNSON | : | |
| In his official capacity as a Member of | : | |
| Local 44 Election Committee | : | |
| 237 Mallow Hill Road, Apt. 1 | : | |
| Baltimore, Maryland 21229 | : | |

| | |
|---|---|
| ANDRE McLEAN | : |
| In his official capacity as a Member of | : |
| Local 44 Election Committee | : |
| 7060 Surrey Drive, Apt. 1 | : |
| Baltimore, Maryland 21215 | : |
| | : |
| AFSCME COUNCIL 3 | : |
| MARYLAND STAFF UNION CORP. | : |
| 1410 Bush Street | : |
| Baltimore, Maryland 21230 | : |
| | : |
| AMERICAN FEDERATION OF | : |
| STATE, COUNTY AND MUNICIPAL | : |
| EMPLOYEES, AFL-CIO | : |
| 1625 L Street, NW | : |
| Washington, DC 20036 | : |
| | : |
| DEFENDANTS | : |
| | : |

**COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiffs Stancil McNair, Teresa Blow, Crystal Boswell, Timmeeka Pettus, Ricardo Ward, and Mitchell Dean, Sr. on behalf of themselves, by and through their undersigned counsel, Thiru Vignarajah, Esq., hereby file this Complaint for Declaratory Judgment and Injunctive Relief and Demand for Jury Trial against Defendants Local 44 Election Committee ("Local 44"); Jamiala Austin, Nathaniel Johnson, and Andre McLean, in their official capacity as Members of the Local 44 Election Committee; AFSCME Council 3 Maryland Staff Union Corporation; and the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME"), and allege as follows:

**INTRODUCTION**

1.      On August 23, 2025, Local 44 conducted elections by secret ballot to decide who would lead the largest union of public sector employees in Baltimore City.

2.      In the wake of two sanitation workers dying on the job in the preceding year, this was an election of historic dimensions, as it presented an opportunity for new leadership of Local 44 after the

declining health and tragic passing in November 2024 of Glenard "Glen" Middleton Sr., who had served as President of Local 44 from 1987 until his retirement in 2023.

3.     In the end, for the position of President, Plaintiff and sanitation worker Stancil McNair decisively prevailed over former Local 44 Vice President Trevor Taylor by a vote of 125 to 103. *See* Madeleine O'Neill, *Insurgent says he won AFSCME Local 44 presidency after grassroots campaign for better pay and working conditions*, BALT. BREW (August 23, 2025). Three members of McNair's slate would also prevail — Plaintiff Timmeeka Pettus as Treasurer, and Plaintiffs Teresa Blow and Crystal Boswell as members of the Executive Board; two others from the slate — Plaintiffs Ricardo Ward and Mitchell Dean Sr. — would finish strong enough for Vice President and Executive Board, respectively, to earn a spot in runoff elections for those two positions.

4.     Union bosses, including Council 3 President Pat Moran who had presided over the umbrella council during a phishing scam where the union mysteriously lost $1 million to a fictional law firm, were quick to act to try to reverse the unexpected setback. *See* Mark Reutter, *AFSCME Council 3 lost $1 million of membership funds in "phishing scam," government documents reveal*, BALT. BREW (Sept. 26, 2025).

5.     Election protests were promptly filed, claiming without evidence that ballots had been cast by individuals who were not valid union members and that Baltimore City Inspector General Isabel Cumming had interfered with the election by posting positive messages about McNair fighting for his fellow workers on her personal social media account. *See* Attachment 17.

6.     Local 44's Election Committee met at least twice to consider the election protests without ever notifying the election winners (who had been sworn in by this time) of the basis of the protests against them. Without giving any Plaintiffs an opportunity to be heard on the allegations (as guaranteed by the AFSCME International Constitution and rudimentary principles of fairness), the Election Committee unceremoniously tossed out the original election results and ordered a new election. *See id.*

7.     Plaintiffs filed timely internal appeals on, *inter alia*, three grounds relevant to this complaint and corresponding emergency petition: (1) there was no evidence of improper voting and, even if there had been, challenges should have been filed at the time of the election, not after the ballots were counted; (2) the

Inspector General is not an "employer" but an independent watchdog with no supervisory authority over AFSCME union members and hence her private social media messages cannot justify invalidating a union's election results; and (3) the failure to provide to Plaintiffs any notice or opportunity to be heard is fatal to the election protests, no matter the merits. *See* Attachments 10 & 11.

8.     Plaintiffs have gained ground through internal appeals but, having exhausted their union remedies, they now face an imminent election do-over that was announced on Monday (November 24) and is now scheduled for ten days from now (Saturday, December 6).

9.     With respect to the spurious voter fraud allegations, the Judicial Panel agreed on appeal that there was no evidence of improper votes and that the required challenges were not timely filed in any event, and hence that protest is extinguished. *See* Attachment 2.

10.     With respect to the absence of notice and an opportunity to be heard, the Judicial Panel inexplicably decided that although there was indisputably no notice of the basis of the protests and no opportunity to be heard on any of the allegations, that failure could be overlooked because Plaintiffs had a chance to address the challenge *on appeal*. The Judicial Panel has taken this position without citing any legal, statutory, or even internal precedent that would allow a contractual guarantee of an "opportunity to be heard" to be interpreted in this grossly diluted fashion. *See id.*

11.     Finally, while acknowledging the volume of authority rooted in federal and state precedent that makes clear that the Baltimore City Inspector General is <u>not</u> an "employer" within the meaning of union contracts, AFSCME's Judicial Panel nevertheless found that the conclusions of the Baltimore City Board of Ethics and "case law cited by [Plaintiffs]" are not relevant because "they fall outside the scope of this internal union proceeding." *See id.* AFSCME is not immune from the law; the contours of its contractual obligations to its members—what the contract means and what it guarantees—are subject to interpretation by courts. Thus, just like any term in any contract, who counts as an "employer" in the context of the AFSCME International Constitution and Election Manual is not a question that can be unilaterally decided by the Judicial Panel without regard for what the law actually says.

12.     Fundamentally, the decision by Local 44's Election Committee to toss the results of the original election and to now schedule a new election is an unlawful breach of contract and an unjustifiable departure from governing union election rules. The Judicial Panel valiantly seeks to defend an indefensible decision by Local 44. As a matter of principle, it is natural for union leadership to want to defend a local union's decision, but this should not come at the expense of flouting governing law and rewriting binding contractual terms to achieve a preferred result. That not only undermines the trust of union members and the public in the integrity of one of the nation's most respected unions, but it lends credence to a caricature of union elections as fraudulent theater designed only to allow union bosses to handpick their own. This complaint and emergency petition provide an opportunity for the Court to correct this injustice.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to Md. Ann. Code, Cts. & Jud. Proc. § 1-501 and § 1-502, which grant the Circuit Courts original jurisdiction over civil actions.

14.     The Court has personal jurisdiction over Defendants pursuant to Md. Ann. Code, Cts. & Jud. Proc. § 6-103, because they conduct continuous and systematic operations within the State of Maryland, maintain offices and representatives in Maryland, and have engaged in the activities giving rise to the claims asserted herein. Defendants have purposefully availed themselves of the privileges of conducting activities within Maryland and are thus subject to jurisdiction under Md. Ann. Code, Cts. & Jud. Proc. § 6-103(b).

15.     The Circuit Court for Baltimore City is the proper venue for this action pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-201 and § 6-202 because Defendants carry on regular business in this jurisdiction; all Defendants reside or maintain offices, staff, or representatives here; the events, decisions, and acts giving rise to the claims occurred, least in part, in Baltimore City; and Plaintiffs suffered injury in this jurisdiction.

16.     To the extent Plaintiffs assert claims arising under the violations of a union constitution and bylaws, such claims are properly brought in this Court because Maryland recognizes jurisdiction over actions alleging that a labor organization breached its contractual obligations, acted arbitrarily, in bad faith, or contrary

to governing rules when internal remedies within the labor organization have been exhausted or are futile, unavailable, inadequate, or incapable of affording the relief sought.

17.    Plaintiffs have exhausted internal union remedies, having sought relief through the internal procedures set forth in AFSCME's International Constitution up to and including review by AFSCME's full Judicial Panel and having concluded that no meaningful opportunity for redress is available.

18.    No other administrative body or exclusive federal forum has primary or preemptive jurisdiction over the claims asserted in this Complaint because Plaintiffs challenge the Defendants' actions as violations of contractual obligations and duties owed under Maryland law.

**PARTIES**

**A.  Plaintiffs**

19.    Plaintiff **Stancil McNair** is a Maryland resident who was elected President of Local 44 on August 23, 2025, and sworn into office on August 30, 2025. McNair is a member in good standing of Local 44, and as such McNair has full rights within the organization, including voting, holding office, and participating in meetings. Since August 30, 2025, McNair's status as President of Local 44 has been questioned and challenged. With respect to the election protest that prompted the decision to re-run the union leadership election, McNair was also denied the opportunity to be heard at the Local 44 level, in direct contravention of the AFSCME International Constitution pertaining to contested elections.

20.    Plaintiff **Timmeka Pettus** is a Maryland resident who was elected Treasurer of Local 44 on August 23, 2025, and sworn into office on August 30, 2025. Pettus is a member in good standing of Local 44 and as such Pettus has full rights within the organization, including voting, holding office, and participating in meetings. Since August 30, 2025, Pettus's status as Treasurer of Local 44 has been questioned and challenged, despite no underlying challenge to her original nomination or the vote tally related to her position. With respect to the election protest that prompted the decision to re-run the union leadership election, Pettus was also denied the opportunity to be heard at the Local 44 level, in direct contravention of the AFSCME International Constitution pertaining to contested elections.

21.     Plaintiff **Teresa Blow** is a Maryland resident who was elected as an Executive Board Member of Local 44 on August 23, 2025, and sworn into office on August 30, 2025. Blow is a member in good standing of Local 44 and as such Blow has full rights within the organization, including voting, holding office, and participating in meetings. Since August 30, 2025, Blow's status as an Executive Board Member of Local 44 has been questioned and challenged, despite no underlying challenge to her original nomination or the vote tally related to her position. With respect to the election protest that prompted the decision to re-run the union leadership election, Blow was also denied the opportunity to be heard at the Local 44 level, in direct contravention of the AFSCME International Constitution pertaining to contested elections.

22.     Plaintiff **Crystal Boswell** is Maryland resident who was elected as an Executive Board Member of Local 44 on August 23, 2025, and sworn into office on August 30, 2025. Boswell is a member in good standing of Local 44 and as such Boswell has full rights within the organization, including voting, holding office, and participating in meetings. Since August 30, 2025, Boswell's status as an Executive Board Member of Local 44 has been questioned and challenged, despite no underlying challenge to her original nomination or the vote tally related to her position. With respect to the election protest that prompted the decision to re-run the union leadership election, Boswell was also denied the opportunity to be heard at the Local 44 level, in direct contravention of the AFSCME International Constitution pertaining to contested elections.

23.     Plaintiff **Ricardo Ward** is a Maryland resident whose election for the Vice President position was subject to a runoff since there was no clear majority among three potential candidates. Ward is a member in good standing of Local 44 and as such Ward has full rights within the organization, including voting, holding office, and participating in meetings. To date, and certainly since August 23, 2025, Ward has not been notified of any runoff election and learned no later than November 24, 2025, of the re-run of the election altogether. With respect to the election protest that prompted the decision to re-run the union leadership election, Ward was also denied the opportunity to be heard at the Local 44 level, in direct contravention of the AFSCME International Constitution pertaining to contested elections.

24.     Plaintiff **Mitchell Dean Sr.** is a Maryland resident whose election for an Executive Board position was subject to a runoff since there was no clear majority among remaining candidates. Dean is a member in good standing of Local 44 and as such Dean has full rights within the organization, including voting, holding office, and participating in meetings. To date, and certainly since August 23, 2025, Dean has not been notified of any runoff election and learned no later than November 24, 2025, of the re-run of the election altogether. With respect to the election protest that prompted the decision to re-run the union leadership election, Dean was also denied the opportunity to be heard at the Local 44 level, in direct contravention of the AFSCME International Constitution pertaining to contested elections.

### B.  Defendants

25.     **Defendant Local 44 Election Committee**, upon information and belief, is responsible for the conduct of Local 44 union elections in accordance with the AFSCME International Constitution. It consists of three members appointed by the President of Local 44 and has authority over nomination of candidates; hearing and deciding election challenges and protests; ensuring proper notices are given relating to the election; preparing and supervising preparation, issuance, return and counting of ballots; certifying election results; and making a report to membership of election results and protests.

26.     **Defendants Jamiala Austin, Nathaniel Johnson, and Andre Mclean**, upon information and belief, currently serve as members of the Local 44 Election Committee. Consistent with past practice, each was appointed by Plaintiff Stancil McNair after McNair was sworn in as President of Local 44.

27.     **Defendant AFSCME Council 3 Maryland Staff Union Corp. (Council 3)** is, upon information and belief, a tax-exempt labor organization headquartered in Baltimore, Maryland which represents 50,000+ public service workers in the local, city, county, state, and higher education positions.

28.     **Defendant American Federation of State, County and Municipal Employees (AFSCME)**, is, upon information and belief, an international labor organization headquartered in the United States. AFSCME oversees, charters, and provides governance structures, policies, and support to its affiliated local unions, including Council 3 and Local 44. AFSCME International conducts business nationwide,

including within this jurisdiction, and is capable of suing and being sued. At all relevant times, AFSCME acted through its officers, agents, representatives, and employees, who were acting within the scope of their authority. The AFSCME International Judicial Panel operates as an agent or alter ego of AFSCME, and its decisions and actions constitute the decisions and actions of AFSCME, the international labor organization.

## STATEMENT OF FACTS

### Membership Contract

29.    On dates specific to each Plaintiff, AFSCME Maryland Local 44 entered into an agreement with Plaintiffs whereby AFSCME contracted to "act as [the] exclusive bargaining representative for purposes of collective bargaining with respect to wages, hours, and other terms and conditions of employment with [Plaintiff's] employer." *See* https://afscmemd.formstack.com/forms/join.

30.    The AFSCME Maryland Membership and Authorization Card incorporates the AFSCME International Constitution and International, Council, or Local Bylaws.

31.    Thus, the AFSCME International Constitution, Local Election Manual, and Bylaws constitute a valid contract between the union and each of its members.

### Nominations and Election

32.    On August 6, 2025, notice of nominations and elections for AFSCME Local 44 was sent to the membership, stating that an election for union leadership positions would take place on August 23, 2025, and specifying that only dues-paying members could be nominated and vote in the upcoming election. The notice was only sent to dues-paying members.

33.    On August 23, 2025, AFSCME Local 44 conducted an election for leadership positions. The election was held at the AFSCME Council 3 union hall. The Local 44 Election Committee verified members who were eligible to vote, and votes were cast via secret ballot on the same day. Upon information and belief, there were no objections raised at this time to any ballots that were cast.

34. Votes were tallied and reported on August 23, 2025, resulting in a 125-103 victory in favor of Plaintiff Stancil McNair and 135-78 victory in favor of Plaintiff Pettus. Plaintiffs Blow and Boswell received 126 and 108 votes, respectively, and 99 were needed to win an Executive Board position. *See* Attachment 17.

35. Plaintiffs McNair and Pettus were duly elected to their respective positions as President and Treasurer; Plaintiffs Blow and Boswell were duly elected to their respective positions as Executive Board Members. *See id.* The election results were certified, and the Plaintiffs were sworn into their respective offices on August 30, 2025. Because of where each of them placed in the election that was conducted on August 23, 2025, Plaintiffs Ward and Dean were entitled to a runoff election to determine the winner for the Vice President and additional Executive Board position respectively. *See id.*

### Social Media Posts by IG Cumming

36. Between on or about August 15, 2025, and August 22, 2025, Baltimore City Inspector General ("IG") Isabel Cumming posted messages on her personal social media accounts drawing attention to the upcoming Local 44 election due to her familiarity with certain union members after the tragic death of one of its members in 2024. Ms. Cumming's social media accounts are explicitly labeled as personal accounts with no relationship to her official duties or position. No money or resources, public or private, was spent to promote any of the social media messages posted during this period. *See* Attachments 5 & 12.

37. Two of the IG's social media posts during that time referenced a single member of the election slate, Plaintiff McNair. These posts subsequently formed a basis for the Local 44 Election Committee's decision declaring the entirety of the Local 44 election void. *See* Attachments 2, 11, & 17.

### Authority of Inspector General

38. Neither the Baltimore City Inspector General nor her Office has any supervisory authority over any AFSCME union worker at any agency in Baltimore City. The IG does not fall anywhere in the supervisory chain of command under the Mayor of Baltimore or under any head of any agency. *See* Attachments 4 & 12. The IG lacks the power to hire, fire, promote, or demote any AFSCME worker. *See*

Attachment 12. The Inspector General is appointed by an advisory board, not by the Mayor or by any agency. *See* Attachment 4, Baltimore City Charter, Article X: Office of Inspector General § 2(a)(1).

**Election Protests**

39.     On the day of the election, Plaintiff McNair filed a written protest with the Local 44 Election Committee, alleging that incumbent Vice President Trevor Taylor had used union resources to further his campaign by sending text messages and emails promoting his candidacy to members based on information obtained from the Local 44 union directory to which Mr. Taylor had access only because he served as Vice President and to which Mr. Taylor denied access when other candidates asked. *See* Attachments 10 & 17.

40.     On the day of the election, Trevor Taylor also allegedly filed protests with the Local 44 Election Committee. The Plaintiffs were not advised of any protests and did not receive written copies from the Local 44 Election Committee. *See* Attachment 10.

41.     On September 5, 2025, Plaintiff McNair received an email from Lakesha Baines, Chair of the Local 44 Election Committee, advising that "protests were filed over the conduct of the election" and that the Committee had "met twice since the election was held and has finished [their] report." In this email, Ms. Baines asked Mr. McNair to convene a meeting on September 11, 2025, at 6 p.m. and indicated that the Election Committee would send an invitation directly to union membership. *See* Attachment 15.

42.     Prior to this September 5th email, the only information concerning the apparent protest by Mr. Taylor was from a news story published in the Baltimore Banner on August 28, 2025. *See* Emily Opilo, *Baltimore's IG tweeted about a city union election. The results are now being contested.*, BALT. BANNER (Aug. 28, 2025).

43.     The focus of the Baltimore Banner article was the IG's tweets and included third-party statements inaccurately framing the Inspector General as part of union or city "management." *See id.*

44.     The story also reported that the IG used "her personal funds to 'boost' tweets $25 at a time," but neglected to clarify when and which posts were boosted and therefore failed to note that the IG spent no money to "boost" any election-related post in the two months before the election. *See id.*

45. In an affirmation filed with Plaintiffs' appeals, the IG unequivocally refutes any "boosts" of social media posts related to the Local 44 election in August 2025. *See* Attachment 12.

46. Aside from this news story, which some Plaintiffs saw and some did not, the first and only communication about the apparent election protest was Ms. Baines's September 5th email to Plaintiff McNair.

## No Opportunity to Be Heard

47. None of the Plaintiffs were advised of the protests by the Election Committee, and no one was invited or provided with an opportunity to respond. In other words, the protest that Mr. Taylor shared with the media was never shared with any of the affected union members. *See* Attachments 10 & 11.

48. After the September 5th email, Local 44 union members received a meeting invitation solely by email on September 9, 2025, and a meeting was conducted on September 11, 2025. *See* Attachment 16.

49. No written report or findings by the Election Committee were shared with the membership before, during, or after the September 11th meeting. Instead, the Election Committee verbally reported on the protests and verbally shared their findings and recommendations.

50. Regarding the protest against Mr. Trevor Taylor filed by Plaintiff McNair, the Local 44 Election Committee shared its conclusion, without elaboration, that there had been no violation.

51. With regard to the two additional protests, Ms. Baines explained at the September 11th meeting that the Local 44 Election Committee had decided to nullify the results of the August 23rd election on the basis of four sets of allegations: (1) the Baltimore City Inspector General Isabel Cumming made financial contributions to Plaintiff McNair; (2) the IG paid to promote her own social media posts concerning the Local 44 election; (3) the IG, because she is supposedly in a supervisory or management role, improperly influenced the election; and (4) that individuals who were not entitled to vote nevertheless cast ballots on the day of the August 23rd election.

52. On September 19, 2025, AFSCME Local 44 Election Chair reaffirmed in part these decisions and announced new elections for October 4, 2025.

## Appeals

53.     On September 21, 2025, Plaintiffs filed a timely appeal to the AFSCME Judicial Panel of the Local 44 Election Committee Decisions of September 11, 2025. *See* Attachment 10.

54.     The AFSCME International Judicial Panel accepted this appeal and scheduled a hearing for October 9, 2025, ultimately assigning AFSCME Judicial Panel Member Nora Grambau to consider the case. *See* Attachment 1.

55.     On October 9, 2025, Grambau heard arguments from Plaintiffs and from Mr. Taylor. The hearing presented detailed arguments and legal support concerning the independence of the Baltimore City Inspector General. Plaintiffs' counsel presented legal authority from Maryland Courts regarding the definition of an employer and detailed how the IG position failed to meet this definition. Also submitted into the record before Grambau was the report and conclusions of the Baltimore City Board of Ethics, which confirmed that the IG had a First Amendment right to speak in her private capacity and also that she did nothing improper because the social media accounts in question were private and no public resources were spent to promote the IG's messages.

56.     Two weeks later, on October 24, 2025, the AFSCME Judicial Panel issued the individual Member's decision prepared by Grambau. On the basis of Grambau's ruling, AFSCME ordered Local 44 to "rerun the election of all positions within 45 days of [the] decision." *See* Attachment 2, at p.17.

57.     The Judicial Panel member's October 24, 2025, decision forthrightly acknowledges that Plaintiffs were not given an opportunity to be heard, as guaranteed to them by AFSCME's International Constitution: "During the investigative hearing it was discovered that neither the appellants nor the Judicial Panel were in receipt of [a foundational] election protest." *See* Attachment 2, at p. 2. The decision further states that it "was improper for the Local to not have afforded the appellants an opportunity to be heard and respond to the election protest at the Local level." *See* Attachment 2, at p. 9. Yet, without reference to any authority within the AFSCME Constitution, Elections Code, or Election Manual, the decision proposed the novel solution that a lack of notice and an opportunity to be heard could be rectified on appeal.

13

58.    On October 29, 2025, Plaintiffs filed a further timely appeal of the decision of the individual Judicial Panel member to the full Judicial Panel of AFSCME, in accordance with the procedures detailed in the International Constitution and AFSCME Local Elections Manual. *See* Attachment 11.

59.    Plaintiffs similarly requested a stay of any election to permit the appeals process to be concluded prior to final action by Local 44. On November 3, 2025, this request was declined.

60.    On November 12, 2025, AFSCME Maryland sent an e-mail to Local 44 members indicating that a new election would be conducted. The e-mail stated, "The President of Local 44 is responsible for… setting the date, time, and location for the vote."

61.    A hearing in front of the full Judicial Panel was conducted on November 18, 2025.

62.    On November 20, 2025, with little elaboration, the full Judicial Panel voted to "sustain the decision of the investigating officer in full." *See* Attachment 3.

63.    On Monday, November 24, 2025, bound by a one-paragraph decision of the AFSCME Judicial Panel, Local 44's Election Committee announced that a re-run of the election would be scheduled twelve (12) days later, on December 6, 2025. *See* Mark Reutter, *No official announcement yet, but Local 44 re-vote is reportedly happening on December 6*, BALT. BREW (Nov. 24, 2025).

**Exhaustion of Union Remedy**

64.    The Plaintiffs' only other option for appeal is to the AFSCME International Convention, which takes place every two years and will next be in Chicago, Illinois from August 16-20, 2026.

65.    Having exhausted all internal remedies available within AFSCME, Plaintiffs now have no further options prior to the scheduled December 6, 2025 election date.

**Procedural and Substantive Violations**

66.    Plaintiffs McNair, Pettus, Blow and Boswell are at risk of being deprived of their protected interest in the election results, as they were duly elected and sworn into office. Additionally, they have been deprived of the exercise of their office.

67.    Plaintiffs Ward and Dean were deprived of their protected interest in an election runoff.

68.     Defendants failed to provide adequate procedural safeguards, including notice and an opportunity to be heard, before nullifying the election results.

69.     The guarantee of notice and an opportunity to be heard is contained in AFSCME's International Constitution, Appendix D—Elections Code. *See* Attachment 8, Elections Code § 4B ("Any protest concerning the conduct of the election may be lodged at the meeting at which the election is conducted or by filing such protest in writing with the subordinate body or the Election Committee within ten days following the election. <u>All interested parties shall be afforded an opportunity to be heard</u>." (emphasis added)).

70.     AFSCME's International Constitution and Local Union Election Manual, which contain contractual commitments that bind union members and the union, forbid undue interference by *employers*. Invalidating an otherwise legitimate election on the grounds that the Inspector General qualifies as an employer when she manifestly does not is also a breach of contract.

71.     The combination and cumulation of these actions have thus violated Plaintiffs' contractual rights under the AFSCME International Constitution and Election Manual, which forbid "employer domination" but do <u>not</u> prohibit involvement by non-employers — and which guarantee due process and fair elections including but not limited to notice and an opportunity to be heard.

72.     Plaintiffs have suffered irreparable harm, including unwanted and unmerited negative attention, reputational damage, and confusion among union members, as a result of these decisions. At present, Plaintiffs are compelled to campaign for a position they already won and currently hold under a cloud of suspicion created by the Judicial Panel's conclusion that the Inspector General's tweets were somehow improper and unduly influenced their earlier election victory.

## COUNT I - Declaratory Judgment

73.     The allegations contained in paragraphs 1-72 of this Complaint are incorporated by reference.

74.     There exists an actual controversy of a justiciable issue between Plaintiffs and Defendants within the jurisdiction of this Court concerning the interpretation of the AFSCME International Constitution

15

and Local Union Election Manual, which are incorporated by reference into the employer-employee contract between the union and its members executed under Maryland law.

75. In accordance with Courts & Judicial Proceedings § 3-409, the controversy concerning Local 44 Election Committee's right to order a new election would be terminated by a judicial declaration that Plaintiffs' rights to notice and an opportunity to be heard on an election protest against them, if originally denied, can or cannot be cured by affording Plaintiffs an opportunity to be heard on appeal.

76. Likewise, in accordance with Courts & Judicial Proceedings § 3-409, the controversy concerning Local 44 Election Committee's right to order a new election would be terminated by a judicial declaration that the Baltimore City Inspector General is or is not an "employer" within the meaning of the contract between the union and its members.

**COUNT II - Injunction**

77. The allegations contained in paragraphs 1-72 of this Complaint are incorporated by reference.

78. Plaintiffs will suffer greatly if an injunction is not granted, as they will be forced to exhaust personal resources and mitigate confusion among members in a second election that rightly should never happen. Plaintiffs will also be compelled to continue to campaign immediately in advance of a contested election under the false impression that they were the beneficiaries of employer domination and improper interference by the Inspector General.

79. Conversely, Defendants including those who are AFSCME Local 44 members will not suffer at all if a TRO is granted since it preserves the status quo, recognizing the officers who have already been properly installed, and will permit a runoff to be scheduled and proceed imminently for the positions not yet filled, either before or after final resolution of the contested legal question by a court of law.

80. AFSCME Local 44's predictable argument that an injunction is contrary to the public interest is facially invalid. Holding an unnecessary and improper election when it cannot be legally justified risks undermining the authority of duly elected Local 44 leadership and sows confusion among members and the

public. The public interest is in reaching final resolution on the interpretation of contested terms within the union-member contract so that the original election results can be firmly reinstated or conclusively discarded.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment upon the previously stated Counts 1-2 as follows:

(1) Issue a declaratory judgment that the August 23, 2025, Local 44 election is valid and binding;

(2) Issue a declaratory judgment that the contract between Local 44 and its members, incorporating by reference the AFSCME International Constitution and the Local Union Election Manual, does not permit invaliding union election results based upon social media posts by the Inspector General of Baltimore City on her personal account;

(3) Issue a declaratory judgment that the Local 44 Election Committee's decision rescinding the August 23, 2025, election violated Plaintiffs' contractual guarantees and hence was invalid;

(4) Issue an injunction restraining Defendants from noticing, scheduling, preparing for, or conducting any new Local 44 election to overturn or reconduct the August 23, 2025 election;

(5) Issue an injunction ordering Defendants to recognize and validate the victors of the August 23, 2025, election and to proceed with any required runoffs based on those results;

(6) Award and grant Plaintiffs any additional relief that this Court deems just and proper in fairness and in furtherance of justice.

## JURY DEMAND

Pursuant to Md. R. Civ. P. Cir. Ct. 2-325, Plaintiffs demand a jury trial on all claims so triable.

Respectfully submitted,

_____
THIRUVENDRAN VIGNARAJAH
Attorney No. 0812180249
Law Offices of Thiru Vignarajah
211 Wendover Road
Baltimore, Maryland 21218
thiru@thirulaw.com | (410) 456-7552

*Counsel for Plaintiffs*

Dated: November 26, 2025

17

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on this 26th day of November 2025, a copy of the foregoing Complaint for Declaratory Judgment and Injunctive Relief and Demand for Jury Trial was filed with the Clerk of the Circuit Court for Baltimore City, and a copy sent by email to:

KATHLEEN M. KELLER
Bredhoff & Kaiser P.L.L.C.
805 15th Street, N.W., Suite 1000
Washington, DC 20005
kkeller@bredhoff.com

*Counsel for Defendants AFSCME and Council 3*

TONYA BAÑA
Tonya Baña LLC
4305 Saint Paul Street
Baltimore, MD 21218
tonya@tonyabana.com

*Counsel for Defendants Local 44 Election Committee and Jamiala Austin, Nathaniel Johnson, and Andre McLean in their official capacities as Members of Local 44 Election Committee*

_____
THIRU VIGNARAJAH

## LIST OF ATTACHMENTS

Attachment 1:        Notice of JPC-25-069 (Sept. 24, 2025)

Attachment 2:        AFSCME Judicial Panel, Grambau Decision (Oct. 24, 2025)

Attachment 3:        AFSCME Judicial Panel, Full Panel Decision (Nov. 20, 2025)

Attachment 4:        Baltimore City Office of Inspector General (OIG) Charter

Attachment 5:        Baltimore City Board of Ethics, Request for Guidance (Sept. 17, 2025)

Attachment 6:        AFSCME International Constitution, Bill of Rights

Attachment 7:        AFSCME International Constitution, Appendix D, Section 1

Attachment 8:        AFSCME International Constitution, Appendix D, Section 4

Attachment 9:        AFSCME Local Elections Manual, p10

Attachment 10:     Plaintiffs' Appeal of Local 44 September 11 Decision (Sept. 21, 2025)

Attachment 11:     Plaintiffs' Appeal of Grambau's Decision (Oct. 29, 2025)

Attachment 12:     Affirmation of Isabel Cumming (Sept. 21, 2025)

Attachment 13:     Affirmation of Stancil McNair (Nov 26, 2025)

Attachment 14:     Affirmation of Teresa Blow (Sept. 20, 2025)

Attachment 15:     Baines email (Sept. 5, 2025)

Attachment 16:     Announcement of September 11 Membership Meeting (Sept. 9, 2025)

Attachment 17:     Local 44 Election Committee Minutes (Sept. 11, 2025)

**AFSCME**

**We Make America Happen**

Lee Saunders
*President*

Elissa McBride
*Secretary-Treasurer*

Carla Insinga
*Judicial Panel Chairperson*

*Judicial Panel Members:*

Michael DeMarco
*Staten Island, NY*

Denise Gilmore
*Baltimore, MD*

Nora Grambau
*Port Huron, MI*

Gerard Jolly
*Grove City, OH*

Sheila Kearns
*Rehoboth, MA*

Frank Piccioli
*Mesa, AZ*

Ralph Portwood
*Minooka, IL*

Timm Twardoski
*Helena, MT*

Tim Warren
*Nelsonville, OH*

September 24, 2025

## JUDICIAL PANEL CASE NO. 25-069
## Local 44 Election Protest

### GREETINGS:

This is to acknowledge receipt of the enclosed correspondence requesting an investigation into the above matter by Siblings Stancil McNair, Teresa Blow, Crystal Boswell, Timeeka Pettus, Ricardo Ward, and Mitchell Dean. They have requested that further elections be placed on hold pending the decision of the Judicial Panel related to the recent election.

I agree that in these circumstances a stay of any election is warranted at this time. Accordingly, Baltimore, Maryland, Municipal Employees Local 44 of AFSCME is directed to suspend any further elections, runoff elections, or rerun elections until this election protest investigation is completed and a written decision is issued by the investigating officer. Decisions and orders of the Judicial Panel are final unless and until they are overturned by an appellate body as directed by the International Constitution.

A Zoom investigation will be held on **Thursday, October 9, 2025, at 10 a.m. EDT**. I will serve as the investigating officer in this matter.

Any member having documents or other information which they believe may have some bearing on this matter is requested to be present and to bring the appropriate documents with you or submit them to the Judicial Panel ahead of the investigative hearing. It is especially directed that the original records be available in case there is a need for inspection. Please submit the following to the Judicial Panel by October 2, 2025:

- a copy of the notice of nominations and elections,
- copies of the minutes of any meetings at which matters concerning the election were considered,
- the results of the election,
- and the report of the Local 44 Election Committee on the election protest that is the subject of this investigation


#192-25

American Federation of State, County and Municipal Employees, AFL-CIO
TEL (202) 429-1210   FAX (202) 822-8169   1625 L Street, NW, Washington, DC 20036

Please find enclosed the Judicial Panel's Videoconference Hearing Policy. This policy must be read, signed, and submitted via email to splum@afscme.org by all individuals who plan to attend the hearing not later than **6 p.m. EDT the day before the hearing**. If this notice has overlooked the inclusion of any protestant, nominee, or election committee member please contact the Judicial Panel as soon as possible to provide their name, title, and contact information.

After submitting the AFSCME Judicial Panel Videoconference Hearing Policy you will be able to access the Zoom Hearing on **October 9, 2025, at 10 a.m. EDT** by logging onto Zoom and entering the following meeting ID and password:

- **Meeting ID: 850 4392 1600**
- **Passcode: 052947**

In Solidarity,

*Carla M. Insinga*

Carla Insinga
Judicial Panel Chairperson

CI:spp

cc:     Lee Saunders, President
        Elissa McBride, Secretary-Treasurer
        Patrick Moran, President Council 3
        Jim Howell, Eastern Regional Director, O&FS
        Kory Blake, AFSD, O&FS
        Stancil McNair, Appellant
        Teresa Blow, Appellant
        Crystal Boswell, Appellant
        Timeeka Pettus, Appellant
        Ricardo Ward, Appellant
        Mitchell Dean, Appellant
        Trevor Taylor, Appellee
        Lakesha Baines, Local 44 Election Committee Chair
        Dana Dunnock, Local 44 Election Committee
        Alonzo Blue, Local 44 Election Committee
        Arthur King
        Edward Brown
        Dara Dorman
        Bernie Taylor
        Anthony Wyche
        Teresa Fleming

Kim Farabee
Gwendolyn Burgess
Zeus Collins
Thiru Vignarajah, Esq. for the Appellants

**AFSCME**
We Make America Happen

Lee Saunders
*President*

Elissa McBride
*Secretary-Treasurer*

Carla Insinga
*Judicial Panel Chairperson*

*Judicial Panel Members:*

Michael DeMarco
*Staten Island, NY*

Denise Gilmore
*Baltimore, MD*

Nora Grambau
*Port Huron, MI*

Gerard Jolly
*Grove City, OH*

Sheila Kearns
*Rehoboth, MA*

Frank Piccioli
*Mesa, AZ*

Ralph Portwood
*Minooka, IL*

Timm Twardoski
*Helena, MT*

Tim Warren
*Nelsonville, OH*

October 24, 2025

## JUDICIAL PANEL CASE NO. 25-069
## Local 44 Election Protest

GREETINGS:

Please find enclosed Judicial Panel Member Nora Grambau's decision in the above-referenced case.

In Solidarity,

*Carla M. Insinga*

Carla Insinga
Judicial Panel Chairperson

CI:spp

cc:    Lee Saunders, President
       Elissa McBride, Secretary-Treasurer
       Patrick Moran, President Council 3
       Jim Howell, Eastern Regional Director, O&FS
       Kory Blake, AFSD, O&FS
       Stancil McNair, Appellant
       Teresa Blow, Appellant
       Crystal Boswell, Appellant
       Timeeka Pettus, Appellant
       Ricardo Ward, Appellant
       Mitchell Dean, Appellant
       Trevor Taylor, Appellee
       Lakesha Baines, Local 44 Election Committee Chair
       Dana Dunnock, Local 44 Election Committee
       Alonzo Blue, Local 44 Election Committee
       Arthur King
       Edward Brown
       Dara Dorman

**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 429-1210    FAX (202) 822-8169    1625 L Street, NW, Washington, DC 20036

Bernie Taylor
Anthony Wyche
Teresa Fleming
Kim Farabee
Gwendolyn Burgess
Zeus Collins
Thiru Vignarajah, Esq. for the Appellants

## JUDICIAL PANEL CASE No. 25-069
## Local 44 Election Protest

This case results from a protest arising out of the August 23, 2025, election of local union officers and trustees in Baltimore, Maryland, Municipal Employees Local 44. Local 44 is affiliated with AFSCME Maryland Council 3; the Maryland State and D.C., AFL-CIO; and the Metropolitan Baltimore Council of AFL-CIO Unions.

The protest was filed on August 27, 2025, by Brother Trevor Taylor, an unsuccessful candidate for the office of Local 44 president in said election. The election committee met and later presented its report to the membership at a membership meeting held on September 11, 2025, and following the membership's vote to rerun the election, Brother Stancil McNair, the successful candidate for the office of Local 44 president; Sister Timmeeka Pettus, the successful candidate for the office of Local 44 secretary treasurer; Sister Teresa Blow, a successful candidate for the Local 44 executive board; Sister Crystal Boswell, a successful candidate for the Local 44 executive board; and Brothers Ricardo Ward and Mitchell Dean, candidates who advanced to a yet to be determined runoff election for the positions of Local 44 vice president and Local 44 executive board respectively, filed a timely appeal to the Judicial Panel on September 21, 2025.

The case was reassigned to Judicial Panel Member Nora Grambau for investigation and decision after the case was originally assigned to Judicial Panel Chairperson Carla Insinga. After giving due notice to all parties concerned, the undersigned met with the interested parties on October 9, 2025, via Zoom. The appellants were represented by Mr. Thiru Vignarajah, Esq.

### THE PROTEST

(See Attached)

### ELECTION RESULTS

(See Attached)

### REPORT OF THE INVESTIGATING OFFICER

During the investigative hearing it was discovered that neither the appellants nor the Judicial Panel were in receipt of Brother Trevor Taylor's August 27, 2025, election protest. The election protest that was appealed to the Judicial Panel dated August 31, 2025, was not put before the election committee and cannot serve as a basis for this decision though the allegations contained therein are similar to the August 27, 2025, election protest with the exception of Article X charges that Brother Taylor included in his August 31, 2025, correspondence. At the request of this investigating officer, Brother Taylor supplied his August 27, 2025, election protest as well as a follow up e-mail dated August 29, 2025, that he sent to the Local 44 Election Committee. The Local 44 Election Committee based its recommendation to rerun the Local 44 election on these documents. The appellants, while not having these documents prior to the hearing, based their appeal to the Judicial Panel on the election committee's decision which laid out Brother Taylor's arguments in his August 27, 2025, election protest. The focus of this decision will be on Brother Taylor's August 27, 2025, election protest, the election committee's recommendation, and the appellants' September 21, 2025, appeal. The original protest

and the August 29, 2025, email correspondence were forwarded to Mr. Thiru Vignarajah, the appellants' attorney in this matter, following the hearing.

At the hearing Brother Taylor set forth the timeline of the election: the notice of nominations and elections was sent to the membership of August 6, 2025, and the notice provided that the election would take place following nominations on August 23, 2025. He asserted that the notice provided that only dues paying members could be nominated and vote in the election, and it was only sent to dues paying members. He alleges that at the election, 25 non-members were permitted to vote and the final tally for the president election was 103 votes for him and 125 votes for Brother Stancil McNair. He explained that on the day of the election there were two registration areas, one located outside the union hall and one located within, to verify a voter's membership status. Candidates were only allowed to be outside and were not allowed to observe the actual election process.

He reported that he filed his election protest on August 27, 2025, and sent it to Local 44 Election Committee Chair Lakesha Baines and sent a follow up email on August 29, 2025. He sent to Council 3 on August 31, 2025, and to the Judicial Panel on September 5, 2025, a different correspondence than what he sent to the election committee.

Brother Taylor then set forth his second item of protest, that the Baltimore City Inspector General improperly endorsed Brother McNair. He explained that the Office of the Inspector General (OIG) prevents fraud and abuse in Baltimore, and he was not sure why Inspector General Isabel Cumming was getting involved with Local 44's internal

affairs. He stated that Inspector General Cumming "shouted out" Brother McNair several times before the election and backed Brother McNair during the election.

Mr. Thiru Vignarajah spoke on behalf of Brother Stancil McNair, Sister Timmeeka Pettus, Sister Teresa Blow, Sister Crystal Boswell, Brother Ricardo Ward, and Brother Mitchell Dean. He outlined four reasons why the appellant's appeal should be granted and the results of the August 23, 2025, election should stand. These reasons are (1) procedural defects exist in Brother Taylor's election protest and the handling of his and other election protests by Local 44; (2) misuse of union resources by Brother Taylor while campaigning for office; (3) the social media posts of Inspector General Cumming did not violate AFSCME's election code; and (4) the issues with the voting process raised by Brother Taylor are not proven and the proper process for challenging a voter's eligibility as set forth by the Elections Code was not followed to permit a protest on these grounds to go forward.

Mr. Vignarajah raised the point that the appellants had not seen Brother Taylor's actual protest because the conclusions drawn by the election committee differed from what was contained in Brother Taylor's August 31, 2025, correspondence. He also claimed that a substantive defect occurred in the Local's election protest process because the appellants were not granted the opportunity to be heard by the election committee prior to the election committee drawing its conclusion on Brother Taylor's protest, despite the election committee purportedly meeting twice before it gave its report and recommendation to rerun the election at the Local 44 September 11, 2025, meeting. He

supported this claim using a September 5, 2025, email sent by Sister Baines to Brother McNair in which Sister Baines, in her capacity as election committee chair, requested Brother McNair call a meeting so that the election committee could present its report to the membership.

Regarding the misuse of union resources, Brother McNair filed an election protest with the Local 44 Election Committee asserting that Brother Taylor utilized Local 44 resources to promote his candidacy. The election committee dismissed Brother McNair's election protest and the election committee's decision was not appealed to the Judicial Panel.

Turning to the first substantive issue that was raised to counter the arguments raised in Brother Taylor's protest, the appellants assert there are two prohibitions in AFSCME governing documents on an employer's involvement in union elections. The first prohibition is on the use of employer funds and resources to support a member's candidacy for union office. The second prohibition is on an employer's dominance over the internal affairs of a union, such as an election. The appellants cite Appendix D, Section 1A of the International Constitution which states "No funds or other resources of the Federation or of any subordinate body, and no funds or resources of any employer, shall be used to support the candidacy of any member for any elective office within the Federation or any subordinate body," and the Bill of Rights for Union Members Number 3 of the International Constitution which states "Members shall have the right to conduct

the internal affairs of the union free from employer domination," to support this conclusion.

The appellants assert that the actions of Inspector General Cumming did not violate either prohibition for two reasons; the first being that no employer resources were spent by the OIG on the inspector general's social media activities, and the second being that the inspector general and OIG do not qualify as an employer of AFSCME members under the International Constitution so the prohibition of the use of employer resources to support a member's candidacy for office that is found in Appendix D, Section 1A of the International Constitution cannot apply to Inspector General Cumming or the OIG.

In digging deeper into the first reason, the appellants argue that there is no evidence that the inspector general contributed funds to Brother McNair or that she paid to "boost" the reach of her social media content involving the Local 44 election. Further, they argue that the inspector general made her social media posts from a private social media account that is separate from her public position as inspector general. Were the inspector general to have made some kind of contribution to Brother McNair or paid to boost social media content AFSCME's elections code does not prohibit a private individual from personally contributing to a member's candidacy and doing so is not a use of union or employer resources.

In addressing the second reason, the appellants argue that AFSCME governing documents do not bar the inspector general from commenting on union elections from her private social media accounts because she is not an employer of AFSCME members.

They argue that, therefore, her social media posts themselves cannot be considered an employer dominating the internal affairs of Local 44 due to her not being an employer, her lack of supervisory authority over Local 44 members, and the limited reach of her social media posts.

Mr. Vignarajah explained that Baltimore City's Code sets forth who or what counts as a supervisory authority, amongst these supervisory authorities are agencies of Baltimore's mayor and the board of estimates. He stated that the OIG does not fall under this classification and has no supervisory authority over employees. He pointed out the Local's collective bargaining agreement (CBA) also recognizes who is a supervisor or what is supervisory authority, and the OIG does not fall within that classification. He stated that the OIG is an office created by the city charter and falls under an independent advisory board. He then cited three cases (*Whitehead v. Safeway Steel Inc.*, 304 Md. 67; *Montgomery Co. Ed. Ass'n v. Bd. of Educ*, 311 Md. 303; *Tyson Farms v. Uninsured Employers' Fund* (2020)), in support of the finding that the inspector general should not be found to be a supervisor or employer. He made the point that the appellants' defenses are in tandem: the social media posts fall short of employer domination because the inspector general did not tell Local 44 members what to do, and because there is no way to tell who saw her posts.

At the hearing Mr. Vignarajah provided some background to the interactions between the OIG and Local 44. He explained that in August 2024, Local 44 member Ronald Silver died while on duty serving the public. The OIG and Inspector General

Cumming sided with the Local 44 membership against the city following Brother Silver's death. Mr. Vignarajah played a recording of a voicemail that AFSCME Council 3 President Patrick Moran left for Inspector General Cumming in which he was complimentary of the OIG's work in investigating the Baltimore Department of Public Works actions leading to Brother Silver's death and asked to discuss with her what else she discovered "to try the right the ship" in DPW so that working conditions could be corrected to prevent hazardous conditions like those leading to Brother Silver's death. Mr. Vignarajah explained the relevance of the voicemail to the proceedings, highlighting that the nature of the call reflected the OIG's neutral position between the union and the employer because in the call Brother Moran asked that the inspector general assist the union's position against the employer.

In addressing their second substantive issue regarding the integrity of the voting process, the appellants assert that the concerns raised by Brother Taylor regarding non-members voting in the election are effectively moot because neither he nor anybody else challenged a voter's eligibility on the date of the election. The appellants point to the process for challenging voters which is found in AFSCME's Local Union Election Manual as the proper process for challenging a voter's eligibility, a voter's eligibility cannot be challenged after the election as part of an election protest. The appellants further assert that no proof has been presented that 25 non-members voted during the election.

After hearing the facts presented and further reviewing the evidence provided, the undersigned renders the following decision:

Brother Trevor Taylor set forth three items of protest in his August 27, 2025, election protest, these protest items are: (1) Non-dues paying members were allowed to register for the union on the day of the election and vote in the election; (2) Brother Stancil McNair, the successful candidate for Local 44 president, received an improper endorsement and support from Baltimore City Inspector General Isabel Cumming; (3) The endorsement and support Brother McNair received may have influenced voters unfairly. Because Protest Items 2 and 3 concern what is essentially the same issue, they are discussed together below.

The appellants assert procedural defects exist in Brother Taylor's election protest, and the Local's handling of Brother Taylor's election protest and other election protests warrant the dismissing of Brother Taylor's election protest and upholding the election. This investigating officer finds it was improper for the Local to not have afforded the appellants an opportunity to be heard and respond to the election protest at the Local level, but this improper action cannot serve as grounds to dismiss an election protest under Appendix D of the International Constitution because through this appeal process all parties have had the opportunity to be heard and fully present their positions and evidence before the Judicial Panel. Additionally, the Judicial Panel stayed the October 4, 2025, rerun election ordered by the elections committee in order to allow this hearing to proceed and the issues decided before a rerun election occurred. As noted previously, this investigating officer finds that Brother Taylor's August 27, 2025, election protest was properly filed in accordance with Appendix D, Section 4B of the International

Constitution. While his election protest was not initially provided to the Judicial Panel or the appellants prior to the investigative hearing, the issues raised in his election protest were made known to the appellants through the election committee's report, which permitted them to prepare their appeal to the Judicial Panel. No findings will be made on the election protest filed by Brother McNair because it was not appealed to the Judicial Panel and therefore is not before the Judicial Panel.

### Protest Item 1: Non-Members Were Allowed to Register as Members

Brother Taylor asserts in his protest that he has "never encountered a union election where non-dues-paying city employees were allowed to register for the union on the same day as the election and still participate in voting." At the hearing and in the election protest, he asserts that the language which appears on the notice of nominations and elections precludes non-members from voting in the election because the notice states "Candidates do not need to be present to be nominated. You must be a dues-paying member to make a nomination and vote." Further, Mr. Steve Turner was not permitted to vote because he was not on the membership list. At the hearing Brother Taylor alleged that 25 non-dues paying members were allowed to vote in the election which contributed to an election result of 103 votes for Brother Taylor to 125 votes for Brother McNair.

The election committee report dated September 11, 2025, upheld this protest item. The election committee found "that the number of votes cast by non-members (25) could have impacted the results of the election. Further, those who did not know they could have signed up that day may have stayed home. Twenty-five people signed up that day

11

and were allowed to vote. There was not enough verification done to ensure that only non-probationary eligible employees were allowed to vote." No member of the election committee was present at the hearing to provide a statement on the conduct of the election.

In their appeal and at the hearing, the appellants assert that this protest item should be dismissed because no evidence was ever presented to show that 25 non-members voted in the election, and no voter's eligibility was properly challenged on the day of the election.

The AFSCME Local Union Election Manual sets forth the process by which a voter's eligibility may be challenged and the process for challenging a voter:

> Occasionally a problem will arise concerning a person who attempts to vote and there is doubt as to the person's eligibility. Challenges can be raised concerning the eligibility of a prospective voter either by a member of the election committee or by an observer representing one of the candidates. It is up to the election committee to resolve the matter.
>
> The prospective voter may, for instance, not be listed on the membership roster and yet still claim to be a member. If the person can produce evidence of dues payment — a stub from a current salary check showing checkoff of dues, or a receipt for current dues issued by the local, for example — the matter can probably be settled on the spot and a ballot issued. If it is a matter requiring further investigation or additional evidence which cannot be produced immediately, the person should be permitted to mark a ballot and then seal it in an envelope with the person's name on the outside. This envelope should then be placed in the ballot box or in a separate container until the challenge is resolved.
>
> As a practical matter, challenges cannot be made after the voter's ballot has been cast and commingled with other ballots. This is equally the case in elections conducted electronically. Once a voter has voted there is no way to remove that vote and any voting system that allows this to occur is not permitted under the International Constitution.

There was no evidence presented, or statement made to conclude that any voter's eligibility was challenged in this election. Because no evidence was presented to support that any ineligible voters cast votes in this election, and further no voters were challenged in the manner set forth by the AFSCME Local Union Election Manual, this protest item is dismissed.

**Protest Item 2: Brother Stancil McNair Received an Improper Endorsement From Baltimore City Inspector General Isabel Cumming Which Influenced the Election's Result.**

At the hearing and in his election protest Brother Taylor asserted that Brother McNair, the successful candidate for president, received improper endorsements from Baltimore City Inspector General Isabel Cumming. In his election protest, Brother Taylor identifies instances in which Inspector General Cumming purportedly endorsed and supported Brother McNair on social media and submitted screenshots of the social media posts.

The appellants do not dispute the inspector general made these posts. The appellants note that the posts were made from the inspector general's personal account. They argue that the posts do not violate AFSCME's Elections Code or International Constitution because no employer resources were spent by the inspector general on the social media posts, and neither the inspector general nor the OIG may be considered an employer of AFSCME members under city or state law, or AFSCME's governing documents. To support their arguments the appellants submitted to the Judicial Panel: a report written by the Baltimore City Board of Ethics on Inspector General Cumming's

social media posts around the election dated September 17, 2025 finding that no post violated any of the city's ethics rules or prestige of office rules; and a written affirmation by Inspector General Cumming dated September 21, 2025, affirming she has no supervisory authority over any AFSCME members, noting the findings of the ethics board, and that she has not made any financial contributions to any AFSCME entity. To further support the argument that neither the inspector general nor the OIG should be considered an employer, a voicemail recording was also submitted and played during the investigative hearing, in which AFSCME Council 3 President Patrick Moran called Inspector General Cumming to request assistance from the OIG against the employer following the death of Local 44 Member Ronald Silver.

The arguments set forward by the appellants, the ethics report, and the case law cited by the appellants are not persuasive to the undersigned because they fall outside the scope of this internal union proceeding that is guided by the AFSCME constitution and principles of trade unionism. The language found in Appendix D, Section 1A which prohibits the use of "funds or resources of any employer. . . to support the candidacy of any member for any elective office with the Federation or any subordinate body," cannot be so narrowly read to not apply to the Baltimore City Inspector General. It would be inconsistent with trade union principles to interpret this language narrowly and Article XII, Section 13 of the International Constitution which states "the language of this Constitution, including the Bill of Rights for Union Members, shall be liberally construed,

and shall be interpreted in a manner designed to fully protect the fundamental rights of members."

The OIG's website indicates that the OIG, while independent, is still an agency of the city that employs AFSCME members, and the inspector general's broad jurisdiction permits the inspector general to investigate allegations of misconduct by AFSCME members involving violations of criminal law, civil statutes, Baltimore City regulations, or employee standards of conduct. Additionally, while it was not made clear how the appellants obtained Brother Moran's recorded voicemail to the inspector general it would seem logical that Inspector General Cumming provided it to the appellants, and again impermissibly assisted the appellants. But at the very least the voicemail is further evidence that the OIG plays some role in labor relations matters which affect AFSCME members. While the inspector general may not employ or supervise AFSCME members, the inspector general is still a city official who exercises some degree of influence over AFSCME members and is therefore considered an employer, if not an agent of the employer, under Appendix D, Section 1A of the International Constitution.        The content of some of the social media posts made by Inspector General Cumming prior to the Local 44 election which were submitted to the Judicial Panel endorse Brother McNair as a candidate in the election. In an August 15, 2025, post the inspector general wrote "Kudos to @BaltimoreDPW worker Stancil McNair who is running for President of the AFSCME Union. Stancil was vocal in making the changes that are starting in DPW. Change only happens when people stand up and are heard! The election is Saturday,

August 23 at Union Hall." In an August 17, 2025, post she wrote "This video was a year ago, now STANCIL MCNAIR who was on of the 1st, @BaltimoreDPW workers brave enough to speak out against the treatment is now running for PRESIDENT of the AFSCME #44 Union! McNair plans to fight for change for essential worker. Not all heroes wear capes."

Inspector General Cumming also wrote social media posts that drew attention to the election. She wrote on August 22, 2025, "Great to see so much interest in the future of the hardworking men and women of @BaltimoreDPW. The elections are tomorrow! Power to the people" On August 23, 2025, the day of the election, she wrote "Sun rising on a beautiful day in Baltimore! Heading off to Fells Point for the Bmore Flea at Broadway event from 10-3 today. Hope all the AFSCME #44 union workers get out and vote today from 1-4 at Union Hall! Have a blessed day" She wrote again on August 23, 2025, "IMPORTANT Election Day for the men & women running for executive board for AFSCME. The election takes place between 1 and 4 p.m. TODAY at the AFSCME union hall at 1410 Bush Street in Baltimore. Members must attend in person to cast their votes."

Also submitted to the Judicial Panel was an undated Instagram post made by Brother McNair. The post contains a picture of the notice of nominations and elections for the August 23, 2025, election. Brother McNair added to the post this caption: "EVERYONE WANTS CHANGE, WELL HERE IT GOES! IM RUNNING FOR THE PRESIDENT OF AFSCME! STAND WITH ME, ITS TIME FOR US TO HAVE A TRUE LEADER! THE REVOLUTIONIS BEING TELEVISED!" Brother McNair's post was

reposted by Inspector General Cumming who seemingly added "Congrats to Stancil McNair for Running for President of AFSCME." Brother McNair then appears to have reposted the inspector general's repost of his post, he added "Thank you!"

AFSCME is committed to ensuring AFSCME local union elections are free from interference from employers and expects employers to refrain from inserting themselves into internal union procedures, to preserve the rights of union members to union democracy and self-governance. In this case, the inspector general's social media posts that endorsed Brother McNair and called attention to Local 44's election regardless of intention, were an act of interference into Local 44's election. Further, an endorsement from an employer—or an official associated with the employer—carries a greater risk of undue influence given the nature of the employer-employee and union-employer relationships. An endorsement by a Baltimore City official, which is viewed as an employer resource, was used to support a member's candidacy for office which is a violation of Appendix D, Section 1A of the International Constitution. Because this violation is conduct that may have affected the outcome of the election, in accordance with Appendix D, Section 4D of the AFSCME Constitution, a rerun of the Local 44 election of officers is warranted. This is necessary to ensure AFSCME members remain confident in the fairness of their union's democratic process.

17

## DECISION

Brother Taylor's election protest is upheld in part and dismissed in part. The August 23, 2025, Local 44 election is void including the races resulting in a runoff election. Local 44 is ordered to rerun the election of all positions within 45 days of this decision. It is not required that nominations are rerun, because no protests were submitted regarding this part of the election process.

October 24, 2025                                    Nora L. Grambau
Port Huron, MI                                     Judicial Panel Member
                                                   AFSCME, AFL-CIO



**AFSCME**
**We Make America Happen**

Lee Saunders
*President*

Elissa McBride
*Secretary-Treasurer*

Carla Insinga
*Judicial Panel Chairperson*

Judicial Panel Members:

Michael DeMarco
*Staten Island, NY*

Denise Gilmore
*Baltimore, MD*

Nora Grambau
*Port Huron, MI*

Gerard Jolly
*Grove City, OH*

Sheila Kearns
*Rehoboth, MA*

Frank Piccioli
*Mesa, AZ*

Ralph Portwood
*Minooka, IL*

Timm Twardoski
*Helena, MT*

Tim Warren
*Nelsonville, OH*

**November 20, 2025**

## JUDICIAL PANEL CASE NO. 25-069-A
### Local 44 Election Protest

GREETINGS:

Enclosed is the decision of the full Judicial Panel on the appeal filed in the above matter.

By a vote of 8 ayes, 0 nays, 0 abstentions, the full Judicial Panel has sustained the decision of the investigating officer. Judicial Panel Member Nora Grambau did not participate in the hearing in accordance with Article VIII, Section 4 of the Rules of Procedure of the Judicial Panel. Judicial Panel Member Denise Gilmore did not participate in the hearing in accordance with Article III, Section 6 of the Rules of Procedure of the Judicial Panel.

In Solidarity,

Carla M. Insinga

Carla Insinga
Judicial Panel Chairperson

CI:spp

cc:  Lee Saunders, President
Elissa McBride, Secretary-Treasurer
Patrick Moran, President Council 3
Jim Howell, Eastern Regional Director, O&FS
Kory Blake, AFSD, O&FS
Stancil McNair, Appellant
Teresa Blow, Appellant
Crystal Boswell, Appellant
Timeeka Pettus, Appellant
Ricardo Ward, Appellant
Mitchell Dean, Appellant



**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 429-1210    FAX (202) 822-8169    1625 L Street, NW, Washington, DC 20036

Trevor Taylor, Appellee
Lakesha Baines, Local 44 Election Committee Chair
Dana Dunnock, Local 44 Election Committee
Alonzo Blue, Local 44 Election Committee
Arthur King
Edward Brown
Dara Dorman
Bernie Taylor
Anthony Wyche
Teresa Fleming
Kim Farabee
Gwendolyn Burgess
Zeus Collins
Thiru Vignarajah, Esq. for the Appellants

## JUDICIAL PANEL CASE NO. 25-069-A
## Local 44 Election Protest

### DECISION ON THE APPEAL TO THE FULL PANEL

The full Judicial Panel, at its meeting on November 18, 2025, pursuant to Appendix D, Section 4E of the International Constitution, heard and decided the appeal filed in this case.

After reviewing the record and discussing the issues presented, the full Judicial Panel voted to sustain the decision of the investigating officer in full, with the following clarification:

Appellants appealed the investigating officer's decision, in part, for failing to address an appeal of the election committee's denial of a protest asserted by Brother McNair against Brother Taylor. In pursuing that appeal of the election committee's decision, appellants indicated "Mr. McNair does not seek to rerun the election." Under the Elections Code, Section 4D, when a violation that may have affected the outcome of the election is established, the only remedy authorized is the holding of a new election. Because appellants did not seek that remedy and did not contend that the alleged violation affected the results of the election, the investigating officer properly regarded the appeal as abandoned. Because a new election was ordered, any error in failing to address Brother McNair's protest is moot, as the remedy would be the same as that ordered by the investigating officer. All officers and candidates are reminded that the Elections Code strictly prohibits the use of union funds or resources to support any member's candidacy for office.

DATED: November 20, 2025                    BY THE FULL JUDICIAL PANEL

Panel Members voting aye: Carla Insinga, Michael DeMarco, Gerard Jolly, Sheila Kearns, Frank Piccioli, Ralph Portwood, Timm Twardoski, Tim Warren

Panel Members abstaining:

Panel Members voting nay:

Panel Members not participating: Nora Grambau, Denise Gilmore

## ARTICLE X
### OFFICE OF THE INSPECTOR GENERAL

### § 1.  Office of Inspector General:  Office Established.

There is an Office of the Inspector General, the head of which is the Inspector General.
*(Res. 18-008, ratified Nov. 6, 2018.)*

### § 2.  Office of Inspector General:  The Inspector General.

(a) *In general*.

   (1) The Inspector General is appointed by an advisory board to be comprised of 11members as provided in this section.

   (2) The advisory board is entitle to the assistance of the Baltimore City Department of Human Resources for purposes of advertising a vacancy and interviewing and hiring candidates for the position of Inspector General.

   (3) The Mayor must provide the advisory board with access to City resources to facilitate the advisory board's completion of its responsibilities.

(b) *Qualifications*.

   An individual is qualified to serve as a member of the advisory board if the individual:

   (1) is a Baltimore City resident;

   (2) is over the age of 21 years old;

   (3) has never been convicted of an offense under Section 16-201(a)(5) or (6) of the State Election Law Article; and

   (4) has a background in, or familiarity with, ethics, law, program or performance evaluation, or accounting or has a familiarity with the Office of the Inspector General and the duties of the Office.

(c) *Eligibility*.

   In addition to the required qualifications in subsection (b) of this section, an applicant is not eligible for appointment to the advisory board if the individual:

   (1) is or becomes an employee or elected officer of:

      (i)  the State of Maryland;

      (ii) the City of Baltimore;

      (iii) any State or City agency, instrumentality, or any other unit of a State entity except:

(A)  a State college;

(B)  a State university; or

(C)  another institution of higher education;

(2) is or becomes a candidate for elected public office of:

(i)  the State of Maryland;

(ii) the City of Baltimore; or

(iii) any county or municipality of the State.

(3) is or becomes an elected municipal officer's:

(i) spouse;

(ii) parent;

(iii) child; or

(iv) sibling;

(4) is or becomes a responsible officer, as defined in Section 1-101(mm) of the State Election Law Article;

(5) is or becomes employed by the City of Baltimore or the State of Maryland in any capacity;

(6) is or becomes a lobbyist under:

(i)  the State General Provisions Article, Title 5 {"Maryland Public Ethics Law"};

(ii) Article 8, Subtitle 8 {"Lobbying"} of the City Code; or

(iii) the ethics code of any political subdivision of the State; or

(7) is or becomes associated with a business entity as described in Article 8, Section 6-6 {"Prohibited participation"} of the City Code.

(d) *Nomination process: In general.*

(1) An individual who meets the requirements set forth in subsections (b) and (c) of this section may submit an application to the member of the City Council who represents the district in which the individual resides, in the form required by the Board of Ethics.

(2) Each member of the City Council must:

(i)  review the applications received pursuant to paragraph (1) of this subsection; and

(ii) select 1 applicant as the nominee to the advisory board from that member's district.

(e) *Nomination process: Diversity*.

(1) The membership of the advisory board must be inclusive and reflect the racial and gender diversity of the City of Baltimore.

(2) A member of the City Council must give reasonable consideration to the diversity of the member's district when selecting a nominee to the advisory board.

(f) *Nomination process: Final appointments*.

(1) Final random selections to the advisory board must be made by the Chair of the Board of Ethics, pursuant to Article VII, Section 110 of this Charter.

(2) 7 of the 11 members of the advisory board must be randomly selected by the Chair of the Board of Ethics on the following basis:

(i)  1 member from among the 2 nominees submitted from City Council districts 1 and 2;

(ii) 1 member from among the 2 nominees submitted from City Council districts 3 and 4;

(iii) 1 member from among the 2 nominees submitted from City Council districts 5 and 6;

(iv) 1 member from among the 2 nominees submitted from City Council districts 7 and 8;

(v) 1 member from among the 2 nominees submitted from City Council districts 9 and 10;

(vi) 1 member from among the 2 nominees submitted from City Council Districts 11 and 12; and

(vii) 1 member from among the 2 nominees submitted from City Council districts 13 and 14.

(3) The remaining 4 members shall consist of:

(i)  1 member of the Association of Certified Fraud Examiners, selected by the Board of Regents of the Association of Certified Fraud Examiners;

(ii) 1 member of the Maryland Association of Certified Public Accountants, selected by the Board of Directors of the Maryland Association of Certified Public Accountants;

(iii) the Dean of the University of Maryland School of Law or the Dean's designee; and

(iv) the Dean of the University of Baltimore School of Law, or the Dean's designee.

(4) The 4 members of the advisory board selected pursuant to  paragraph (3) of this subsection must also comply with all eligibility and qualification requirements for advisory board members outlined in this subsection.

(g) *Term of members*.

    (1) The terms of the members of the advisory board must be staggered and may not be coterminous with the Mayor's term of office.

    (2) Of the initial 11 appointments to the advisory board:

        (i) the members appointed pursuant to paragraphs (2)(v) and (3) of Subsection (f) of this section must each serve a term of 3 years; and

        (ii) the remaining members must each serve a term of 4 years.

    (3) After the initial terms of the advisory board members have expired, a member of the advisory board shall serve a term of 4 years.

    (4) The term required by paragraph (2)(i) of this subsection shall be considered a full term for the purposes of the term limits established in Article IV, Section 6(e) of this Charter.

    (5) No member of the advisory board may serve more than 2 consecutive full terms.

(h) *Removal of advisory board member*.

A member of the advisory board may be removed for cause by a vote of the majority of the members of the advisory board.

(i) *Vacancies*.

The Chair of the Board of Ethics shall select at random a member from the nominations submitted at the outset of that particular position's term.

(j) *Procedures*.

    (1) A quorum of the advisory board consists of 6 members.

    (2) The advisory board shall elect a chair from the membership of the advisory board.

    (3) An affirmative vote of at least 6 members shall be necessary to appoint an Inspector General.

(k) *Required training*.

Prior to beginning their duties, the members of the advisory board shall attend a training session, to be provided by the Office of the Inspector General, that details:

    (1) the rules governing the advisory board; and

    (2) the rules governing and duties of the Inspector General.

(l) *Annual overview.*

The advisory board shall appear before the City Council at least once a year to provide the City Council with an overview of the activities of the advisory board and the Office of the Inspector General.
*(Res. 22-004, ratified Nov. 8, 2022.)*

## § 3.  Office of Inspector General:  The Inspector General.

(a) *Qualifications.*

(1) The Inspector General shall be appointed without regard to political affiliation and must have substantial experience in auditing, financial analysis, criminal justice law, management analysis, public administration, investigations, or another appropriate field.

(2) The Inspector General shall hold at the time of appointment, or be required to obtain within 7 months after appointment, certification as a Certified Inspector General.

(b) *Term.*

The Inspector General shall serve a term of 6 years commencing from the date of appointment.

(c) *Removal.*

The Inspector General may be removed from office by an affirmative vote of a majority of the members of the advisory board for:

(1) misconduct in office;

(2) persistent failure to perform the duties of office; or

(3) conduct prejudicial to the proper administration of justice.

(d) *Reports concerning a vacancy or incapacity.*

Whenever the Office of the Inspector general remains vacant for 180 days, or whenever the Inspector General is incapacitated or otherwise unable to perform the duties of the office for 180 days, the Chair of the advisory board shall issue a report to the City Council on the 180th day, and every 2 months thereafter until the vacancy is filled or the Inspector General reports to work, describing the status of the efforts to fill the vacancy or the status of the Absent Inspector General.

(e) *Performance review.*

The advisory board shall meet at least once annually to review the performance of the Inspector General.
*(Res. 18-008, ratified Nov. 6, 2018; Res. 22-004, ratified Nov. 8, 2022.)*

## § 4.  Office of Inspector General:  Powers and Duties.

(a) *IG as head of Office.*

The Inspector General shall supervise and direct the Office of the Inspector General.

(b) *Responsibilities of Office.*

The Office of the Inspector General is responsible for:

(1) investigating complaints of fraud, financial waste, and abuse in City government; and

(2) promoting efficiency, accountability, and integrity in City government.

(c) *Jurisdiction of Office.*

The Office of the Inspector General may investigate allegations that involve City government and potential violations of laws or regulations by any:

(1) City elected official;

(2) City employee;

(3) member of a board or commission established or governed by the City Charter, City Code, or an executive order issued by the Mayor;

(4) City contractor or person negotiating a contract with the City;

(5) person seeking certification to provide goods or services to the City; or

(6) external recipient of City funds, benefits, or services.

(d) *Issuing subpoenas.*

(1) To perform the duties of office, the Inspector General may issue a subpoena to require:

(i) any person to appear under oath as a witness; or

(ii) the production of any information, document, report, record, account, or other material.

(2) The Inspector General may enforce any subpoena issued pursuant to this subsection in any court of competent jurisdiction.

(e) *Annual report.*

(1) The Office of the Inspector General shall prepare and publish an annual report of the Office's activities.

(2) The annual report may include recommendations regarding program weakness, contracting irregularities, or other institutional problems discovered by the Office.

(3) The annual report shall be:

    (i) submitted to all of the members of the advisory board; and

    (ii) after any redactions required by law, posted on the Office of the Inspector General's website.

*(Res. 18-008, ratified Nov. 6, 2018; Res. 22-004, ratified Nov. 8, 2022.)*

## § 5. Office of Inspector General: Budget.

(a) *IG to prepare proposed budget.*

The Inspector General shall formulate and prepare annually, or as frequently as required by law, a proposed budget to fund the operations of the Office and shall transmit the proposed budget to the advisory board for its review.

(b) *Advisory board to approve or revise.*

(1) The advisory board shall meet to review the proposed budget submitted by the Inspector General for the purpose of assessing and determining whether, in the judgement of the advisory board, the proposed budget provides sufficient funding to meet the duties of the Office.

(2) The advisory board shall, by an affirmative vote of at least 4 of its members, either:

    (i) approve the proposed budget as submitted; or

    (ii) revise the proposed budget if the advisory board disagrees with the substance of any item contained in the proposed budget, including estimates of need and amounts of requested funding.

(c) *Submission.*

(1) The budget approved by the advisory board pursuant to subsection (b) of this section shall be the Office budget the advisory board recommends to the Board of Estimates.

(2) The advisory board, on behalf of the Office of the Inspector General, shall submit the recommended budget to the Board of Estimates in a timely manner in order for the recommended budget to be considered for inclusion in the Ordinance of Estimates.

(d) *Funding.*

The Office of the Inspector General shall be funded annually in the Ordinance of Estimates.

*(Res. 18-008, ratified Nov. 6, 2018; Res. 22-004, ratified Nov. 8, 2022.)*

## § 6. Office of Inspector General:  Administration and Operation.

(a) *Staff*.

The Inspector General may appoint such other employees to assist in the conduct of the Office as may be provided in the Ordinance of Estimates.

(b) *Deputy Inspector General*.

The Inspector General shall appoint a Deputy Inspector General, who shall serve as the Acting Inspector General if the Inspector General is absent or unavailable for duty.

(c) *Administrative and operational procedures*.

The administrative and operational procedures of the Office may be established by law or by rule or regulation adopted by the Inspector General.

*(Res. 18-008, ratified Nov. 6, 2018; Res. 22-004, ratified Nov. 8, 2022.)*

## § 7. Office of Inspector General:  Transition Provisions.

(a)  *Incumbent Inspector General*.

The individual holding the position of Inspector General of the City of Baltimore in the Law Department on November 6, 2018, will assume the position of Inspector General created by this Article on the date this Article goes into effect.

(b)  *Initial term* .

The 6 year term of the Inspector General who assumes office under the provisions of this Article runs from the effective date of this Article.

*(Res. 18-008, ratified Nov. 6, 2018; Res. 22-004, ratified Nov. 8, 2022.)*

*{PAGE INTENTIONALLY LEFT BLANK}*

*Stephan Fogleman, Chair*
*Arnold Sampson*
*John McCauley*
*Noelle Newman*
*Vacant*



*Executive Director: Isabel Mercedes Cumming*
*Director: J. Christoph Amberger, Esq.*

**BALTIMORE CITY BOARD OF ETHICS**

---

September 17, 2025

<u>*Via Electronic Mail*</u>

Inspector General Isabel Mercedes Cumming
Suite 635
100 N. Holliday Street
Baltimore, MD 21202

Re: <u>Request for Guidance on Social Media Posts</u>

Dear Inspector General Cumming;

You asked the Baltimore City Ethics Board ("Board") to review certain social media posts on your personal accounts. The Board has reviewed the pertinent facts and relevant law and determined that there was no violation of any provision of Art. 8 of the Baltimore City Code ("the Ethics Law").

**A.    Facts**

At issue are posts and "Tweets" in reference to the August 2025 leadership elections of the American Federation of State, County, and Municipals Employees, Council 3, Local 44 ("AFSCME"). This is a non-governmental, third-party entity that self-characterizes as an "organization that reflects and facilitates First-Amendment activity by public employees[.]"[1] Counsel for that union represented that "AFSCME and its member employees are <u>protected from government conduct</u> that unduly interferes with, or chills, the exercise of their rights." (Emphasis supplied.)

**<u>Referenced postings:</u>**

1. **Facebook** https://www.facebook.com/reel/3282120005274843 posted on Aug. 17, 2025

[Video clip extracted from a year-old local news broadcast (7/24/2024).]

---

[1] Letter dated 12/27/2024 addressed to the Office of the Inspector General ("OIG") by attorney David Gray Wright, Esq., of KSC Law, in response to an OIG information request.

---

*This video was a year ago, now STANCIL MCNAIR who was one of the 1st @BaltimoreDPW workers brave enough to speak out against the treatment is now running for PRESIDENT of the AFSCME #44 Union!  McNair plans to fight for change for essential workers.*

*Update - Historic turnout & the McNair team ended up winning.*

**2.  X.com:**

**(1) posted on August 23, 2025:** Isabel22 @isabel_cumming

*IMPORTANT Election Day for the men & women running for executive board for AFSCME. The election takes place between 1 and 4 p.m.  TODAY at the AFSCME union hall at 1410 Bush Street in Baltimore. Members must attend in person to cast their votes.* 👊💥
Link to: https://www.baltimorebrew.com/2025/08/22/showdown-coming-between-sanitation-worker-activists-and-their-union-at-tomorrows-local-44-election/

**(2) posted on Aug. 23, 2025:** Isabel22 @isabel_cumming

[Image of sunrise over Baltimore harbor]
*Sun rising on a beautiful day in Baltimore! Heading off to Fells Point for the Bmore Flea* [Market] *event at Broadway from 10-3 today. Hope all the ASCFME #44 union workers get out and vote today from 1-4 at Union Hall! Have a blessed day.* [heart emojis]

**(3) posted on Aug. 22, 2025:** Isabel22 @isabel_cumming

*Great to see so much interest in the future of the hardworking men and women of @BaltimoreDPW*
*The elections are tomorrow!  Power to the people*
Link to: https://foxbaltimore.com/news/local/bal
timore-union-leadership-faces-shake-up-as-dpw-workers-push-for-change

**(4) posted on Aug 17, 2025:** *See*, Facebook post, *supra*.

**(5) posted on Aug 16, 2025**: Isabel22 @isabel_cumming

*Kudos to @BaltimoreDPW worker Stancil McNair who is running for President of the AFSCME Union. Stancil was vocal in making the changes that are starting in DPW. Change only happens when people stand up and are heard!  The election is Saturday, August 23 at Union Hall.*

**B.      Analysis**

**1.  <u>Overview – Prestige of Office</u>**

Baltimore City's Ethics Law is codified in Article 8 of the City Code. The Maryland Public Ethics Law, MD. CODE ANN., General Provisions ("GP") § 5-101 *et seq*., requires that local ethics codes

adopt conflict of interest provisions that are "similar" to analogous provisions set forth in State law. *See* GP § 5-808(a). Local conflict of interest provisions applicable to public officials must be equivalent to analogous State provisions. *See* GP § 5-808(b). The City's "prestige of office" provision applies to all City public official and is nearly identical to the analogous State provision. *Cf.* Code Art. 8 § 6-36; GP § 5-506.

The "prestige of office" provision is subject to some interpretation and contextual fact-finding. Typically, a violation occurs when City officials use their office to <u>inappropriately benefit themselves or others materially, financially or economically.</u> The Board has formally opined that a City official providing a letter of reference for a vendor may violate § 6-36. *See* Board Opinion 14-001. Informally, the Board has advised officials to avoid situations where the official might appear to be using their office or materials associated with their office, such as official letterhead or City email, to endorse a particular private business. Because the facts and circumstances to each case vary, the Board has avoided a "one size fits all" interpretation of what would constitute a violation of § 6-36.

Because the State's law and the City's law are nearly identical, the Board frequently looks how the State has interpreted certain provisions for guidance. *See, Zell v. Safe Deposit & Tr. Co. of Baltimore*, 173 Md. 518, 525 (1938) (stating that when one jurisdiction adopts another jurisdiction's law, consideration should be given to the other jurisdiction's interpretation).

The State Ethics Commission (the "State Commission" or "Commission") has indicated that the "gain" for purposes of the provision refers to an "*economic gain*" rather than a non-material, amorphous, speculative, or intangible gain. *See generally* State Ethics Opinion Nos. 90-9, 81-14, 91-11, 93-1. Similar to the City, the State Commission appears to have avoided an over-arching test to determine what constitutes a "prestige of office" violation, relying on each case's unique facts and circumstances.

Due to the lack of specificity in the City and State opinions as to what constitutes a "prestige of office" violation, and relying on the plain meaning of "gain" as a term of art in pertinent legal references[2], the Board has considered "prestige of office" violations to generally apply to situations

---

[2] "Gain: Profits; winnings; increment of value. *Gray v. Darlington*, 15 Wall. 65, 21L. Ed. 45; *Thorn v. De Breteuil,* SO App. Div. 405, 83 N. Y. Supp. 840." *See*, https://thelawdictionary.org/gain/ Access 9/12/25. BLACK's LAW DICTIONARY 6th Ed. (1990) is even more specific: "Profits, winning, increment of value. Difference between receipts and expenditures; pecuniary gain. Difference between cost and sale price. Appreciation on value or worth of securities or property. Excess of revenues over expenses from a specific transaction. *Etc.*".

---

where a public official's title or office was intentionally used for economic "gain", both for the respective official and/or another.

This is clearly not the case here, nor have allegations been made that any party has realized or is likely to realize an economic or material gain as a proximate result of the cited postings.

## 2. Prestige of Office – Political Activity/Social Media

Baltimore City Ethics Board has not issued a formal Board Opinion on the Ethics implications of social media use or whether a City official may use social media.[3]

The State Commission has provided no guidance about whether personal or multi-use social media accounts may constitute a violation of applicable ethics laws. However, the preponderance of multi-use accounts has been acknowledged by the Maryland Joint Committee on Legislative Ethics (the "Committee"), which is the body that is responsible for advising members of the General Assembly on State Ethics law and enforcing that law on those (elected) members. For example, in its 2020 Ethics Guide, the Committee outlined the permissible use for multi-use social media accounts:

> Members often use social media as a tool for engaging the public about legislation and other official matters. Some members maintain social media accounts that contain only legislative and other nonpolitical information for the benefit of constituents, while other accounts are more political and include information about campaign events and fundraising activities.

> Public resources are to be used for public purposes and should not be used for campaign or political fundraising purposes. Therefore, public resources, including staff on State time and State computers, may not be used to post campaign-related content on a member's social media account.

> Consistent with the rules for personal/political websites, addresses of social media accounts may not be included as part of official letterhead or on official business cards. Similarly, members may not include links to social media accounts on the "signature" text at the end of an outgoing email message from a General Assembly email account. The address of a social media account that contains no campaign content may be included in the text of a letter sent on official General Assembly stationery or email.

---

[3] However, the Ethics Law exempts political activity from many of its provisions. For example, a political contribution is excluded from the definition of a "gift." See Code, § 2-17(b). Similarly, City elected officials are not barred from accepting free tickets to a political event. See Code, § 6-28(4).

*See* Joint Committee on Legislative Ethics, 2020 Ethics Guide, p. 77.

Clearly, the General Assembly's ethics guidance does not forbid the use of personal or multi-use social media accounts by elected officials generally, but there may be instances on a granular level that might give rise to an ethics violation, such as the inclusion of a multi-use account on an official document like letterhead or an email. This is not the case here.

Neither the State Commission nor the Committee have made any finding that these practices violated State Ethics laws.

3.    **Other Legal Concerns**

**(a)    "Conflict of Interest"**

Like the statutory meaning of "gain" (*see,* FN2), allegations of "conflict of interest" must be reviewed based on the meaning of that term within the statutory context. Art. 8 provides:

> **§ 2-19. "Interest".**
> (a)    In general.
> "Interest" means, except as specified in subsection (b) of this section, any <u>legal or equitable economic interest</u>, whether or not subject to an encumbrance or a condition, that is owned or held wholly or partly, jointly or severally, or directly or indirectly.

(Emphasis supplied.)

For purposes of the Ethics Law, the meaning of "interest" thus comprises *concrete economic and legal interests*, including employment and property interests (*see*, Art. 8 § 7-3. {Statement by official of proposed action.}: "An official must disclose employment and interests that raise a potential conflict of interest in connection with a specific proposed action by the official.")

No economic, financial, or legal interest and no prohibited employment interest is implied in or by your posts.

**(b)    Constitutional issues**

Government regulation or intrusion into a public official's personal or otherwise non-governmental social media account raises First Amendment issues.[4]

---

[4] "[M]any public officials possess a broad portfolio of governmental authority that includes routine interaction with the public, and it may not be easy to discern a boundary between their public and private lives. Yet these officials too have the right to speak about public affairs in their personal capacities. [Citation omitted.] Lest any official lose that right, it is crucial for the plaintiff to show that the official is purporting to exercise state authority in specific posts." *Lindke v. Freed*, 601 U.S. 187, 203, 144 S. Ct. 756, 770, 218 L. Ed. 2d 121 (2024).

The 4th Circuit has laid out a test to determine what differentiates a personal social media account from a governmental social media account. *See, Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019). In that case, the Court determined that the social media account in question, used by an elected official in Fairfax, Virginia, was a governmental social media account because, among other things, the accounts were categorized as **a government page** and branded that way, the accounts listed governmental contact information, and the accounts included a link to an official county website.

Your accounts are clearly marked as **personal pages**. They span several years preceding your current position and provide a forum for your private sentiments, family news, community engagement, personal and professional achievements, and third-party media coverage. While there are occasional postings relating to your professional activities, the pages don't cross-reference any City, municipal, or other governmental internet presence:

1.    **Facebook Account:**[5] The Facebook account is "attorneyisabel". The branding of that account is "Digital Creator", *NOT Inspector General for Baltimore City*. The "About" page comprises greatly abridged academic credentials (personal), place of residence (personal), and name of spouse (personal). The "About Isabel" feature also contains purely personal information: "Mom of four great boys, Steve, Joey Jett, Kyle and Connor as well as huge skate fan all of the time and fighting fraud, financial waste and abuse most of the rest of the time -- occasionally getting to chill with my husband - once in a blue moon!" The only link contained in the informational sections links to a 6-year-old YouTube film relating to her son's skateboarding (with over a million views).

Conversely, the Facebook account of the OIG is clearly marked **"Baltimore City of the Inspector General"**, with a Page characterization of "Public and Government Service" and the official address and office phone number of that office.[6] It contains no personal information relating to you.

2.    **X.com Account:**[7] The account **Isabel22 @isabel_cumming** is clearly labeled as "personal account" and was created in 2014, long before you were employed by the City in your current position:

---

[5] https://www.facebook.com/attorneyisabel Access 9/12/25.

[6] https://www.facebook.com/BaltoCityOIG Access 9/12/25.

[7] https://x.com/isabel_cumming Access 9/12/25

*Trying to make a difference. IG Baltimore* 💛🖤 *Personal acct. -pics from my 30,000 taken of Baltimore! It takes courage not to be discouraging-Sk8 on* 🇵🇷
*Baltimore, MD m.youtube.com/watch?v=XM_E9q…*
Joined November 2014[8]

Conversely, the OIG's official page on x.com is **https://x.com/OIG_Baltimore** with the handle:

*The Office of Inspector General is an Independent entity with the mission of detecting and preventing fraud, waste, and abuse within City Government. Baltimoreoig. baltimorecity.gov*
Joined August 2010

Combining characteristics of private[9] communications and those of a public figure, your personal pages in question cannot be seen as "official" or governmental pages. There is no indication that the accounts at issue are run or hosted by City government. Nor do your posts "show that the official is purporting to exercise state authority in specific posts." (*See*, FN4.) Given these indicia, it would be difficult for a reasonable person to conclude under the *Randall* test that your accounts are governmental accounts or that they were used for government purposes.

The courts have upheld government employee's right to have their own social media accounts and thoughts. *Candus Thomson v. Mark Belton, Sec. of State DNR*, Civil Action No. ELH-18-3116, 2018 WL 6173443, *14 (D. Md. 2018) (reiterating that the government cannot take retaliatory action against an employee for exercising free speech rights). As personal accounts, they are protected under the First Amendment from restrictive government action, including action by the Ethics Board.[10]

### C. Conclusion

Neither State nor City have taken legislative action to prohibit public officials from using social media to communicate both governmental and private messaging. Thus, there is no basis for

---

[8] The creation date alone marks this account as personal or at least non-specific to City government in general and the OIG in particular. It would not be possible for it to have been the "official" page of the Baltimore City Inspector General because that page has existed since 2010.

[9] "Private" here is limited to mean "restricted to Friends and Followers" as a posting on social media rarely is "private" as but designed to be publicized to various levels of recipients.

[10] Beyond constitutional concerns, Maryland state law prohibits the Board, or any other unit of City government, from asking for passwords to access these pages in order to regulate an employee's social media posts. *See* MD. CODE ANN., Lab. & Emp., § 3-712 (b) (1) ("Subject to paragraph (2) of this subsection, an employer may not request or require that an employee or applicant disclose any user name, password, or other means for accessing a personal account or service through an electronic communications device.")

finding a violation of the City Ethics Law for the mere posting of personal opinion or community-related information on personal or even multi-purpose accounts. Furthermore, the Supreme Court has held that:

> The state-action doctrine requires [Appellant] to show that [Appellee] (1) <u>had actual authority to speak on behalf of the State on a particular matter</u>, and (2) <u>purported to exercise that authority in the relevant posts</u>.

*Lindke v. Freed*, 601 U.S. 187, 204, 144 S. Ct. 756, 770, 218 L. Ed. 2d 121 (2024). (Emphasis supplied.)

This is clearly not the case here: You do not invoke governmental authority to speak on a matter that is outside of the City's administrative jurisdiction. The posts also do not purport to be made under color of governmental authority. They may generally encourage voting[11] but contain no express directive to vote for a particular candidate. They combine factual information and personal opinion. No facts have been adduced to show (1) how many qualified union voters actually read the respective posts, let alone (2) actually voted for a particular candidate as a proximate result of the posts. There is also no indication (nor have allegations been made) that you used City resources or ordered City employees to post your personal or official media messaging on the respective personal accounts.

The social media accounts in question clearly belong to you as a natural person, public figure and engaged citizen, not the City of Baltimore or the OIG. As such, they are considered protected speech.

Cordially yours,

J. Christoph Amberger
Director, Ethics Board

Cc.: Members of the Board

---

[11] Encouragement to exercise one's right to vote hardly "unduly interferes with, or chills, the exercise of their [i.e., union members'] rights." *See*, FN1.

Unions are under a solemn obligation: to represent members forcefully and effectively in negotiations with management and to conduct internal union affairs according to democratic standards.

Therefore, we the members of the American Federation of State, County and Municipal Employees, in convention assembled, adopt this Constitution and this

## Bill of Rights for Union Members

1. No person otherwise eligible for membership in this union shall be denied membership, or otherwise discriminated against as a member, because of race, creed, color, national origin, ethnicity, sex, age, sexual orientation, gender identity or expression, disability, immigration status, or political belief.

2. Members shall suffer no impairment of freedom of speech concerning the operations of this union. Active discussion of union affairs shall be encouraged and protected within this organization.

3. Members shall have the right to conduct the internal affairs of the union free from employer domination.

4. Members shall have the right to fair and democratic elections, at all levels of the union. This includes due notice of nominations and elections, equal opportunity for competing candidates, and proper election procedures which shall be constitutionally specified.

5. Members shall have an equal right to run for and hold office, subject only to constitutionally specified qualifications, uniformly applied.

6. Members shall have the right to a full and clear accounting of all union funds at all levels. Such accounting shall include, but not be limited to, periodic reports to the membership by the appro-

given to the membership prior to the date on which the vote is taken. A written copy of the proposed amendment shall be furnished to every eligible voter at the meeting at which the vote is taken.

# APPENDIX D

## Elections Code

**Section 1.** General provisions.

A. No funds or other resources of the Federation or of any subordinate body, and no funds or resources of any employer, shall be used to support the candidacy of any member for any elective office within the Federation or any subordinate body.

B. No publication sponsored by or supported by the Federation or any subordinate body shall endorse or support any candidate for elective office within the Federation or any subordinate body.

C. Any nominee or announced candidate for elective office shall have the right once prior to the election to have mailed, through the union office but at private expense, campaign literature. In a local union election, such literature may be mailed to each member in good standing. In an International Union or council election, such literature may be mailed to each affiliated subordinate body and/or to each member in good standing.

D. No member whose eligibility for membership is based upon employment in a position for which another organization is the exclusive representative with regard to wages, hours, or other terms and conditions of employment shall be eligible to seek or hold office at any level of the union; provided, that any member now serving a term of office shall not be barred by this Section from completing the remainder of such term of office.

M. All election records, including ballots and electronic votes, shall be retained by the subordinate body for at least one year after the election.

**Section 3.** Election of convention delegates.

A. Local unions shall elect council delegates in the manner prescribed for the election of local union officers, subject to the provisions of paragraph C, below.

B. Locals and councils shall elect delegates to conventions of the International Union in the manner prescribed for the election of local and council officers, subject to the provisions of paragraph C, below, and of Article IV of this Constitution.

C. The election by local unions of council delegates and of delegates to conventions of the International Union shall not require a majority of the votes cast unless such requirement is specifically contained in the local union constitution.

**Section 4.** Challenges and protests.

A. Any member of a local union or any council delegate may challenge the eligibility of any nominee by filing such challenge with the Election Committee prior to the holding of the election. The Election Committee shall make a determination regarding the challenge, and shall report its ruling to the subordinate body. The subordinate body shall either accept or reject the ruling of the Election Committee prior to the election.

B. Any protest concerning the conduct of the election may be lodged at the meeting at which the election is conducted or by filing such protest in writing with the subordinate body or the Election Committee within ten days following the election. All interested parties shall be afforded an opportunity to be heard. The membership of the subordinate body shall either accept or reject the recommended

147

APPENDIX D

decision of the Election Committee not later than thirty days after the filing of the protest.

C. If the subordinate body determines that there were violations which may have affected the outcome of the election, it may order such election or any part thereof set aside, and a new election held. Any officers who have been installed prior to such determination shall remain in office pending the outcome of any new election or of a future appeal.

D. Any protestant or nominee adversely affected by a decision on a challenge or a protest may file a written appeal with the Judicial Panel within ten days of the subordinate body's decision, or, if no decision has been rendered, within forty days after filing the original protest with the subordinate body. Upon receipt of such an appeal, the Chairperson of the Judicial Panel shall designate one or more members of the Judicial Panel to conduct an investigation, affording all interested parties an opportunity to be heard, and such member or members shall issue a decision within forty days after the filing of the protest. If the investigation shows that there were violations which may have affected the outcome of the election, the election or any part thereof may be set aside and a new election held. In such circumstances, the new election may be conducted under the supervision of a representative designated by the Panel member or members who conducted the investigation.

E. Decisions made by a Panel member or members may be appealed to the full Judicial Panel by filing written notice of such appeal within ten days after the decision is issued. Should a decision not be issued within the time limit set forth above, an appeal to the full Judicial Panel may be filed within ten days after the expiration of such time limit. The Judicial Panel shall hear and decide such appeal at its next meeting.

The Judicial Panel shall provide an opportunity for all interested parties to be heard, and shall consider all other information obtained in the investigation conducted by a member or members of the Judicial Panel.

F.  Decisions of the Judicial Panel under this Section may be appealed to the International Convention. Notice of such appeal shall be filed in writing with the International Secretary-Treasurer within thirty days after the decision of the Judicial Panel. Pending the decision of the Convention, the decision of the Judicial Panel will be in effect.

G. No subordinate body funds shall be used to institute legal action outside the union to challenge election rulings.

H. Challenges and protests regarding the election of council delegates shall be handled in the manner prescribed for challenges and protests regarding the election of officers of subordinate bodies.

**Section 5.** Challenges and protests regarding election of delegates to International Union Conventions.

A.  A challenge or protest regarding the election of delegates to a convention of the International Union must be filed with and decided by a subordinate body by or on the date of the meeting at which the report of the Elections Committee is voted on. A written appeal from the decision of the subordinate body may be filed with the Judicial Panel not later than the fifth day following the subordinate body's action on the challenge or protest; provided that the Judicial Panel shall not have jurisdiction to hear appeals filed within twenty (20) days of the opening day of the Convention. The Chairperson of the Judicial Panel shall designate one or more members of the Judicial Panel to conduct an investigation and decide the appeal in the manner provided in Section 4(D) as expeditiously as possible. An appeal from

ATTACHMENT 9

Action on a challenge may later be appealed to the Judicial Panel, under the provisions of Section 4 of Appendix D of the International Constitution. The filing of such an appeal, however, cannot be used as a basis for delaying the election.

# Election campaigning

The general provisions on the rights and the restrictions on campaigning for office in the local union can be found in Section 1 of Appendix D of the International Constitution. Basically, these provisions are as follows:

1. No union funds or resources, and no funds or resources of any employer, can be used in campaigning for union office. Union resources include not only physical resources, but also images and electronic resources, and candidates must avoid campaign communications that utilize such union resources.

2. No publication of any kind which is sponsored by or supported by the union can make any endorsement or otherwise support any candidate for union office.

3. Any member who has been nominated for office or who announces an intention to run for office has the right to one* mailing to the membership made through the union office before the election. This mailing is not to be made at the union's expense.

It is probably this third provision that is the most misunderstood. Note that the right is "the right to mail," not "the right to print." The candidate must prepare the materials to be mailed, furnish the envelopes, do the stuffing and sealing, and put on the stamps or furnish the money to pay for the mailing meter charge. The candidate must, in effect, furnish everything but the names and

------

* *In local unions that include members employed by private sector employers, federal law requires that the union comply with all reasonable requests by a candidate to mail campaign materials to the membership. In those cases, the union cannot limit candidates to only one mailing.*

# LAW OFFICES OF THIRU VIGNARAJAH
## JUSTICE FOR ALL

**VIA EMAIL – RETURN RECEIPT REQUESTED**

September 21, 2025

AFSCME International Judicial Panel
Attn: Judicial Panel Chairperson Carla Insinga
1625 L Street NW
Washington, DC 20036

### APPEAL OF LOCAL 44 ELECTION COMMITTEE DECISIONS OF SEPTEMBER 11, 2025

### Introduction

The recent decision by Local 44's Election Committee to toss the results of last month's officer elections and to hold a new election is an unlawful breach of contract, an unjustifiable departure from governing union election rules, and a manifest public disgrace. It undermines the trust of union members and the public in the integrity of Local 44, and it lends credence to a caricature of union elections as fraudulent theater designed only to allow union bosses to handpick their own. The case for reversing the Election Committee's decisions is as clear as it is imperative.

Remarkably, despite repeated requests by multiple candidates who won their elections on August 23, 2025, Local 44's Election Committee has still never provided a written report of its recommendations or underlying findings, nor made available the original written protests that supposedly precipitated their investigation and involvement. This is not just irregular — it is a flagrant violation of AFSCME's International Constitution, which states that, whenever there is a protest of an election, "***all interested parties shall be afforded an opportunity to be heard***." None of the candidates on whose behalf this appeal is filed was shown the underlying protests; and none of them were invited to respond or given an opportunity to be heard. For this violation alone, the Judicial Panel can and should reverse the Election Committee's decisions to nullify the August 23rd election and to schedule a new one.

Moreover, if the Election Committee's decision was based, as some understand it, either upon the Baltimore City Inspector General's ("IG") social media posts concerning the election or upon the counting of votes by individuals whose union membership was allegedly in question, there is no merit to either set of claims. In fact, the Baltimore City Board of Ethics recently published its determination that there was nothing improper about the Inspector General's posts or tweets concerning a "non-governmental, third-party entity" over which the IG has no supervisory authority. *See* Attachment 1 - Baltimore City Board of Ethics Request for Guidance on Social Media Posts, at pages 1, 9; *see also* Attachment 2 - Affirmation of Isabel Cumming.

Furthermore, AFSCME's Local Union Election Manual sets forth rules for challenging ballots at the time of the election, which did not happen; the Election Manual also makes clear that a post-election

1

protest of a ballot that has been cast and counted is emphatically not allowed: "As a practical matter, ***challenges cannot be made*** after the voter's ballot has been cast and commingled with other ballots. . . . Once a voter has voted there is no way to remove that vote and any voting system that allows this to occur is not permitted under the International Constitution." *See* AFSCME Local Union Election Manual (hereinafter "Election Manual"), at page 17.

For these reasons and on additional grounds set forth in greater detail below, we respectfully request that the Election Committee's decisions be summarily reversed, that the results of the original election be reinstated, and that the election set for October 4, 2025, be canceled.

Because the proposed election is imminent, should the AFSCME International Judicial Panel need additional time to consider this matter, we ask that the Panel immediately suspend the October 4th election so that candidates do not exhaust resources (or themselves) in the days immediately preceding a second election that rightly should never happen.

As a courtesy, we respectfully advise that, should the Panel be unable to render a decision by <u>COB Thursday, September 24</u> and has not postponed the October 4th election, in an abundance of caution, Appellants will file an emergency petition in the Circuit Court for Baltimore City to enjoin AFSCME Local 44 from holding an unwarranted second election that violates its members' contractual rights.

<u>**Scope of Appeal**</u>

Please receive this written correspondence and its supporting attachments as appeals of the decisions announced by the AFSCME Local 44 Election Chair on September 11, 2025, and reaffirmed in part in an email transmitted on September 19, 2025. *See* Attachments 3A-3C. This appeal is governed by the AFSCME <u>International Constitution</u>, Appendix D—Elections Code (hereinafter "Elections Code") and by the AFSCME <u>Local Union Election Manual</u> (hereinafter "Elections Manual").

This appeal is filed on behalf of Stancil McNair, who was duly elected President of Local 44 on August 23, 2025, and was sworn in August 30, 2025. The appeal is joined by Timmeeka Pettus, who was also duly elected Secretary Treasurer on August 23; by Teresa Blow and Crystal Boswell, who were both duly elected to the Executive Board on that same date; and by Ricardo Ward and Mitchell Dean Sr., both of whom are entitled to two-person runoff elections after finishing in the top two for the positions of Vice President and Executive Board, respectively. These individuals will be collectively referred to as "Appellants" in the context of this appeal.

The appeal is timely because it is filed within ten (10) days of September 11, 2025, as required by AFSCME's election rules. *See* Elections Code § 4(D). This appeal challenges two decisions:

- Vacatur of the August 23, 2025 election results and the scheduling of a new election for October 4, 2025; and

- Rejection of Mr. McNair's protest that Mr. Trevor Taylor, against whom Mr. McNair ran for President, used union resources to advance his candidacy.

Both decisions are unsupported by the record and contrary to governing rules set forth in the Elections Code of the AFSCME International Constitution and the AFSCME Local Union Election Manual.

## Background

Elections for leadership positions for Local 44 were originally conducted on August 23, 2025. Ballots were cast and counted that day. Mr. McNair prevailed over Mr. Taylor in the race for President; Ms. Pettus won the election for Secretary Treasurer; and Ms. Blow and Ms. Boswell were elected to the Executive Board. Mr. Ward and Mr. Dean earned runoffs by finishing in the top two for Vice President and the Executive Board, respectively.

On August 30, 2025, Mr. McNair, Ms. Pettus, Ms. Blow, and Ms. Boswell were formally sworn in, and each began to serve their terms on the Executive Board (Blow & Boswell) and as President (McNair) and Secretary Treasurer (Pettus).

Protest against Mr. Taylor. On the day of the election, Mr. McNair filed a written protest with the Election Committee, alleging that Mr. Taylor had used union resources to further his campaign, specifically by sending text messages and emails promoting his candidacy to union members based on information from the Local 44 union directory to which Mr. Taylor had access only because he previously served as Vice President.

Numerous Local 44 union members received these campaign messages from Mr. Taylor, none of whom provided Mr. Taylor with their contact information directly. Moreover, included in this appeal is the affirmation of Ms. Blow who spoke to Mr. Taylor by phone on August 19, 2025, and who states, under penalty of perjury, that Mr. Taylor acknowledged during that call that he was using the private union directory and that he would not share the directory with any other candidate. *See* Attachment 7 - Affirmation of Teresa Blow; *see also* Attachment 3D (sample campaign message sent by email by Mr. Taylor on August 22, 2025—the day before the union election).

Furthermore, on August 30, 2025, when the new officers and executive board members were sworn in, President Pat Moran of Council 3 told the new officers that he had spoken to Mr. Taylor about the misuse of the union directory and that Mr. Trevor "was wrong to do that." *See* Attachment 5 - Affirmation of Stancil McNair. In addition to Mr. McNair, Ms. Boswell, Ms. Blow, and Ms. Pettus have confirmed that they were also present during this conversation and recall Mr. Moran's statements.

Protest of August 23rd Election. It was only on September 5, 2025, that President McNair received an email from Lakesha Baines, Chair of the Election Committee, advising that "protests were filed over the conduct of the election" and that the Committee had "met twice since the election was held and has finished [their] report." In this email, Ms. Baines asked Mr. McNair to open a meeting on September 11, 2025, at 6 p.m. and indicated that the Election Committee would send an invitation directly to union membership. *See* Attachment 3A.

Prior to this September 5th email, the only information concerning the apparent protest by Mr. Taylor was from a news story published in the Baltimore Banner on August 28, 2025. *See* Emily Opilo, *Baltimore's IG tweeted about a city union election. The results are now being contested.*, BALT. BANNER (Aug. 28, 2025). The focus of this article was the Inspector General's tweets and included third-party statements inaccurately framing the Inspector General as part of union or city "management" and therefore criticizing her social media posts about the elections. The story also reported that the IG used "her personal funds to 'boost' tweets $25 at a time," but neglected to clarify when and which posts were boosted and therefore failed to note that the IG spent no money to "boost" any election-related post in the two months before the election.

Aside from this news story, which some Appellants saw and some did not, the first and only communication about the apparent protest was Ms. Baines' September 5th email to Mr. McNair. None of the Appellants were told by the Election Committee about the protest, and no one was invited or provided with an opportunity to respond. In other words, the protest that Mr. Taylor apparently shared with the Baltimore Banner was never shared with any of the affected union members.

After the September 5th email, union members received an invitation solely by email on September 9, 2025, and the meeting was conducted on September 11, 2025. *See* Attachment 3B.

No written report or findings by the Election Committee were shared with the membership before, during, or after the meeting. Instead, the Election Committee verbally reported on the protests and their findings and recommendations.

First, regarding the protest against Mr. Taylor filed by Mr. McNair, the Election Committee shared its conclusion without elaboration that there had been no violation.

Second, with regard to the protests seeking to invalidate the election, Ms. Baines explained at the September 11th meeting that the Committee had decided to recommend nullifying the results of the August 23rd election on the basis of four sets of allegations: (1) the Baltimore City Inspector General Isabel Cumming made financial contributions to Mr. McNair; (2) the IG paid to promote her own social media posts concerning the Local 44 election; (3) the IG, because she is supposedly in a supervisory or management role, improperly influenced the election; and (4) that individuals who were not entitled to vote nevertheless cast ballots on the day of the August 23rd election.

To be clear, this understanding of the basis of the Election Committee's decisions is derived from what union members recall from the presentation on September 11. Despite multiple written requests sent by email to, among others, Ms. Baines and President Pat Moran of Council 3, none of the Appellants have received a copy of the report that Ms. Baines referenced in her September 5th email, which stated the Election Committee had "finished [their] report." *See* Attachment 3A. Furthermore, after the September 11th meeting, Ms. Blow and Ms. Boswell approached Ms. Baines and requested a copy of the protests and findings from which the Committee was reading; their request was denied.

Appellants now have a copy of the "protest" filed by Mr. Taylor directly to the AFSCME International Judicial Panel, which is dated August 31. *See* Attachment 4B - Taylor Protest to Int'l Judicial Panel. (Appellants only have this because the Judicial Panel provided it to Mr. McNair in correspondence dated September 16, 2025. *See* Attachment 4A - Letter from Carla Insinga to Stancil McNair.) Mr. Taylor's protest demands that Mr. McNair be disqualified partly on the basis of his "unusually close relationship" with the Baltimore City Inspector General. *See* Attachment 4B, at *2. That letter also alleges, under the caption of election irregularities, that "individuals who were not dues-paying union members were allowed to register for union membership and vote immediately." *See id.* at *4.

It remains unclear to Appellants whether the Election Committee's articulation of its decision on September 11th controls or whether the allegations in Mr. Taylor's letter somehow became the grounds on which the August 23rd election results were nullified.

Either way, the Election Committee's decisions are incompatible with the facts and the law.

4

## Argument

### A. Decision to Reject Protest of Mr. Taylor's Use of Union Resources

The Elections Code provides that "no funds or resources of the union shall be utilized to support the candidacy of any member for any elective office." *See* Elections Code § 1(A). The Local Union Election Manual further clarifies that "union resources include not only physical resources, but also images and electronic resources," and warns candidates to avoid campaign communications that utilize such union resources. *See* Election Manual, at page 10.

On August 23, 2025, Mr. McNair timely submitted a protest alleging that Mr. Taylor used union membership contact lists—specifically email addresses and mobile phone numbers not available to the public and accessible to Mr. Taylor solely by virtue of his officer role—to disseminate unsolicited campaign messages to thousands of Local 44 members in the days leading up to the election. Multiple Local 44 members with no prior personal relationship with Mr. Taylor received these campaign messages. No other candidate enjoyed comparable access to these union lists.

A union-maintained membership/contact list and any affiliated email/text distribution capacity are union resources under the Election Manual's definition. *See* Election Manual, at page 10 ("Union resources include not only physical resources, but also images and electronic resources, and candidates must avoid campaign communications that utilize such union resources."). Using them for campaign messages is therefore a textbook violation of Elections Code § 1(A). *See also* Labor Management Reporting and Disclosure Act, Title IV, 29 U.S.C. § 481(g) (the parallel federal standard that no union funds or resources or employer funds may be used to promote a candidacy).

Put simply, the decision rejecting Mr. McNair's protest is incompatible with clear evidence that Mr. Taylor sent emails and text messages to union members using contact information from the Local 44 union directory, a resource to which he had access only because he served as the union's vice president. *See also* Attachment 7 - Affirmation of Teresa Blow ¶ 9.

As for the appropriate remedy, Mr. McNair won the August 23rd election notwithstanding Mr. Taylor's misuse of union resources. Accordingly, Mr. McNair does not seek to rerun the election because the losing candidate violated the rules. Instead, he respectfully requests a measured sanction consistent with the Elections Code — *e.g.*, a written finding of violation, mandatory compliance training, and, if appropriate, reimbursement or discipline as provided by the Constitution—together with prospective relief (*e.g.*, formal safeguards around contact-list access and campaign communications).

### B. Decision to Overturn the Election

First, any protests challenging the election itself are procedurally defective for at least two reasons: (1) the only known protest was filed directly to the AFSCME International Judicial Panel on August 31, 2025, and there is no evidence any protest was filed — as required — with the Local 44 Election Committee within 10 days of the August 23rd election, and (2) interested parties, specifically the candidates whose victories were invalidated, were never given an opportunity to be heard, which flatly violates the AFSCME International Constitution:

> Any protest concerning the conduct of the election may be lodged at the meeting at which the election is conducted or **by filing such protest in writing with the subordinate body or the Election Committee within ten days** following the election. **All interested parties shall be afforded an opportunity to be heard**.

*See* Elections Code § 4B (emphasis added).

It is conceivable that Mr. Taylor submitted a written protest to the Election Committee that was identical to what he transmitted to the AFSCME International Judicial Panel and that he discussed in the Baltimore Banner article on August 28. But the Election Committee should be compelled to provide a copy of that written protest and the corresponding email in which it was sent to them. It is not enough that Mr. Taylor addressed a written protest to the AFSCME International Judicial Panel or that he shared and discussed his protest with the media. The Elections Code § 4B requires him to file a "protest in writing with the subordinate body or the Election Committee within ten days." Thus, even if a written protest can now be produced, if it was not filed in writing with the *proper local authority* within ten days of the August 23rd election, Mr. Taylor's protest was defective.

The more fundamental problem is that none of the Appellants were ever given an opportunity to be heard. The protest at issue sought to abrogate the results of an election at which Appellants won the position outright or, as in the case of Mr. Ward and Mr. Mitchell, placed in the top two and hence were entitled to a two-person runoff. Thus, Appellants are obviously "interested parties" and hence are guaranteed an opportunity to be heard under the AFSCME Constitution. *See* Attachments 5-10 - Affirmations of Stancil McNair, Timmeeka Pettus, Teresa Blow, Crystal Boswell, Mitchell Dean Sr., and Ricardo Ward ("Appellants' Affirmations").

These procedural grounds alone are sufficient to justify reversing the Election Committee's decisions and reinstate the results of the original August 23rd election.

Alongside these procedural defects, there is also no merit or evidence to support the substantive findings shared by Ms. Baines on September 11 or the claims contained in Mr. Taylor's formal protest submitted to the AFSCME International Judicial Panel.

<u>First</u>, there is no evidence that the Inspector General contributed funds to Mr. McNair or his campaign. On the contrary, the IG has now executed an affirmation under penalty of perjury that she has never contributed, directly or indirectly, to AFSCME, Local 44, or Mr. McNair. It should be noted that, even if the IG made a personal financial contribution to Mr. McNair or his campaign, Appellants are unaware of any rule or restriction that would forbid this since a private individual's financial support is not a use of union resources and the Inspector General is not an employer or management. *See* Attachment 2 - Affirmation of Isabel Cumming.

<u>Second</u>, there is no evidence the Inspector General paid to boost social media posts that referenced the Local 44 election. Again, the IG's affirmation makes clear that while she has in the past used private funds to promote posts on her personal social media accounts, she did not do that for any of her recent posts about the Local 44 union election. Again, it should be noted that even assuming *arguendo* that the Inspector General had boosted posts about the election, a personal contribution by a private individual is not a use of union resources and hence is not prohibited by Elections Code § 1(A) (which regulates union funds/resources). *See id.* Not surprisingly, the Baltimore City Board of

6

Ethics has also now confirmed that there was nothing improper about the Inspector General's posts from her clearly-identified personal, non-governmental social media accounts. *See* Attachment 1.

<u>Third</u>, using the Inspector General's personal tweets as a pretext to overturn an otherwise valid election is a transparent and indefensible perversion of union protections enshrined in the Elections Code and AFSCME Constitution.

The AFSCME Bill of Rights guarantees that members "shall have the right to conduct the internal affairs of the union *free from employer domination*." *See* AFSCME Bill of Rights for Union Members § 3 (emphasis added). The Elections Code states that "no funds or resources of any employer[] shall be used to support the candidacy of any member for any elective office." *See* Elections Code § 1(A). The Election Manual contains a parallel prohibition and makes clear that "no funds or resources of any employer[] can be used in campaigning for union office." *See* Election Manual, at page 10.

Nothing in any of these governing authorities bars the Inspector General of Baltimore City from commenting on a union election on her personal social media accounts because she is not management or an employer of any union member, she did not contribute financially or pay to boost any election-related post in the two months preceding the election, and her tweets about the election — even if they had been promoted with a $25 boost — do not constitute "employer domination" of the union's internal affairs and cannot justify voiding election results and scheduling a new one.

As the IG makes clear in her sworn affirmation, neither she nor her Office has any supervisory authority over any AFSCME union worker at any agency in Baltimore City. She lacks the power to hire, fire, promote, or demote any AFSCME worker. And she does not fall anywhere in the supervisory chain of command under the Mayor of Baltimore or under any head of any agency. *See* Attachment 2 - Affirmation of Isabel Cumming ¶¶ 2-3.

In fact, her position is supervised only by an independent *citizen* advisory board who hires and reviews the work of her Office. Ms. Cumming is no doubt well-known and well-respected for the important work she does in Baltimore City, but that does not alter the structure or legal status of her Office, and it does not transform the Inspector General into a supervisor, employer, or management of any AFSCME union worker.

Accordingly, the rules in the Elections Code and Election Manual barring the use of "funds or resources of any employer" to promote a campaign are not germane and simply do not apply to the Inspector General, especially when she is speaking in her private capacity.

To be clear, however, even if those rules did apply to her, the Inspector General's affirmation makes clear that she has "never financially contributed to AFSCME, AFSCME Local 44, or to any AFSCME Local 44 candidate campaign, in either [her] professional or personal capacity." *See id.* at ¶ 8. Moreover, even as Ms. Cumming notes that, over the past two months, she has posted on her private social media accounts about the Local 44 elections, she now confirms that she "never paid, using personal, governmental, or any other resources, to 'boost' any post that relates to that election." *See id.* at ¶ 4-6.

Thus, there simply is no plausible violation of any applicable union election rule—and certainly not a violation that could justify throwing out the results of an election altogether and holding another one.

<u>Finally</u>, there is the matter of whether ballots were cast by individuals who should not have been permitted to vote in the election that was held on August 23, 2025. This protest was referenced both by Ms. Baines, in her oral explanation of the Election Committee's decision on September 11, and by Mr. Taylor, in his protest improperly filed with the AFSCME International Judicial Panel.

As the Election Manual affirms, the AFSCME Constitution guarantees "all local union members . . . shall be afforded a reasonable opportunity to vote." The Election Manual explicitly discusses what this right looks like in practice and what to do about an individual whose right to vote is disputed:

> Occasionally a problem will arise concerning a person who attempts to vote and there is doubt as to the person's eligibility. Challenges can be raised concerning the eligibility of a prospective voter either by a member of the election committee or by an observer representing one of the candidates. It is up to the election committee to resolve the matter.

> The prospective voter may, for instance, not be listed on the membership roster and yet still claim to be a member. If the person can produce evidence of dues payment — a stub from a current salary check showing checkoff of dues, or a receipt for current dues issued by the local, for example — the matter can probably be settled on the spot and a ballot issued. If it is a matter requiring further investigation or additional evidence which cannot be produced immediately, the person should be permitted to mark a ballot and then seal it in an envelope with the person's name on the outside. This envelope should then be placed in the ballot box or in a separate container until the challenge is resolved.

*See* Election Manual, at page 17.

There are further instructions in the Election Manual regarding how to go about dealing with challenged ballots set aside because the individual's eligibility to vote is in question.

> When the tabulation has been completed, the committee should turn its attention to any remaining challenged votes. If the number of challenged ballots is not large enough to change the outcome of any of the contests, the committee is free to refuse to decide the challenges. In that case, they remain in the sealed envelopes but are retained with the rest of the ballots and the election records.

> If the number is great enough that it might affect the outcome of one or more races, the committee must then take up each challenge separately and, without opening the envelope, make a decision as to whether or not the ballot should be counted. In those cases where the committee decides to count the ballot, the envelope should be opened and the ballot deposited, unexamined, in the now-empty ballot box. When all challenges have been disposed of, the ballots in the box should be counted and added to the previous tally. A record should be maintained of the names of those whose ballots were challenged and of the disposition of each.

*See* Election Manual, at pages 20-21.

This is the proper procedure that should have been followed had Mr. Taylor or an observer or anyone else expressed concerns about specific voters' eligibility on the day of the election. The difficulty for

Mr. Taylor is that he has raised this challenge in the context of a post-election protest. Unfortunately for him, the Election Manual directly and lucidly addresses whether such a challenge is possible:

> As a practical matter, <u>challenges cannot be made after the voter's ballot has been cast and commingled with other ballots</u>. This is equally the case in elections conducted electronically. <u>Once a voter has voted there is no way to remove that vote and any voting system that allows this to occur is not permitted under the International Constitution</u>.

*See* Election Manual, at page 17 (emphasis added).

* * * * *

For all of these reasons, Appellants respectfully submit that the proper recourse at this time is to reverse the Election Committee's decision to nullify the August 23rd election results and to cancel the proposed rerun of the election set for October 4, 2025.

In the end, this dispute can be framed and resolved on clear and narrow grounds: (1) the Election Committee did not give "all interested parties" (Appellants among them) the opportunity to be heard with regard to the protests that were the basis of the Committee's decision; (2) there is no evidence to support any of the claims that the Inspector General funded a candidate or boosted a social media post, and there are no union election rules that prohibit such actions even if she did; (3) challenges to ballots being cast by individuals whose eligibility to vote is disputed must be brought at the time of the election — they simply cannot be manufactured after the ballots have been cast, commingled, and counted and a winner declared by a disappointed candidate after he loses the race.

### Requested Relief

Appellants respectfully ask the Judicial Panel to:

- Reverse the September 11, 2025, decision invalidating the August 23, 2025, election;
- Reinstate the original results and provide for runoffs where needed;
- Cancel the October 4, 2025 rerun;
- Order appropriate sanctions for Mr. Taylor's use of union resources.

Should the Judicial Panel need time to hear evidence and consider the matter, Appellants would ask that the October 4th election be indefinitely suspended until a final decision on the appeal is rendered.

Thank you in advance for your prompt attention and measured consideration of this matter. Should the Panel have any questions or require additional information, Appellants are happy to oblige.

With gratitude,

9

## List of Attachments

Attachment 1: Baltimore City Board of Ethics Request for Guidance on Social Media Posts

Attachment 2: Affirmation of Isabel Cumming

Attachment 3: Email Correspondence

   A. Email from Lakeisha Baines to Stancil McNair (September 5, 2025)
   B. Email from Election Committee announcing special meeting (September 9, 2025)
   C. Email from Election Committee to ASFCME Local 44 membership (September 19, 2025)
   D. Sample campaign message from Trevor Taylor (August 22, 2025)

Attachment 4: Election Protest Addressed to International Judicial Panel

   A. Letter from Carla Insinga to Stancil McNair (dated September 16, 2025)
   B. Protest by Trevor Taylor sent to Judicial Panel (dated August 31, 2025).

Attachment 5:  Affirmation of Stancil McNair (President, Local 44)

Attachment 6:  Affirmation of Timmeeka Pettus (Secretary Treasurer, Local 44)

Attachment 7:  Affirmation of Teresa Blow (Executive Board, Local 44)

Attachment 8:  Affirmation of Crystal Boswell (Executive Board, Local 44)

Attachment 9:  Affirmation of Mitchell Dean Sr. (candidate for Executive Board, Local 44)

Attachment 10:Affirmation of Ricardo Ward (candidate for Vice President, Local 44)

## List of References

AFSCME International Constitution, Appendix D (Elections Code), §§ 1(A), 4(D) (prohibiting use of union and employer funds to support candidacy; outlining procedures and deadlines for protests)

AFSCME International Constitution, Bill of Rights § 3

AFSCME Local Union Election Manual, pages 10, 17, 20-21 (defining "union resources" to include images and electronic resources; barring challenges after ballots are cast and commingled; outlining process for addressing challenged ballots)

Emily Opilo, *Baltimore's IG tweeted about a city union election. The results are now being contested.*, BALT. BANNER (Aug. 28, 2025)

Labor Management Reporting and Disclosure Act, Title IV, 29 U.S.C. § 481(g) (indicating no labor-organization moneys may be used to promote a candidacy)

# LAW OFFICES OF THIRU VIGNARAJAH

### JUSTICE FOR ALL

**VIA EMAIL – RETURN RECEIPT REQUESTED**

October 29, 2025

AFSCME International Judicial Panel
Attn: Judicial Panel Chairperson Carla Insinga
1625 L Street NW
Washington, DC 20036

## APPEAL OF PANEL MEMBER NORA GRAMBAU'S DECISION (OCT. 24, 2025)

*~ Filed under Elections Code, Appendix D, Section 4(e) ~*

### INTRODUCTION

Appellants respectfully submit that the recent decision by Judicial Panel Member Nora Grambau in JPC 25-069 requires reconsideration and therefore file this timely appeal to the full Judicial Panel.

A union member's agreement with AFSCME is an enforceable contract, and incorporated into that contractual agreement are the rights and remedies guaranteed by the AFSCME International Constitution, Appendix D — Elections Code (hereinafter "Elections Code") and the AFSCME Local Union Election Manual (hereinafter "Election Manual"). Violating those provisions is an actionable breach of contract, and this appeal provides the full Judicial Panel an opportunity to avoid that breach and to correct course without the need for protracted and costly litigation.

Appellants do not say that lightly. There are no less than three clear and material errors that require the full Judicial Panel's review. First, the panel member's decision forthrightly acknowledges that Appellants were not given an opportunity to be heard, as guaranteed to them by AFSCME's International Constitution: "During the investigative hearing it was discovered that neither the appellants nor the Judicial Panel were in receipt of Brother Trevor Taylor's August 27, 2025, election protest." Member Decision, at p. 2. The decision further states that it "was improper for the Local to not have afforded the appellants an opportunity to be heard and respond to the election protest at the Local level." Member Decision, at p. 9. Yet, without reference to any authority within the AFSCME Constitution, Elections Code, or Election Manual, the decision arbitrarily concludes that the lack of due process can be rectified on appeal. This logic, if adopted by the Panel, would effectively erase the due process guarantee from the Elections Code and AFSCME Constitution. Just as an election protest filed past the prescribed deadline would be an invalid protest, an Election Committee decision made without giving interested parties an opportunity to be heard is an invalid decision.

Second, the panel member's decision inexplicably asserts that, "the election committee dismissed Brother [Stancil] McNair's election protest [regarding misuse of union resources by Mr. Trevor Taylor,] and the election committee's decision was not appealed to the Judicial Panel." Member

1

Decision, at p. 5. Respectfully, Appellants do not understand this finding. On page 2 itself of Appellants' appeal, under the title "Scope of Appeal," the appeal specifically stated:

> This appeal challenges two decisions:
>
> - Vacatur of the August 23, 2025 election results and the scheduling of a new election for October 4, 2025; and
>
> - *Rejection of Mr. McNair's protest that Mr. Trevor Taylor*, against whom Mr. McNair ran for President, *used union resources to advance his candidacy*.
>
> *Both decisions* are unsupported by the record and contrary to governing rules set forth in the Elections Code of the AFSCME International Constitution and the AFSCME Local Union Election Manual.

*See* Appeal of Local 44 Election Committee Decisions of Sept. 11, 2025, at p. 2 (emphasis added); *see also id.*, at p. 5 (dedicating a full page of the appeal to the misuse of resources by Mr. Taylor).

The ruling that this issue was not appealed cannot be reconciled with either the written appeal or with the arguments presented at the October 9, 2025 hearing. A review of both confirms that Appellants plainly appealed the Election Committee's decision about the misuse of resources by Mr. Taylor, and the member's contrary ruling should be corrected by the full Judicial Panel.

<u>Finally</u>, on whether tweets by the Baltimore City Inspector General ("IG") necessitated a new election, the panel member's decision states that "the ethics report and the case law cited by appellants" are not germane because "they fall outside the scope of this internal union proceeding." Member Decision, at p. 13. Respectfully, AFSCME's internal proceedings are not immune from the law; its contract with members — what that contract guarantees and what it means — are subject to interpretation by courts. Hence, just like any term in any contract, who counts as an "employer" in the context of the AFSCME International Constitution and Election Manual is not a term that can be unilaterally interpreted by a judicial panel member without regard for what the law says.

In fact, the member's decision tacitly admits that an inspector general does not strictly qualify as an "employer" by repeatedly using other constructions such as "an employer, if not an agent of the employer" (page 14) or "an employer — or an official associated with the employer…" (page 16). The flaw here is that the Elections Code only bars interference by an "employer," and that contractual term cannot be capriciously expanded to include any "city official who exercises some degree of influence over AFSCME members," (page 14) when no legal authority supports that definition.

Fundamentally, the decision by Local 44's Election Committee to toss the results of the original election and to hold a new election is an unlawful breach of contract and an unjustifiable departure from governing union election rules. The opinion by the panel member valiantly seeks to defend an indefensible decision by Local 44. As a matter of principle, it is natural for union leadership to want to defend a local union's decision, but this should not come at the expense of flouting governing law and rewriting binding contractual terms to achieve a preferred result. That not only undermines the trust of union members and the public in the integrity of one of the nation's most respected unions, but it lends credence to a caricature of union elections as fraudulent theater designed only to allow union bosses to handpick their own.

The case for reversing the Election Committee's ruling and for correcting the panel member's decision is as clear as it is imperative.

For these reasons and on additional grounds set forth in greater detail below, we respectfully request that the October 24, 2025 decision by Panel Member Nora Grambau be reviewed and reversed in part, that the results of the original election be reinstated, and that any proposed rerun be canceled.

Because the member's decision orders that a new election be held "within the next 45 days" (that is, by December 8, 2025), should the full Judicial Panel need additional time to consider this matter, we ask the Panel to adopt the same approach taken by the panel member to suspend elections until a final decision is rendered — and in fairness until both sides are afforded an opportunity to consider whether to further appeal the full Panel's decision to the International Convention. *See* Elections Code § 4(f).

As a courtesy, we respectfully advise that, if the Panel is unable to render a decision by <u>COB Friday, November 14</u> and has not suspended any proposed rerun, Appellants will — in an abundance of caution — file an emergency judicial petition in state or federal court to enjoin AFSCME Local 44 from holding an unwarranted second election that violates its members' contractual rights.

### SCOPE OF APPEAL

Please receive this written correspondence and its supporting attachments as an appeal of the decision issued by Panel Member Nora Grambau on October 24, 2025. This appeal is timely filed because it is within ten (10) days of the panel member's decision of October 24, 2025, as required by AFSCME's election rules. *See* Elections Code § 4(d).

This appeal is filed on behalf of Stancil McNair, who was duly elected President of Local 44 on August 23, 2025, and was sworn in August 30, 2025. The appeal is joined by Timmeeka Pettus, who was also duly elected Secretary Treasurer on August 23; by Teresa Blow and Crystal Boswell, who were both duly elected to the Executive Board on that same date; and by Ricardo Ward and Mitchell Dean Sr., both of whom are entitled to two-person runoff elections after finishing in the top two for the positions of Vice President and Executive Board, respectively. As before, these individuals will be collectively referred to as "Appellants" in the context of this appeal.

This appeal challenges the following rulings:

- That Appellants did not appeal the Election Committee's decision to reject Mr. McNair's protest that Mr. Taylor used union resources to advance his candidacy; and

- That a new Local 44 union leadership election is warranted because of social media posts on the private account of the inspector general, where no legal authority or precedent supports the conclusion that the inspector general is an employer and where no funds or other resources were spent on the social media posts in question.

Both decisions are unsupported by the record and contrary to governing rules set forth in the Elections Code and the Election Manual.[1]

---

[1] To be clear, Appellants do not appeal the ruling that "no evidence was presented to support that any ineligible voters cast votes in this election" and that "no voters were challenged in the [required] manner." Member Decision, at p. 12.

3

BACKGROUND

Elections for leadership positions for Local 44 were originally conducted on August 23, 2025. Ballots were cast and counted that day. Mr. McNair prevailed over Mr. Taylor in the race for President; Ms. Pettus won the election for Secretary Treasurer; and Ms. Blow and Ms. Boswell were elected to the Executive Board. Mr. Ward and Mr. Dean earned runoffs by finishing in the top two for Vice President and the Executive Board, respectively.

On August 30, 2025, Mr. McNair, Ms. Pettus, Ms. Blow, and Ms. Boswell were formally sworn in, and each began to serve their terms on the Executive Board (Blow & Boswell) and as President (McNair) and Secretary Treasurer (Pettus).

Protest against Mr. Taylor. On the day of the election, Mr. McNair filed a written protest with the Election Committee, alleging that Mr. Taylor had used union resources to further his campaign, specifically by sending text messages and emails promoting his candidacy to union members based on information from the Local 44 union directory to which Mr. Taylor had access only because he previously served as Vice President.

Numerous Local 44 union members received these campaign messages from Mr. Taylor, none of whom provided Mr. Taylor with their contact information directly. Moreover, included in this appeal is the affirmation of Ms. Blow who spoke to Mr. Taylor by phone on August 19, 2025, and who states, under penalty of perjury, that Mr. Taylor acknowledged during that call that he was using the private union directory and that he would not share the directory with any other candidate. *See* Attachment 7 - Affirmation of Teresa Blow; *see also* Attachment 3D (sample campaign message sent by email by Mr. Taylor on August 22, 2025 — the day before the union election).

Furthermore, on August 30, 2025, when the new officers and executive board members were sworn in, President Pat Moran of Council 3 told the new officers that he had spoken to Mr. Taylor about the misuse of the union directory and that Mr. Trevor "was wrong to do that." *See* Attachment 5 - Affirmation of Stancil McNair. In addition to Mr. McNair, Ms. Boswell, Ms. Blow, and Ms. Pettus have confirmed that they were also present during this conversation and recall Mr. Moran's statements.

Protest of August 23rd Election. It was only on September 5, 2025, that President McNair received an email from Lakesha Baines, Chair of the Election Committee, advising that "protests were filed over the conduct of the election" and that the Committee had "met twice since the election was held and has finished [their] report." In this email, Ms. Baines asked Mr. McNair to open a meeting on September 11, 2025, at 6 p.m. and indicated that the Election Committee would send an invitation directly to union membership. *See* Attachment 3A.

Prior to this September 5th email, the only information concerning the apparent protest by Mr. Taylor was from a news story published in the Baltimore Banner on August 28, 2025. *See* Emily Opilo, *Baltimore's IG tweeted about a city union election. The results are now being contested.*, BALT. BANNER (Aug. 28, 2025). The story reported that the IG used "her personal funds to 'boost' tweets $25 at a time," but neglected to clarify when and which posts were boosted and therefore failed to note that the IG spent no money to "boost" any election-related post in the two months before the election.

4

Aside from this news story, the first and only communication about the apparent protest was Ms. Baines' September 5th email to Mr. McNair. None of the Appellants were told by the Election Committee about the protest, and no one was invited or provided with an opportunity to respond.

After the September 5th email, union members received an invitation solely by email on September 9, 2025, and the meeting was conducted on September 11, 2025. *See* Attachment 3B.

No written report by the Election Committee was shared with the membership before, during, or after the meeting. Instead, the Committee verbally reported the protests and their findings.

First, regarding the protest against Mr. Taylor for using union resources, the Election Committee shared its conclusion without elaboration that there had been no violation by Mr. Taylor.

Second, with regard to the protests seeking to invalidate the election, Ms. Baines stated at the meeting that the Committee had decided to recommend nullifying the results of the August 23rd election on the basis of unsolicited social media posts by the Inspector General.

On September 21, 2025, Appellants submitted their appeal of the Election Committee's September 11th decision. Appellants requested that the proposed rerun of the election be suspended during the pendency of their appeal. On September 24, 2025, Judicial Panel Chairperson Carla Insinga acknowledged the timely appeal and agreed that "in these circumstances a stay of any election is warranted at this time."

On October 9, 2025, Judicial Panel Member Nora Grambau heard arguments from both sides and, two weeks later, on October 24, 2025, issued the decision that is now the subject of this appeal.

**ARGUMENT**

**No Opportunity to Be Heard**

Before delving into the merits of the panel member's decision on the IG issue, it should be emphasized that the original protest and decision were flatly defective because, as the panel member's decision itself concedes, it was "improper" that Appellants were not given an opportunity to be heard, as guaranteed by the AFSCME International Constitution. The panel member's only answer is that an opportunity to be heard was provided on appeal and hence the violation was remedied. But the panel member cites no authority to support this novel construction of the fundamental right to be heard; and Appellants are unaware of any legal authority, in any context, that takes the position that failing to provide an opportunity to be heard in the first instance, when it matters most, can be rectified by later providing that opportunity during the course of an appeal. This is a classic due process violation, and the textbook remedy is to invalidate the protest and the decision — not to manufacture a corollary rule out of thin air that an opportunity to be heard during a later appeal is enough. *See* Elections Code § 4B ("Any protest concerning the conduct of the election may be lodged at the meeting at which the election is conducted or <u>by filing such protest in writing with the</u> <u>subordinate body or the Election Committee within ten days</u> following the election. <u>All interested parties shall be afforded an opportunity to be heard.</u>" (emphasis added)).

**Independence of the Inspector General**

As to the merits, this appeal can be resolved on clear and narrow grounds: (1) there is no legal authority to support the conclusion that the Inspector General qualifies as an "employer" to whom the "employer domination" prohibition applies; (2) even if the Inspector General, for the sake of argument, qualified as

5

an "employer," positive social media posts from a personal, non-governmental account that are not supported or boosted by any funds, public or private, do not count as an "employer resource"; and (3) even if, again for the sake of argument, the Inspector General was an employer and her social media posts were improper, there is no evidence that those posts influenced the election at all, let alone enough to justify the extraordinary remedy of holding a new election.

<u>First</u>, as the IG makes clear in her sworn affirmation, neither she nor her Office has any supervisory authority over any AFSCME union worker at any agency in Baltimore City. She lacks the power to hire, fire, promote, or demote any AFSCME worker. The Inspector General is appointed by an advisory board, not by the Mayor or by any agency. *See* Baltimore City Charter, Article X: Office of Inspector General § 2(a)(1). And she does not fall anywhere in the supervisory chain of command under the Mayor of Baltimore or under any head of any agency. *See* Attachment 2 - Affirmation of Isabel Cumming ¶¶ 2-3.

Not surprisingly, the Board of Ethics has also confirmed that there was nothing improper about the IG's posts from her clearly-identified personal, non-governmental social media accounts. *See* Attachment 1.

The panel member's contrary decision is rooted in the unsupportable premise that any "city official who exercises some degree of influence over AFSCME members" is "therefore considered an employer." Member Decision, at p. 14. The decision however supplies literally no legal authority or precedent to justify or support this expansive definition of "employer."

Ms. Cumming is no doubt well-known and well-respected for the important work she does in Baltimore City, but that does not alter the structure or legal status or powers of her Office, and it does not transform the IG into a supervisor, employer, or management of any AFSCME union worker.

It is problematic and perhaps telling that the panel member's decision does not reckon with or even reference the volume of authority expressly contradicting its interpretation of employer or manager that was presented by Appellants:

  ➢ Baltimore City Code, Article 12, Municipal Labor Relations, § 1-1(k)(1)

    "'Supervisory employees' means those employees having the authority to exercise independent judgment in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or having the responsibility to direct them or adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a routine or clerical nature but requires the use of independent judgment."

  ➢ *American Federal of Teachers v. Community College of Baltimore County*, State of Maryland, Public Employee Relations Board, PERB UC 2025-01, at *3, *13 (May 23, 2025).

    "[T]he mere presence of managerial-sounding titles . . . does not establish supervisory status. Rather, the burden rests on the employer to demonstrate that these individuals regularly and independently exercise supervisory authority over other bargaining unit members."

    "The burden of proof [involves being able to] . . . demonstrate, through specific and credible evidence, that the employee regularly exercises one or more supervisory functions with independent judgment. . . including authority to effectively recommend employment actions where such recommendations are routinely followed without independent investigation."

➢ National Labor Relations Act (NLRA), 29 U.S.C. §152(11)

"The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

➢ *Tyson Farms, Inc. v. Uninsured Employers' Fund*, 471 Md. 386, 389, 407, 391 (2020).

"To determine whether an employer-employee relationship exists, this Court has established the following five factors: (1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer."

"[T]he 'decisive test in determining whether' an employment relationship exists 'is whether the employer has the right to control and direct the employee in the performance of the work and in the manner in which the work is to be done.'"

"[E]xtensive involvement in, and control over . . . day-to-day operation . . . gave rise to an employment relationship as a matter of law."

➢ *Whitehead v. Safway Steel Products, Inc.*, 304 Md. 67, 79 (1985).

"We believe that the control exercised by Safway . . . clearly establishes an employer/employee relationship. Safway instructed Whitehead on the task to be performed, supervised his work, and was free to reassign him to any other duties that warranted attention. If Whitehead's work was unsatisfactory, Safway was free to dismiss him and request an additional worker."

➢ Md. Education Code Ann. § 6-901

Defining a supervisor as "any individual within an employer's organization who has the authority to direct and control the work performance of an employee, or who has managerial authority to take corrective action regarding the violation of a law, rule, or regulation."

Second, the rules in the Elections Code and Election Manual barring the use of "funds or resources of any employer" to promote a campaign are not germane when no funds, public or private, are spent and when the individual is speaking in her private capacity.

To be clear, the IG's affirmation confirms that she has "never financially contributed to AFSCME, AFSCME Local 44, or to any AFSCME Local 44 candidate campaign, in either [her] professional or personal capacity." *See* Affirmation of Isabel Cumming at ¶ 8. Moreover, even as Ms. Cumming notes that, over the past two months, she has posted on her private social media accounts about the Local 44 elections, she confirms that she "never paid, using personal, governmental, or any other resources, to 'boost' any post that relates to that election." *See id.* at ¶ 4-6.

When no funds of any kind are spent, it strains credulity to conclude that private social media posts

constitute an "employer resource." This is yet again a position that is adopted by the panel member's decision without a citation or reference to any legal authority or precedent.

<u>Third</u>, this protest has supplied no evidence of what impact, if any, the IG's private social media posts had on the Local 44 election. There are no references to print, radio, or television stories about the posts *before* the election (there were none); no accounting of how many AFSCME members or voters even saw the posts; and no indication that a single voter was influenced by the IG's personal social media accounts.

The only general assessment of the potential impact of the IG's posts is buried in a conclusory statement that the inspector general is an employer or "an official associated with the employer": "[A]n endorsement from an employer — or an official associated with the employer — carries a greater risk of undue influence given the nature of employer-employee and union-employer relationships." Member Decision, at p. 16.

Where a union decides to disregard the results of an election and conduct a new one, surely more than mere conjecture is needed to justify such an extreme remedy for the possible influence of positive social media posts on a city official's private account of unknown reach.

Indeed, to justify invalidating an entire election, the interference must rise to the level of *employer domination*. *See* AFSCME Bill of Rights for Union Members § 3 (emphasis added). The panel member's decision affirms that the IG "wrote social media posts that drew attention to the election" (page 15) and claims "regardless of intention [these tweets] were an act of interference into Local 44's election." (page 16). However, tweets about the election fall woefully short of "employer domination" of the union's internal affairs. Thus, even if the IG was an employer and even if her social media posts were improper, there is still nothing in the record to justify voiding election results and scheduling a new election altogether.

### Appeal of Decision on Taylor's Use of Union Resources

Lastly, the full Judicial Panel should correct the panel member's mistaken conclusion that Appellants did not appeal the Election Committee's decision to reject Mr. McNair's protest of Mr. Taylor's use of union resources. That issue was squarely and extensively addressed in Appellants' writing filing as well as during the hearing on October 9.

This is especially important in the context of this appeal. Given the clear finding that there was no evidence of the most serious allegation — that is, that ineligible union members improperly cast ballots on August 23, 2025 — at worst, the IG's private social media posts with no funding behind them and Mr. Taylor's misuse of union resources including membership lists with personal contact information offset one another and further make clear that the extraordinary remedy of a new election is impossible to justify. Thus, Mr. Taylor's electoral violations supply one more reason why the original election results should be reinstated and the duly-elected officers who have already been sworn in for over a month should be permitted to continue their work.

Here, for the record and for ease of reference, is an excerpt from page 5 of the original appeal setting forth the argument with respect to Mr. Taylor's misuse of union resources:

A.  <u>Decision to Reject Protest of Mr. Taylor's Use of Union Resources</u>

The Elections Code provides that "no funds or resources of the union shall be utilized to support the candidacy of any member for any elective office." *See* Elections Code § 1(A). The Local Union Election Manual further clarifies that "union resources include

not only physical resources, but also images and electronic resources," and warns candidates to avoid campaign communications that utilize such union resources. *See* Election Manual, at page 10.

On August 23, 2025, Mr. McNair timely submitted a protest alleging that Mr. Taylor used union membership contact lists—specifically email addresses and mobile phone numbers not available to the public and accessible to Mr. Taylor solely by virtue of his officer role—to disseminate unsolicited campaign messages to thousands of Local 44 members in the days leading up to the election. Multiple Local 44 members with no prior personal relationship with Mr. Taylor received these campaign messages. No other candidate enjoyed comparable access to these union lists.

A union-maintained membership/contact list and any affiliated email/text distribution capacity are union resources under the Election Manual's definition. *See* Election Manual, at page 10 ("Union resources include not only physical resources, but also images and electronic resources, and candidates must avoid campaign communications that utilize such union resources."). Using them for campaign messages is therefore a textbook violation of Elections Code § 1(A). *See also* Labor Management Reporting and Disclosure Act, Title IV, 29 U.S.C. § 481(g) (the parallel federal standard that no union funds or resources or employer funds may be used to promote a candidacy).
Put simply, the decision rejecting Mr. McNair's protest is incompatible with clear evidence that Mr. Taylor sent emails and text messages to union members using contact information from the Local 44 union directory, a resource to which he had access only because he served as the union's vice president. *See also* Attachment 7 - Affirmation of Teresa Blow ¶ 9.

*See* Appeal of Local 44 Election Committee Decision of September 11, 2025, at p. 5.

\* \* \* \* \*

For these reasons, Appellants respectfully submit that the Judicial Panel should reverse in part the judicial member's decision, reinstate the original election results, and foreclose the need for an altogether new election.

Thank you in advance for your prompt attention and measured consideration of this matter. Should the Panel have any questions or require additional information, Appellants are happy to oblige.

With gratitude,

_____
Thiru Vignarajah

### List of Attachments

Attachment 1: Baltimore City Board of Ethics Request for Guidance on Social Media Posts

Attachment 2: Affirmation of Isabel Cumming

Attachment 3: Email Correspondence

    A. Email from Lakeisha Baines to Stancil McNair (September 5, 2025)
    B. Email from Election Committee announcing special meeting (September 9, 2025)
    C. Email from Election Committee to ASFCME Local 44 membership (September 19, 2025)
    D. Sample campaign message from Trevor Taylor (August 22, 2025)

Attachment 4: Election Protest Addressed to International Judicial Panel

    A. Letter from Carla Insinga to Stancil McNair (dated September 16, 2025)
    B. Protest by Trevor Taylor sent to Judicial Panel (dated August 31, 2025).

Attachment 5:  Affirmation of Stancil McNair (President, Local 44)

Attachment 6:  Affirmation of Timmeeka Pettus (Secretary Treasurer, Local 44)

Attachment 7:  Affirmation of Teresa Blow (Executive Board, Local 44)

Attachment 8:  Affirmation of Crystal Boswell (Executive Board, Local 44)

Attachment 9:  Affirmation of Mitchell Dean Sr. (candidate for Executive Board, Local 44)

Attachment 10: Affirmation of Ricardo Ward (candidate for Vice President, Local 44)

### List of References

AFSCME International Constitution, Appendix D (Elections Code), §§ 1(A), 4(D) (prohibiting use of union and employer funds to support candidacy; outlining procedures and deadlines for protests)

AFSCME International Constitution, Bill of Rights § 3

AFSCME Local Union Election Manual, pages 10, 17, 20-21 (defining "union resources" to include images and electronic resources; barring challenges after ballots are cast and commingled; outlining process for addressing challenged ballots)

Emily Opilo, *Baltimore's IG tweeted about a city union election. The results are now being contested.*, BALT. BANNER (Aug. 28, 2025)

Labor Management Reporting and Disclosure Act, Title IV, 29 U.S.C. § 481(g) (indicating no labor-organization moneys may be used to promote a candidacy)

## <u>AFFIRMATION OF ISABEL CUMMING</u>

I, Isabel Mercedes Cumming, affirm under the penalties of perjury to the following statements:

1.    I currently serve as the Inspector General for Baltimore City.

2.    The position of Inspector General of Baltimore City is supervised by an independent citizen advisory Board who hires and reviews the Inspector General according to Article 10 of the Baltimore City Code. The Inspector General does not work in the supervisory chain of the Mayor of Baltimore. The Mayor cannot hire or fire the Inspector General.

3.    The Inspector General has no supervisory authority over any AFSCME union workers in the City. This includes in the Department of Public Works (DPW). The Inspector General has no authority to hire or fire or promote or demote any AFSCME worker.

4.    The handle for my personal "X" account is "Isabel22 (@isabel_cumming)". It is expressly labeled as a personal account and was created in 2014, years before I was employed by Baltimore City in my current position as Inspector General.

5.    The "Isabel22 (@isabel_cumming)" account on "X" is not and has never been an "official" or government account.

6.    In the past two months, I published personal social media posts that reference the recent ASFCME Local 44 elections including information about the time and location of voting. I never paid, using personal, governmental, or any other resources, to "boost" any post that relates to that election.

7.    The Baltimore City Board of Ethics has determined that none of the social media posts dealing with the AFSCME election violated any ethical rules or prestige of office rules.

8.    I have never financially contributed to AFSCME, AFSCME Local 44, or to any AFSCME Local 44 candidate campaign, in either my professional or personal capacity.

9.    I make this statement based on my personal knowledge and, where indicated, upon information and belief.

_Isabel Mercedes Cumming (Sep 21, 2025 13:27:06 EDT)_
_____
Isabel Cumming

Date: _Sept 21, 2025_

### AFFIRMATION OF STANCIL MCNAIR

I, Stancil McNair, affirm under the penalties of perjury to the following statements:

1.  I have worked at the Department of Public Works (DPW) in Baltimore City, Maryland, for 13 years and am a member in good standing of AFSCME Local 44.

2.  I was a candidate for President in the Local 44 union election that was conducted on August 23, 2025.

3.  I prevailed in that election and was sworn in on August 30, 2025.

4.  On August 30, 2025, I spoke with Pat Moran, President of Council 3, about my opponent Trevor Taylor using the union directory to send messages to union members promoting his candidacy. Mr. Moran said that he had spoken to Mr. Taylor about the misuse of union resources and that Mr. Trevor "was wrong to do that." Crystal Boswell (Executive Board), Teresa Blow (Executive Board), and Timmeeka Pettus (Secretary Treasurer) were also sworn in that day and were present during my conversation with Mr. Moran.

5.  I have learned that there was a protest filed concerning the August 23rd election.

6.  I was never provided a copy of the protest before a decision was announced on September 11, 2025, and still to this day have not seen either the protest itself or a written report of the Election Committee's findings.

7.  I was not given notice of the protest at the time it was supposedly filed, was never invited to submit evidence in response to the allegations in the protest, and more broadly was never afforded an opportunity to be heard with respect to the protest, as is guaranteed by the AFSCME International Constitution – Appendix D, Section 4B, at page 147:

    > Any protest concerning the conduct of the election may be lodged at the meeting at which the election is conducted or by filing such protest in writing with the subordinate body or the Election Committee within ten days following the election. All interested parties shall be afforded an opportunity to be heard.

7.  I am an interested party because the Election Committee's decision vacates the election in which I prevailed and requires me once again to run for office against the full slate of original candidates.

8.  I have complied with AFSCME Judicial Panel's mandate to conduct a new election despite a limited timeframe to appoint members to a new Election Committee and announce the rerun to Local 44 membership.

9.  The 12 day period between the announcement of the new election and its conduct (specifically November 24, 2025 to December 6, 2025) means that significant resources must be devoted during a time when many union members are not at work, but instead are traveling or spending time with their families. Devoting resources to campaigning for

an election that may or may not be needed during this time period would cause irreparable harm in terms of my ability to confront the challenges we face.

10.    I have received unwanted and unmerited negative attention, being required to repeatedly defend Local 44, myself, and our election processes.

11.    I respectfully submit that the unwarranted distraction of the open questions surrounding the August 2025 election are causing irreparable harm to the union. Invalidly losing my ability to lead the union through an important chapter would be devastating to the progress we have made and the work that still needs to be done.

12.    I find myself compelled to explain to fellow union members and constituents the winding road of this unsettled dispute. Trying to campaign while under this cloud of suspicion is nearly impossible and is doing irreparable harm to our campaign.

13.    I speak to dozens of Local 44 members every day. There is already so much going on, including issues relating to worker safety, workplace support systems, and a new contract with Baltimore City. I need to be able to do my job, and an unjustified new election damages my ability to do so. Conflicting results for one or more officeholders will cause even greater irreparable harm.

14.    I make this statement based on my personal knowledge and, where indicated, on information and belief.

_Stancil McNair_
Stancil McNair (Nov 26, 2025 23:35:13 EST)

Date: _Nov 26, 2025_

_____
Stancil McNair

ATTACHMENT 14

## <u>AFFIRMATION OF TERESA BLOW</u>

I, Teresa Blow, affirm under the penalties of perjury to the following statements:

1. I am an employee of the Department of Public Works (DPW) in Baltimore City, Maryland, and am a member in good standing of AFSCME Local 44.

2. I have worked at DPW for 4 years.

3. I was a candidate for Executive Board in the Local 44 union election that was conducted on August 23, 2025.

4. I prevailed in that election and was sworn in on August 30, 2025.

5. I have learned that there was a protest filed concerning the August 23rd election.

6. I was never provided a copy of the protest before a decision was announced on September 11, 2025, and still to this day have not seen either the protest itself or a written report of the Election Committee's findings.

7. I was not given notice of the protest at the time it was supposedly filed, was never invited to submit evidence in response to the allegations in the protest, and more broadly was never afforded an opportunity to be heard with respect to the protest, as is guaranteed by the AFSCME International Constitution – Appendix D, Section 4B, at page 147:

    > Any protest concerning the conduct of the election may be lodged at the meeting at which the election is conducted or by filing such protest in writing with the subordinate body or the Election Committee within ten days following the election. **All interested parties shall be afforded an opportunity to be heard**.

8. I am an interested party because the Election Committee's decision vacates the election in which I prevailed and requires me once again to run for office against the full slate of original candidates.

9. I received a phone call from Trevor Taylor on August 19, 2025, shortly before the election. During that phone call, Mr. Taylor stated that he was using the union's private directory in his campaign. Furthermore, Mr. Taylor said that he would not give the directory to any other candidate.

10. I make this statement based on my personal knowledge and, where indicated, on information and belief.


_____
Teresa Blow (Sep 20, 2025 15:26:33 EDT)
Teresa Blow

Date: Sept 19, 2025

Begin forwarded message:

On Friday, September 5, 2025, 3:47 PM, Lakesha Baines <lakesha.d.baines@hotmail.com> wrote:

> Hi President McNair. This is Lakesha, the election chair. As you know, protests were filed over the conduct of the election. The elections committee has met twice since the election was held and has finished our report. Our next step according to the election code is to present our report to membership. We would like to do this on Thursday, Sep 11,2025 at 6pm at Bush st. Can you please call a meeting? We can send an email on behalf of the elections committee announcing the meeting. We just ask that you open the meeting, then we can present the report.
>
> Respectfully,
>
> Sent from my iPhone

Thank you!     What is this?



Thursday: Sept. 11 Membership Meeting

AFSCME Local 44 <info@afscmemd.org> Unsubscribe

AFSCME Local 44 members,

We will be holding a special membership meeting on **Thursday, September 11 at 6:00 PM in the AFSCME Maryland Solidarity Hall (1410 Bush Street, Baltimore, MD 21230).** The Election Committee will be giving a report and recommendations on next steps.

Need to update your contact information? Let us know here.

AFSCME Maryland Council 3 represents over 50,000 public service workers at the local, city, county, and state levels as well as in higher education and the private sector who provide the valuable public services that our communities rely on. From Western Maryland to the Eastern Shore, we make Maryland happen.

Bush Street Office
1410 Bush Street, Suite A
Baltimore, MD 21230
(410) 837-7275

www.afscmemd.org | info@afscmemd.org

Election Committee 9/11/25

Here is the Election Committee's report for the Local 44 officer election held on August 23, 2025.

The following were declared winners based on votes cast.

- President - Stancil McNair
- Vice President – No candidate reached a majority. A run-off is required for Arthur King and Ricardo Ward.
- Secretary-Treasurer – Timmeka Pettus
- Recording – Secretary – Dara Dorman
- Executive Board – Two candidates received a majority - Teresa Blow and Crystal Boswell. A run-off for the 3rd position is needed between Anthony Wyche and Mitchell Dean Sr.
- 1Year Trustee – No candidate reached a majority, run off would be needed for Kim Farabee and Reginald Moore.
- 2 Year Trustee – Shakendra Diggs.

After the election, the Election Committee received three protests about the conduct of the election from candidates including the winner of the election. The purpose of the Election Committee is to determine whether the protests could impact the outcome of the election. The committee met twice (on aug 29 and sept 5) to review and investigate the charges.

Below is an overview of the protests:

1. Protest (Combined):

   The election notice said that only dues paying members could nominate and vote. Non-members were allowed to sign up on site. This contradicts the stated rules.

   Member was not allowed to vote, and non-members were allowed to vote. There was no verification process to ensure that individuals met the criteria for membership or to confirm they were not on probation. The notice mailed to members on August 6 stated, "You must be a dues paying member to make a nomination and vote."

   Committee Response:

   The committee rules that the number of votes cast by non-members (25) could have impacted the results of the election. Further, those who did not know they could have signed up that day may have stayed home. Twenty-five people signed up that day and were allowed to vote. There was not enough verification done to ensure that only non-probationary eligible employees were allowed to vote.

2. Protest: Candidate Trevor Taylor used AFSCME resources by sending an email that included results of the negotiations. AFSCME and Baltimore City helped by finishing negotiations.

   Committee Response: This email was sent out by the election committee on behalf of the candidate. The information that the candidate sent out was publicly available on the Local 44 website and was sent to all members of Local 44, 2202, and 558 at 9:39 am. The bargaining team can communicate about results of sessions. There is no violation of the constitution for candidates promoting their work for the union as a reason for members to vote for them.

Election Committee 9/11/25

However, candidates cannot send email from AFSCME local 44 email addresses, and we have put in place strict rules for such conduct for the next election.

3. Protest: Endorsements from city officials in union elections. Opponent Stancil McNair received public endorsements from Baltimore City official, Isabel Cumming on 8/15, 8/17, 8/20, 8/23, promoting candidate Stancil McNair and the time and place of the election. City official Isabel Cumming used personal funds to promote Stancil McNair's candidacy. Violation of Ethical Boundaries: City officials should avoid involvement in union elections and create an uneven playing field and undermine the fairness and integrity of the election.

AFSCME Bill of Rights guarantees, "Members shall have the right to conduct the internal affairs of the union free from employer domination."

AFSCME Constitution: Article 10 prohibits, "Acting in collusion with management to the detriment of the welfare of the union or its management."

Article 10, Section K prohibits: "The solicitation or acceptance of a bribe or the acceptance of a gift of more than nominal value from any employer, member......which has or is seeking to establish a business relationship with the Federation or subordinate body."

Committee Response: A city official's endorsement in the union election violated the AFSCME Bill of Rights and impacted the outcome of the election.

4. Evidence of pre-existing attempts to interfere: 12/12/24 Cumming issued a subpoena requesting union's financial statements. This raised immediate red flags about her office's intent to scrutinize union operations, which is outside the IG's purview. These activities raise additional questions about whether her ongoing personal and professional engagement in the union's operations has biased the election or damaged the union's ability to freely govern itself. Member requested full investigation into the IG's role.

Committee Response: This complaint is not in the committee's purview.

<u>Ordering a New Election</u>

After reviewing the protests and the AFSCME constitution, we have determined that the violations impacted the results of the election, and we are ordering a new election. In addition, we are ordering the following safeguards:

- Candidates are entitled to up to two emails sent out promoting their candidacy by the Election Committee.
- Candidates are prohibited from sending out any communication regarding the election from a Local 44 email address.
- Management to include all city management, city officials, and elected officials in the city of Baltimore are prohibited from communicating in any way about the election or any candidate running for office. This includes privately to members of the bargaining unit and publicly in the press, on social media etc.
- Management to include all city management, city officials, and elected officials in the city of Baltimore are prohibited from providing financial support to any candidate running for office.
- Candidates are prohibited from talking to the media until after the election is over.
- No one will be allowed to sign up and vote on election day. Probationary employees will not be allowed to vote. Members must be dues-paying members to vote.

Election Committee 9/11/25

- If someone alleges to be a member is not on the membership list, they will be allowed to vote provisionally . If the provisional votes could determine the outcome of the election, the Election Committee will research their eligibility.

The Election Committee will rerun the entire election on October 4 from 11am-2pm in Solidarity Hall at 1410 Bush St.

Election Committee 9/11/25

Results of 8/23/25 Election

President
Stancil McNair 125
Trevor Taylor 103

Vice President
*Votes needed to win are 112 (223 votes cast divided by 2 (1 position times 2)*
Arthur King 72
Clarence Thomas 68
Ricardo Ward 83

Secretary Treasurer
Ed Brown 78
Timmeeka Pettus  135

Recording Secretary
Dara Dorman

Executive Board Votes
*Votes needed to win are 99 (593 votes cast divided by 6 (3 positions times 2)*
Bernie Taylor 65
Anthony Wyche 85
Teresa Fleming  71
Everette Johnson 16
Teresa Blow 126
Mitchell Dean Sr. 80
Crystal Boswell 108
Pam Hart 23
Daniel Smith 19

1 Year Trustee
*Votes needed to win are  100 (200 votes cast  divided by 2 (1 position times 2)*
Kim Farabee 93
Gwendolyn Burgess 38
Allen Mahomes Jr.  27
Reginald Moore 42

2 Year Trustee

Shakendra Diggs 136

Election Committee 9/11/25

James Artis 58

## IN THE CIRCUIT COURT FOR BALTIMORE CITY

|  |  |  |
|---|---|---|
| | : | |
| STANCIL McNAIR | : | |
| 130 S. Loudon Avenue | : | |
| Baltimore, Maryland 21229 | : | |
| | : | |
| THERESA BLOW | : | |
| 818 E. Preston Street | : | |
| Baltimore, Maryland 21202 | : | |
| | : | |
| TIMMEEKA PETTUS | : | **Case No.** |
| 705 Cumberland Street | : | |
| Baltimore, Maryland 21218 | : | |
| | : | |
| CRYSTAL BOSWELL | : | |
| 1924 Oak Hill Avenue | : | |
| Baltimore, Maryland 21218 | : | |
| | : | |
| RICARDO WARD | : | |
| 5526 Frederick Avenue | : | |
| Baltimore, Maryland 21228 | : | |
| | : | |
| MITCHELL DEAN, Sr | : | |
| 4718 Duncrest Avenue | : | |
| Baltimore, Maryland 21206 | : | |
| | : | |
| PLAINTIFFS | : | |
| | : | |
| v. | : | |
| | : | |
| LOCAL 44 ELECTION COMMITTEE, | : | |
| American Federation of State, County | : | |
| & Municipal Employees (AFSCME) | : | |
| 1410 Bush Street, Suite A | : | |
| Baltimore, Maryland 21230 | : | |
| | : | |
| JAMIALA AUSTIN | : | |
| In her official capacity as a Member of | : | |
| Local 44 Election Committee | : | |
| 2715 Jenner Drive, Apt C | : | |
| Baltimore, Maryland 21209 | : | |
| | : | |
| NATHANIEL JOHNSON | : | |
| In his official capacity as a Member of | : | |
| Local 44 Election Committee | : | |
| 237 Mallow Hill Road, Apt. 1 | : | |
| Baltimore, Maryland 21229 | : | |

1

| | |
|---|---|
| ANDRE McLEAN | : |
| In his official capacity as a Member of | : |
| Local 44 Election Committee | : |
| 7060 Surrey Drive, Apt. 1 | : |
| Baltimore, Maryland 21215 | : |
| | : |
| AFSCME COUNCIL 3 | : |
| MARYLAND STAFF UNION CORP. | : |
| 1410 Bush Street | : |
| Baltimore, Maryland 21230 | : |
| | : |
| AMERICAN FEDERATION OF | : |
| STATE, COUNTY AND MUNICIPAL | : |
| EMPLOYEES, AFL-CIO | : |
| 1625 L Street, NW | : |
| Washington, DC 20036 | : |
| | : |
| DEFENDANTS | : |
| | : |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND REQUEST FOR HEARING

Plaintiffs Stancil McNair, Teresa Blow, Crystal Boswell, Timmeeka Pettus, Ricardo Ward, and Mitchell Dean, Sr., on behalf of themselves, by and through their undersigned counsel, Thiru Vignarajah, Esq., hereby move pursuant to Maryland Rules 15-504 and 15-505 for a temporary restraining order (TRO) and preliminary injunction restraining and enjoining Defendants Local 44 Election Committee ("Local 44"); Jamiala Austin, Nathaniel Johnson, and Andre McLean, in their official capacity as Members of the Local 44 Election Committee; AFSCME Council 3 Maryland Staff Union Corporation ("Council 3"); and the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME") from holding an unlawful and unjustifiable reelection that is currently set for December 6, 2025. Running a second union leadership election would cause irreparable harm and clearly breach Defendants' contractual obligations, since Local 44 already conducted a valid election on August 23, 2025, on the basis of which Plaintiffs either won a runoff slot or were duly elected and sworn into their respective offices three months ago, on August 30, 2025.

On Monday, November 24, 2025, bound by a one-paragraph decision of the AFSCME Judicial Panel, Local 44's Election Committee announced that a re-run of the election would be scheduled in twelve (12)

days, on December 6, 2025. *See* Mark Reutter, *No official announcement yet, but Local 44 re-vote is reportedly happening on December 6*, BALT. BREW (Nov. 24, 2025). As set forth more fully in the accompanying Memorandum in Support of Plaintiffs' Emergency Petition (as well as in Plaintiffs' Complaint), re-running a union election in violation of AFSCME's International Constitution and the AFSCME Local Union Election Manual constitutes a breach of contract that, if permitted, would produce irreparable harm. The only justification proffered by AFSCME's Judicial Panel for ordering a new election is that Baltimore City's Inspector General ("IG") Isabel Cummings made positive posts about one candidate on her personal social media accounts. But this can only be conceived of as a plausible basis for re-running the election if the Inspector General were an "employer" of AFSCME union members. There is, however, no legal authority to support the union's conclusion that the IG qualifies as an "employer" to whom any union election provision would apply. On the contrary, there is ample federal and state precedent that uniformly confirms that the Inspector General is an independent officer who does not act as an employer of any AFSCME union member and that, as the Baltimore City Board of Ethics independently found, there was nothing improper with social media posts on a private account that were unaccompanied by the use of any personal or public resources. *See* Attachment 5.

Moreover, as the union has expressly admitted in affirming and adopting the original October 24, 2025, decision of Judicial Panel Member Nora Grambau, Plaintiffs were not given notice or an opportunity to be heard in response to the election protest that precipitated the decision to re-run the election: "During the investigative hearing it was discovered that neither the appellants nor the Judicial Panel were in receipt of Brother Trevor Taylor's August 27, 2025, election protest." *See* Attachment 2, at p. 2. Grambau's decision further stated that it "was improper for the Local to not have afforded [Plaintiffs] an opportunity to be heard and respond to the election protest at the Local level." *Id.*, at p. 9. The failure to afford Plaintiffs that bare minimum procedural guarantee is alone enough to nullify the challenge to the original election.

Indeed, Plaintiffs seek an emergency TRO and preliminary injunction in exactly the circumstances where Maryland courts have affirmed that it is suitable for judicial review of an organization's internal actions, that is, where "an organization acts inconsistently with its own rules," *NAACP v. Golding*, 342 Md. 663, 678

(1995); where members have not been accorded "at least rudimentary procedural protections, such as notice and an opportunity to be heard" before they are deprived of "important membership rights," *see Evans v. Brown*, 134 Md. 519, 521-22 (1919); or where "courts have frequently intervened in disputes within labor unions, because of the pecuniary impact of union membership," so long as "the aggrieved union member exhaust[s] the remedies open to that member under the union rules before permitting the member to see aid from the courts." *Golding*, 342 Md. at 680.

Here, Plaintiffs timely filed a full-throated appeal of the Election Committee's original September 11, 2025, decision to order a new election, and subsequently filed a timely appeal of Grambau's October 24, 2025, ruling ratifying the Election Committee's decision. *See* Attachments 10 & 11. It is only after the full Judicial Panel issued (on November 20, 2025) a perfunctory affirmation of Grambau's decision, and after the Local 44 Election Committee announced (on November 24, 2025) a new election date that Plaintiffs, having exhausted all reasonably available internal remedies,[1] seek judicial review of the union's actions.

Accordingly, Plaintiffs seek an emergency temporary restraining order (TRO) to block Local 44's Election Committee from holding a second election before judicial resolution of the question of whether the first election was valid. To proceed without a conclusive judicial answer to whether the Inspector General is an "employer" within the meaning of the contract to which the union and its members are bound will sow confusion and risk chaotic outcomes that can be readily avoided.

After all, a union's own constitution forms a binding contract between the union and its members. *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 182 (1967), *Int'l Ass'n of Machinists v. Gonzales*, 356 U.S. 617, 618 (1958). This contract is subsequently enforceable under state contract law. *NLRB v. Boeing Co.*, 412 U.S. 67, 74 (1973). Thus, a union member's agreement with AFSCME is an enforceable contract, and incorporated into that contractual agreement are the rights and remedies guaranteed by the AFSCME International

---

[1] Plaintiffs could conceivably request that the AFSCME International Convention review the full Judicial Panel's decision. But the Convention only takes place every two years, with the last one in August 2024 and the next one set for August 2026. This is a futile and impracticable option that Plaintiffs are not required to pursue in order to seek judicial review of the union's actions.

Constitution, Appendix D — Elections Code (hereinafter "Elections Code") and the AFSCME Local Union Election Manual (hereinafter "Election Manual"). Violating those provisions, as the Judicial Panel's decision certainly does, is an actionable breach of contract.

As the Panel Member's decision itself concedes, it was "improper" that the Plaintiffs were not given an opportunity to be heard, as guaranteed by the AFSCME International Constitution. *See* Attachment 2. The Panel Member's only answer is that an opportunity to be heard was provided on appeal and hence the violation was cured. *Id.* But the Panel Member cites no authority to support this novel construction of the fundamental right to be heard; and Plaintiffs are unaware of any legal authority, in any context, that takes the position that failing to provide an opportunity to be heard in the first instance, when it matters most, can be rectified by later providing that opportunity during the course of an appeal. This is a classic due process violation, and the textbook remedy is to invalidate the protest and the decision — not to manufacture a corollary rule out of thin air that an opportunity to be heard during a later appeal is enough. *See* Attachment 8, § 4B ("Any protest concerning the conduct of the election may be lodged at the meeting at which the election is conducted or <u>by filing such protest in writing with the subordinate body or the Election Committee within ten days</u> following the election. <u>All interested parties shall be afforded an opportunity to be heard</u>." (emphasis added)).

Additionally: (1) there is no legal authority to support the conclusion that the Inspector General qualifies as an "employer" to whom the "employer domination" prohibition applies; (2) even if the Inspector General, for the sake of argument, qualified as an "employer," positive social media posts from a personal, non-governmental account that are not supported or boosted by any funds, public or private, do not count as an "employer resource"; and (3) even if, again for the sake of argument, the Inspector General was an employer and her social media posts were improper, there is no evidence that those posts influenced the election at all, let alone enough to justify the extraordinary remedy of holding a new election.

First, as the IG makes clear in her sworn affirmation, neither she nor her Office has any supervisory authority over any AFSCME union worker at any agency in Baltimore City. *See* Attachment 12. She lacks the power to hire, fire, promote, or demote any AFSCME worker. *Id.* The Inspector General is appointed by an

advisory board, not by the Mayor or by any agency. *See* Attachment 4, Baltimore City Charter, Article X: Office of Inspector General §2(a)(1). And she does not fall anywhere in the supervisory chain of command under the Mayor or any head of any agency. *See* Attachment 12, Affirmation of Isabel Cumming ¶¶ 2-3.

Not surprisingly, the Baltimore City Board of Ethics also confirmed that there was nothing improper about the IG's posts from her clearly-identified personal, non-governmental social media accounts. *See* Attachment 5. The ASFCME Judicial Panel Member's contrary decision is rooted in the unsupportable premise that any "city official who exercises some degree of influence over AFSCME members" is "therefore considered an employer." *See* Attachment 2, at p. 14. The decision however supplies literally no legal authority or precedent to justify or support this expansive definition of "employer."

As Plaintiffs set forth in detail in the accompanying Memorandum in Support, there is ample state and federal authority that make clear that the Judicial Panel's decision that an independent watchdog with no supervisory authority is nevertheless an "employer" is a factually baseless and legally indefensible position.

Second, the rules in the Elections Code and Election Manual barring the use of "funds or resources of any employer" to promote a campaign are not germane when no funds, public or private, are spent and when the individual is speaking in her private capacity. To be clear, the IG's affirmation confirms that she has "never financially contributed to AFSCME, AFSCME Local 44, or to any AFSCME Local 44 candidate campaign, in either [her] professional or personal capacity." *See* Attachment 12, at ¶ 8. Moreover, even as Ms. Cumming notes that, over the past two months, she has posted on her private social media accounts about the Local 44 elections, she confirms that she "never paid, using personal, governmental, or any other resources, to 'boost' any post that relates to that election." *See id.* at ¶ 4-6.

When no funds of any kind are spent, it strains credulity to conclude that private social media posts constitute an "employer resource." This was yet again a position adopted by the Panel Member's decision without a citation or reference to any legal authority or precedent. The protests and subsequent appeals supplied no evidence of what impact, if any, the IG's private social media posts had on the Local 44 election. There are no references to print, radio, or television stories about the posts before the election (there were

none); no accounting of how many AFSCME members or voters even saw the posts; and no indication that a single voter was influenced by the IG's personal social media accounts.

The only general assessment of the potential impact of the IG's posts is buried in a conclusory statement that the inspector general is an employer or "an official associated with the employer": "[A]n endorsement from an employer — or an official associated with the employer — carries a greater risk of undue influence given the nature of employer-employee and union-employer relationships." *See* Attachment 2, at p. 16. Where a union decides to disregard the results of an election and conduct a new one, surely more than mere conjecture is needed to justify such an extreme remedy for the theoretical influence of social media posts from an individual's private account of unknown reach.

Indeed, to justify invalidating an entire election, the interference must rise to the level of *employer domination*. *See* Attachment 6, § 3 (emphasis added). The Panel Member's decision affirms that the IG "wrote social media posts that drew attention to the election" (page 15) and claims "regardless of intention [these tweets] were an act of interference into Local 44's election." (page 16). *See* Attachment 2, at p. 15 & 16. However, tweets about the election fall woefully short of "employer domination" of the union's internal affairs. Thus, even if the IG was an employer and even if her social media posts were improper, there is still nothing in the record to justify voiding election results and scheduling a new election altogether.

Under these circumstances, Plaintiffs seek a temporary restraining order and immediate injunctive relief prohibiting the Local 44 Election Committee from proceeding with a new election as a pretext for divesting duly elected officers of their rightful entitlement to direct union matters. This deprivation of members' rights to election their own leadership and decide upon their own representation threatens irreparable harm both to the reputation of Local 44 and its leadership, undermining the credibility of the Plaintiffs and undercutting their influence in advocating for members' rights.

Accordingly, for these reasons and for the reasons set forth in detail in the accompanying Memorandum in Support, Plaintiffs respectfully request that this Court:

A. Issue a temporary restraining order and preliminary injunction that restrains and enjoins Defendants from noticing, scheduling, preparing for, or conducting any new Local 44 election that would overturn or re-run the August 23, 2025 election, and

B. Issue a scheduling order that provides for an evidentiary hearing, expedited briefing, and argument, so that this matter may be expeditiously resolved.

C. Awarding such other and further relief this Court deems just and proper.

**REQUEST FOR HEARING**

Plaintiffs request an immediate hearing on this emergency motion as soon as practicable.

Respectfully submitted,

_____

THIRUVENDRAN VIGNARAJAH
Attorney No. 0812180249
Law Offices of Thiru Vignarajah
211 Wendover Road
Baltimore, Maryland 21218
thiru@thirulaw.com | (410) 456-7552

*Counsel for Plaintiffs*

Dated: November 26, 2025

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on this 26th day of November 2025, a copy of the foregoing Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Request for Hearing was filed with the Clerk of the Circuit Court for Baltimore City, and a copy sent by email to:

KATHLEEN M. KELLER
Bredhoff & Kaiser P.L.L.C.
805 15th Street, N.W., Suite 1000
Washington, DC 20005
kkeller@bredhoff.com

*Counsel for Defendants AFSCME and Council 3*

TONYA BAÑA
Tonya Baña LLC
4305 Saint Paul Street
Baltimore, MD 21218
tonya@tonyabana.com

*Counsel for Defendants Local 44 Election Committee and Jamiala Austin, Nathaniel Johnson, and Andre McLean in their official capacities as Members of Local 44 Election Committee*

_____
THIRU VIGNARAJAH

## IN THE CIRCUIT COURT FOR BALTIMORE CITY

| | | |
|---|---|---|
| STANCIL McNAIR<br>130 S. Loudon Avenue<br>Baltimore, Maryland 21229 | : : : : | |
| THERESA BLOW<br>818 E. Preston Street<br>Baltimore, Maryland 21202 | : : : : | |
| TIMMEEKA PETTUS<br>705 Cumberland Street<br>Baltimore, Maryland 21218 | : : : : | **Case No.** |
| CRYSTAL BOSWELL<br>1924 Oak Hill Avenue<br>Baltimore, Maryland 21218 | : : : : | |
| RICARDO WARD<br>5526 Frederick Avenue<br>Baltimore, Maryland 21228 | : : : : | |
| MITCHELL DEAN, Sr<br>4718 Duncrest Avenue<br>Baltimore, Maryland 21206 | : : : : | |
| PLAINTIFFS | : : | |
| v. | : : | |
| LOCAL 44 ELECTION COMMITTEE,<br>American Federation of State, County<br>& Municipal Employees (AFSCME)<br>1410 Bush Street, Suite A<br>Baltimore, Maryland 21230 | : : : : : | |
| JAMIALA AUSTIN<br>In her official capacity as a Member of<br>Local 44 Election Committee<br>2715 Jenner Drive, Apt C<br>Baltimore, Maryland 21209 | : : : : : | |
| NATHANIEL JOHNSON<br>In his official capacity as a Member of<br>Local 44 Election Committee<br>237 Mallow Hill Road, Apt. 1<br>Baltimore, Maryland 21229 | : : : : : | |

1

ANDRE McLEAN                               :
In his official capacity as a Member of    :
Local 44 Election Committee                :
7060 Surrey Drive, Apt. 1                   :
Baltimore, Maryland 21215                   :
                                            :
AFSCME COUNCIL 3                            :
MARYLAND STAFF UNION CORP.                  :
1410 Bush Street                            :
Baltimore, Maryland 21230                   :
                                            :
AMERICAN FEDERATION OF                      :
STATE, COUNTY AND MUNICIPAL                 :
EMPLOYEES, AFL-CIO                          :
1625 L Street, NW                           :
Washington, DC 20036                        :
                                            :
        DEFENDANTS                          :
                                            :

## MEMORANDUM IN SUPPORT OF EMERGENCY
## MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs Stancil McNair, Teresa Blow, Crystal Boswell, Timmeeka Pettus, Ricardo Ward, and

Mitchell Dean, Sr. on behalf of themselves, by and through their undersigned counsel, Thiru Vignarajah,

Esq., hereby submit this Memorandum in Support of the Emergency Motion for Temporary Restraining

Order. Plaintiffs also request an emergency hearing as soon as practicable.

## INTRODUCTION

On Monday, November 24, 2025, the Election Committee for Local 44 — the local labor affiliate

of the American Federation of State, County and Municipal Employees (AFSCME) — announced that it

was scheduling a new election for union leadership on December 6, 2025. In doing so, it was obediently

carrying out a lawless directive handed down by AFSCME's Judicial Panel, which recently affirmed that

because Baltimore City Inspector General Isabel Cumming had posted positive messages about Plaintiff

Stancil McNair on her personal social media account, the prior election in August 2025 where he and his

insurgent slate had prevailed had to be nullified and redone. That ruling is legally indefensible and

constitutes a breach of the contract between the union and its members.

The basis of the Judicial Panel's decision is as simple as it is wrong: AFSCME's International Constitution and Bill of Rights, which are incorporated by reference into the contractual agreements between AFSCME and its members, promises that union members shall be free of "*employer* domination" and that the "funds or resources of any *employer*" cannot be used to promote a candidate's campaign. The flaw in this logic is that Baltimore City's Inspector General, as a matter of state law, is an independent watchdog with no supervisory authority over AFSCME union workers and hence, under clear state and federal precedent, is not an "employer" within the meaning of the relevant contractual terms. Thus, regardless of whether a half-dozen tweets on a personal social media account amount to "employer domination" and regardless of whether the IG spent private funds to boost these posts — the record is clear she did not — because the Inspector General is emphatically not an employer, her words and actions cannot be a legitimate basis for negating and re-running an otherwise valid election.

This is the first of two standalone reasons why this Court should grant a temporary restraining order (TRO) halting the proposed election. Separate from the substantive legal error in the Judicial Panel's reasoning, there is a procedural defect as well: Plaintiffs were not given, as guaranteed to them in the AFSCME Constitution, notice or an opportunity to be heard in response to the election protest that precipitated the decision to re-run the election. Panel member Nora Grambau's original decision (which was affirmed without elaboration) explicitly admitted this: "During the investigative hearing it was discovered that neither the appellants nor the Judicial Panel were in receipt of Brother Trevor Taylor's August 27, 2025, election protest." *See* Attachment 2, at p. 2. Grambau's decision further stated that it "was improper for the Local to not have afforded [Plaintiffs] an opportunity to be heard and respond to the election protest at the Local level." *Id.*, at p. 9. The union's only answer is that this (constitutional) due process violation was cured because Plaintiffs had an opportunity to address the allegations on appeal. Neither Grambau nor the Judicial Panel supply any legal precedent or line of reasoning to support an interpretation of this contractual guarantee that would effectively erase the guarantee from the contract.

Thus, Plaintiffs seek an emergency TRO and preliminary injunction in exactly the circumstances where Maryland courts have affirmed that it is suitable for judicial review of an organization's internal

actions, that is, where "an organization acts inconsistently with its own rules," *NAACP v. Golding*, 342 Md. 663, 678 (1995); where members have not been accorded "at least rudimentary procedural protections, such as notice and an opportunity to be heard" before they are deprived of "important membership rights," *see Evans v. Brown*, 134 Md. 519, 521-22 (1919); or where "courts have frequently intervened in disputes within labor unions, because of the pecuniary impact of union membership," so long as "the aggrieved union member exhaust[s] the remedies open to that member under the union rules before permitting the member to seek aid from the courts." *Golding*, 342 Md. at 680.

Fundamentally, the decision by Local 44's Election Committee to toss the results of the original election and to now schedule a new election is an unlawful breach of contract and an unjustifiable departure from governing union election rules. The Judicial Panel valiantly seeks to defend an indefensible original decision by Local 44. It is natural for union leadership to want to defend a local union's decision, but this should not come at the expense of flouting governing law and rewriting binding contractual terms to achieve a preferred result. That not only undermines the trust of union members and the public in the integrity of one of the nation's most respected unions, but it lends credence to a caricature of union elections as fraudulent theater designed only to allow union bosses to handpick their own. This emergency petition asks this Court to freeze the status quo in order to avoid this potential injustice.

## FACTS

*(Please note these facts are substantially recited in Plaintiffs' main Complaint.)*

### Election Context

On August 23, 2025, Local 44 conducted elections by secret ballot to decide who would lead the largest union of public sector employees in Baltimore City. In the wake of two sanitation workers employed by the Department of Public Works (DPW) dying on the job in the preceding year, this was an election of historic dimensions, as it presented an opportunity for new leadership of Local 44 for the first time in a generation, after the declining health and tragic passing in November 2024 of Glenard "Glen" Middleton Sr., who had served as President of Local 44 from 1987 until his retirement in 2023.

Unfortunately, soon after an election that saw an insurgent slate led by Plaintiff and DPW employee Stancil McNair prevail, union bosses coordinated with the defeated slate to file manufactured protests in an effort to overturn the election. The Local 44 Election Committee, whose members at the time were appointed by the incumbent leaders, tossed out the original election results and ordered a new election without ever notifying McNair or his slate of the basis of the election protest and without giving Plaintiffs an opportunity to be heard on the validity of the allegations. This alone violated a bedrock commitment contained in the contract to which every AFSCME union member is a party.

### Membership Contract

On dates specific to each Plaintiff, AFSCME Maryland Local 44 entered into an agreement with Plaintiffs whereby AFSCME contracted to "act as [the] exclusive bargaining representative for purposes of collective bargaining with respect to wages, hours, and other terms and conditions of employment with [Plaintiff's] employer." *See* https://afscmemd.formstack.com/forms/join. The AFSCME Maryland Membership and Authorization Card incorporates the AFSCME International Constitution and International, Council, or Local Bylaws. *Id.* Thus, the AFSCME International Constitution, Local Election Manual, and Bylaws constitute a valid contract between the union and each of its members.

### Nominations and Election

On August 6, 2025, notice of nominations and elections for AFSCME Local 44 was sent to the membership, stating that an election for union leadership positions would take place on August 23, 2025, and specifying that only dues-paying members could be nominated and vote in the upcoming election. The notice was only sent to dues-paying members.

On August 23, 2025, AFSCME Local 44 conducted an election for leadership positions. The election was held at the AFSCME Council 3 union hall. The Local 44 Election Committee verified members who were eligible to vote, and votes were cast via secret ballot on the same day. Upon information and belief, there were no objections raised at this time to any ballots that were cast.

Votes were tallied and reported on August 23, 2025, resulting in a 125-103 victory in favor of Plaintiff Stancil McNair and 135-78 victory in favor of Plaintiff Pettus. Plaintiffs Blow and Boswell

received 126 and 108 votes, respectively, and 99 were needed to win an Executive Board position. *See* Attachment 17. Plaintiffs McNair and Pettus were duly elected to their respective positions as President and Treasurer; Plaintiffs Blow and Boswell were duly elected to their respective positions as Executive Board Members. *See id.* The election results were certified, and the Plaintiffs were sworn into their respective offices on August 30, 2025. Because of where each of them placed in the election that was conducted on August 23, 2025, Plaintiffs Ward and Dean were entitled to a runoff election to determine the winner for the Vice President and additional Executive Board position respectively. *See id.*

### Social Media Posts by IG Cumming

Between on or about August 15, 2025, and August 22, 2025, Baltimore City Inspector General ("IG") Isabel Cumming posted messages on her personal social media accounts drawing attention to the upcoming Local 44 election due to her familiarity with certain union members after the tragic death of one of them in 2024. Cumming's social media accounts are explicitly labeled as personal accounts with no relationship to her official duties or position. *See* Attachment 5. No money or resources, public or private, was spent to promote any of the social media messages posted during this period. *See* Attachment 12.

Two of the IG's social media posts during that time referenced a single member of the election slate, Plaintiff McNair. These posts subsequently formed a basis for the Local 44 Election Committee's decision declaring the entirety of the Local 44 election void. *See* Attachments 2 & 11.

### Authority of Inspector General

Neither the Baltimore City Inspector General nor her Office has any supervisory authority over any AFSCME union worker at any agency in Baltimore City. The IG does not fall anywhere in the supervisory chain of command under the Mayor of Baltimore or under any head of any agency. *See* Attachments 4 & 12. The IG lacks the power to hire, fire, promote, or demote any AFSCME worker. *See* Attachment 12. The Inspector General is appointed by an advisory board, not by the Mayor or by any agency. *See* Attachment 4, Baltimore City Charter, Article X: Office of Inspector General § 2(a)(1).

In her sworn affirmation, the Inspector General has also affirmed that she uses personal, not governmental, accounts for her social-media posts about union issues. *See* Attachment 12. She further

avows that she has "never financially contributed to AFSCME, AFSCME Local 44, or to any AFSCME Local 44 candidate campaign" and that she "never paid, using personal, governmental, or any other resources, to 'boost' any post that relates to that election" in the two months prior to the August 23 vote. *Id.* The Baltimore City Ethics Board investigated and publicly cleared the Inspector General of any wrongdoing. *See* Attachment 5.

**Election Protests**

Union bosses, including Council 3 President Pat Moran who had presided over the umbrella council during a phishing scam during which the union mysteriously lost $1 million to a fictional law firm, were quick to act to try to reverse the unexpected setback. *See* Mark Reutter, *AFSCME Council 3 lost $1 million of membership funds in "phishing scam," government documents reveal*, BALT. BREW (Sept. 26, 2025). Election protests were promptly filed, claiming without evidence that ballots had been cast by individuals who were not valid union members and that Baltimore City Inspector General Isabel Cumming had interfered with the election by posting positive messages about McNair fighting for his fellow workers on her personal social media account.

Specifically, on the day of the election, Trevor Taylor apparently filed protests with the Local 44 Election Committee. The Plaintiffs were not advised of any protests and did not receive written copies from the Local 44 Election Committee. *See* Attachment 10.

On September 5, 2025, Plaintiff McNair received an email from Lakesha Baines, Chair of the Local 44 Election Committee, advising that "protests were filed over the conduct of the election" and that the Committee had "met twice since the election was held and has finished [their] report." *See* Attachment 15. In this email, Ms. Baines asked Mr. McNair to convene a meeting on September 11, 2025, at 6 p.m. and indicated that the Election Committee would send an invitation directly to union membership. *Id.*

Prior to this September 5th email, the only information concerning the apparent protest by Mr. Taylor was from a news story published in the Baltimore Banner on August 28, 2025. *See* Emily Opilo, *Baltimore's IG tweeted about a city union election. The results are now being contested.*, BALT. BANNER (Aug. 28, 2025).

The focus of the Baltimore Banner article was the IG's tweets and included third-party statements inaccurately framing the Inspector General as part of union or city "management." *See id.*

The story also reported that the IG used "her personal funds to 'boost' tweets $25 at a time," but neglected to clarify when and which posts were boosted and therefore failed to note that the IG spent no money to "boost" any election-related post in the two months before the election. *See id.* In an affirmation filed with Plaintiffs' appeals, the IG unequivocally refutes any "boosts" of social media posts related to the Local 44 election in August 2025. *See* Attachment 12. Aside from this news story, which some Plaintiffs saw and some did not, the first and only communication about the apparent election protest was Ms. Baines's September 5th email to Plaintiff McNair.

### No Opportunity to Be Heard

To be clear, Local 44's Election Committee met at least twice to consider the election protests without ever notifying the election winners (who had been sworn in by this time) of the basis of the protests against them. Without giving any Plaintiffs an opportunity to be heard on the allegations (as guaranteed by the AFSCME International Constitution and rudimentary principles of fairness), the Election Committee unceremoniously tossed out the original election results and ordered a new election. Remarkably, its decision was not based upon evidence of fraud, but instead on protected speech from an independent city watchdog and on a misreading of AFSCME's own governing documents.

None of the Plaintiffs were advised of the protests by the Election Committee, and no one was invited or provided with an opportunity to respond. In other words, the protest that Mr. Taylor apparently shared with the Baltimore Banner was never shared with any union members. *See* Attachments 10 & 11.

After the September 5th email, Local 44 union members received a meeting invitation solely by email on September 9, 2025, and a meeting was conducted on September 11, 2025. *See* Attachment 16. No written report or findings by the Election Committee were shared with the membership before, during, or after the September 11th meeting. Instead, the Election Committee verbally reported on the protests and verbally shared their findings and recommendations.

Regarding the protest against Mr. Trevor Taylor filed by Plaintiff McNair, the Local 44 Election Committee shared its conclusion, without elaboration, that there had been no violation.

With regard to the two additional protests, Ms. Baines explained at the September 11th meeting that the Local 44 Election Committee had decided to nullify the results of the August 23rd election on the basis of four sets of allegations: (1) the Baltimore City Inspector General Isabel Cumming made financial contributions to Plaintiff McNair; (2) the IG paid to promote her own social media posts concerning the Local 44 election; (3) the IG, because she is supposedly in a supervisory or management role, improperly influenced the election; and (4) that individuals who were not entitled to vote nevertheless cast ballots on the day of the August 23rd election.

On September 19, 2025, AFSCME Local 44 Election Chair reaffirmed in part these decisions and announced new elections for October 4, 2025.

### Appeals

On September 21, 2025, Plaintiffs filed a timely appeal to the AFSCME Judicial Panel of the Local 44 Election Committee Decisions of September 11, 2025. *See* Attachment 10. The AFSCME International Judicial Panel accepted this appeal and scheduled a hearing for October 9, 2025, ultimately assigning AFSCME Judicial Panel Member Nora Grambau to consider the case. *See* Attachment 1.

Plaintiffs' internal appeals concentrate on, *inter alia*, three grounds relevant to this emergency petition: (1) there was no evidence of improper voting and, even if there had been, challenges should have been filed at the time of the election, not after the ballots were counted; (2) the Inspector General is not an "employer" but an independent watchdog with no supervisory authority over AFSCME union members and hence her private social media messages cannot justify invaliding a union's election results; and (3) the failure to provide to Plaintiffs any notice or opportunity to be heard is fatal to the election protests, no matter the merits.

At the hearing on October 9, 2025, Grambau heard arguments from Plaintiffs and from Mr. Taylor. The hearing presented detailed arguments and legal support concerning the independence of the Baltimore City Inspector General. Plaintiffs' counsel presented legal authority from Maryland Courts

regarding the definition of an employer and detailed how the IG position failed to meet this definition. Also submitted into the record before Grambau was the report and conclusions of the Baltimore City Board of Ethics, which confirmed that the IG had a First Amendment right to speak in her private capacity and also that she did nothing improper because the social media accounts in question were private and no public resources were spent to promote the IG's messages. *See* Attachment 5.

Plaintiffs have gained ground through internal appeals but, having exhausted their union remedies, they now face an imminent reelection announced by email on Monday, November 24, that is now scheduled for ten days from now (Saturday, December 6).

With respect to the spurious voter fraud allegations, the Judicial Panel agreed on appeal that there was no evidence of improper votes and that the required challenges were not timely filed in any event, and hence that protest is extinguished. *See* Attachment 2, at p. 12.

With respect to the absence of notice and an opportunity to be heard, Grambau inexplicably decided that although there was indisputably no notice of the basis of the protests and no opportunity to be heard on any of the allegations, that failure could be overlooked because Plaintiffs had a chance to address the challenge on appeal: "During the investigative hearing it was discovered that neither the appellants nor the Judicial Panel were in receipt of [a foundational] election protest." *See id*, at p. 2. The decision further states that it "was improper for the Local to not have afforded the appellants an opportunity to be heard and respond to the election protest at the Local level." *See id*, at p. 9. Yet, without reference to any authority within the AFSCME Constitution, Elections Code, Election Manual, or even internal union precedent, the decision proposed the novel solution that a lack of notice and an opportunity to be heard could be rectified on appeal.

Finally, while acknowledging the volume of authority rooted in federal and state precedent that makes clear that the Baltimore City Inspector General is not an "employer" within the meaning of union contracts, Grambau nevertheless concluded that the conclusions of the Baltimore City Board of Ethics and "case law cited by [Plaintiffs]" are not relevant because "they fall outside the scope of this internal union proceeding." *See id*, at p. 13. AFSCME is not immune from the law; the contours of its contractual

obligations to its members—what the contract means and what it guarantees—are subject to interpretation by courts. Thus, just like any term in any contract, who counts as an "employer" in the context of the AFSCME International Constitution and Election Manual is not a question that can be unilaterally decided by the Judicial Panel without regard for what the law actually says.

On October 29, 2025, Plaintiffs filed a further timely appeal of the decision of the individual Judicial Panel member to the full Judicial Panel of AFSCME, in accordance with the procedures detailed in the International Constitution and AFSCME Local Elections Manual. *See* Attachment 11.

Plaintiffs similarly requested a stay of any election to permit the appeals process to be concluded prior to final action by Local 44. On November 3, 2025, this request was declined.

On November 12, 2025, AFSCME Maryland sent an e-mail to Local 44 members indicating that a new election would be conducted. The e-mail stated, "The President of Local 44 is responsible for… setting the date, time, and location for the vote."

After a hearing in front of the full Judicial Panel was held on November 18, 2025, with little elaboration, the full Judicial Panel voted on November 20, 2025, to "sustain the decision of the investigating officer in full." *See* Attachment 3.

On Monday, November 24, 2025, bound by a one-paragraph decision of the AFSCME Judicial Panel, Local 44's Election Committee announced that a re-run of the election would be scheduled twelve (12) days later, on December 6, 2025. *See* Mark Reutter, *No official announcement yet, but Local 44 re-vote is reportedly happening on December 6*, Balt. Brew (Nov. 24, 2025).

### Exhaustion of Union Remedy

The Plaintiffs' only other option for appeal is to the AFSCME International Convention, which takes place every two years and will next be in Chicago, Illinois from August 16-20, 2026. Having exhausted all internal remedies available within AFSCME, Plaintiffs now have no further traditional options besides judicial review to avoid irreparable prior to the scheduled December 6, 2025 election date.

\* \* \* \* \*

## ARGUMENT

### Legal Standard

Maryland Rule 15-504 governs the issuance of temporary restraining orders:

A temporary restraining order may be granted only if (1) it clearly appears from specific facts shown by affidavit or other statement under oath that immediate, substantial, and irreparable harm will result to the party seeking the order before a full adversary hearing can be held on the propriety of a preliminary or final injunction, and (2) the court examines and makes appropriate findings regarding:

(A) the likelihood that the moving party will succeed on the merits;
(B) the balance of harm to each party if relief is or is not granted;
(C) whether the moving party will suffer irreparable injury unless the order is granted; and
(D) a determination that granting the order is not contrary to the public interest.

Md. Rule 15-504(a); *see also Schisler v. State*, 394 Md. 519, 534 (2006); *Fuller v. Republican Cent. Comm. of Carroll Cnty.*, 120 A.3d 751, 764 (Md. 2015). Plaintiffs satisfy each element.

### Analysis

### I.      Plaintiffs Are Likely to Prevail on the Merits

AFSCME's International Constitution, Elections Code, and Local Election Manual constitute an enforceable contract between AFSCME and its members. Maryland follows the "objective law of contracts," giving contractual language its plain meaning. *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985). The governing constitution and bylaws of an association are treated as a contract; becoming a member means agreeing that disputes will be resolved according to those rules. *Most Worshipful United Grand Lodge of F. & A.M. of Maryland v. Lee*, 128 Md. 42, 49 (1916). The Local 44 Election Committee and Judicial Panel violated that contract in at least three independent ways, any one of which establishes Plaintiffs' likelihood of success.

A. AFSCME Violated Its Own Constitution by Denying Due Process

The Elections Code could not be clearer: "All interested parties shall be afforded an opportunity to be heard." Elections Code §4(B). The Judicial Panel member's decision *expressly concedes* that this did not happen: "It was improper for the Local to not have afforded the appellants an opportunity to be heard and respond to the election protest at the Local level." Attachment 2, at 9.

12

That concession should end the inquiry. Plaintiffs — who won a contested election, were sworn into office, and began their service as officers of Local 44 — were never shown the underlying protests, never given written findings, and never invited to respond before the Election Committee secretly recommended nullifying their victories. This is precisely the violation that Maryland courts have held justifies intervention: where an organization has "not been conducted in accordance with the prescribed rules of procedure" and a member "has been given no opportunity to appear and defend himself before the tribunal which is to hear and determine the charges preferred against him, the court, when called upon, will not hesitate to interfere." *Most Worshipful United Grand Lodge*, 128 Md. at 49.

The Panel member's attempt to "cure" this violation by providing an opportunity to be heard on appeal finds no support in AFSCME's governing documents or Maryland law. An appeal is not a substitute for due process at the decision-making stage. If it were, the constitutional guarantee of notice and an opportunity to be heard would be meaningless; any organization could rule first, consider explanations after making its decision, and represent that those arguments were meaningfully considered after the fact. Indeed, it is telling that the illustration provided by Maryland's highest court in *Golding* of a procedural protection so vital that it would routinely justify judicial involvement in an organization's internal affairs is the procedural commitment to an opportunity to be heard. *Golding*, 342 Md. at 678-79 (citing an opportunity to be heard as a "rudimentary procedural protection" to which a member would be entitled). Decisions have a momentum to them — and absent a concrete opportunity to present arguments and evidence and influence an initial decision before it is made, it blinks reality to suggest that a chance to alter a decision on appeal satisfies the foundational guarantee of notice and an opportunity to be heard. That is not due process, and thankfully that is not the law.

B. The Panel's "Employer" Interpretation Is Arbitrary and Contrary to Law

The Elections Code prohibits "employer domination" and the use of "funds or resources of any employer" to promote a candidacy. *See* Attachment 6, at ¶3 & Attachment 7, §1(A). The Panel treated the Inspector General, an independent city watchdog with no supervisory authority over any union member, as an "employer" and classified her unpaid, unpromoted social media posts on a personal account as

"employer resources." This conclusion and interpretation of common contract terms contradict Maryland law, the City Charter, and common sense.

In both labor law and ordinary English, "employer" refers to an entity or official with authority to hire, fire, promote, discipline, or otherwise control employment. Maryland statutes and case law consistently define supervisory employees and employers in terms of such concrete powers – "to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline." Baltimore City Code, Art. 12, §1-1(k)(1); National Labor Relations Act, 29 U.S.C. §152(11); *accord. Tyson Farms, Inc. v. Uninsured Employers' Fund*, 471 Md. 386, 389, 407 (2020). As the IG makes clear in her sworn affirmation, neither she nor her Office has any supervisory authority over any AFSCME union worker at any agency in Baltimore City. She lacks the power to hire, fire, promote, or demote any AFSCME worker. The Inspector General is appointed by an advisory board, not by the Mayor or by any agency. *See* Baltimore City Charter, Article X: Office of Inspector General §2(a)(1). And she does not fall anywhere in the supervisory chain of command under the Mayor of Baltimore or under any head of any agency. *See* Attachment 2 - Affirmation of Isabel Cumming ¶¶ 2-3.

Equally arbitrary is the Panel's treatment of social-media posts as "employer resources." The undisputed record shows the posts were made from personal accounts; the Baltimore City Ethics Board cleared the IG of any misuse of City resources; and she provided no in-kind support to any candidate — no campaign materials, staff time, or access to employer facilities. *See* Attachments 5 & 12. In the Elections Code context, "employer resources" plainly means tangible resources controlled by the employer – funds, facilities, equipment, staff time – not an individual's protected speech in a personal capacity. *See* Attachment 5 ("Government regulation or intrusion into a public official's personal or otherwise nongovernmental social media account raises First Amendment issues." *Id.* at 5. Specifically, "[T]hese officials too have the right to speak about public affairs in their personal capacities. *Id.*, n.4)

The Panel member's decision tacitly admits this problem, repeatedly hedging with constructions like "an employer, if not an agent of the employer" or "an official associated with the employer." Attachment 2 at 14, 16. By expanding "employer" to "any city official who exercises some degree of

influence" and treating unpaid personal tweets as "employer resources," the decision rewrites the Elections Code in a way that chills speech, contradicts the Ethics Board's findings, and has no basis in law.

It is problematic and perhaps telling that the Judicial Panel at no point even attempts to address the volume of authority presented by Plaintiffs on appeal to show that a wide range of legal precedents directly contradict the Panel's interpretation of employer or manager:

➢ Baltimore City Code, Article 12, Municipal Labor Relations, § 1-1(k)(1)

"'Supervisory employees' means those employees having the authority to exercise independent judgment in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or having the responsibility to direct them or adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a routine or clerical nature but requires the use of independent judgment."

➢ *American Federal of Teachers v. Community College of Baltimore County, State of Maryland, Public Employee Relations Board*, PERB UC 2025-01, at *3, *13 (May 23, 2025) (emphasis added)

"**[T]he mere presence of managerial-sounding titles**... does not establish supervisory status. . . the burden rests on the employer to demonstrate that these individuals regularly and independently exercise supervisory authority over other bargaining unit members."

"The burden of proof [involves being able to] ... demonstrate, through specific and credible evidence, that the employee regularly exercises one or more supervisory functions with independent judgment... including authority to. . . recommend employment actions where such recommendations are routinely followed without independent investigation."

➢ National Labor Relations Act (NLRA), 29 U.S.C. §152(11)

"The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

➢ *Tyson Farms, Inc. v. Uninsured Employers' Fund*, 471 Md. 386, 389, 407, 391 (2020)

"To determine whether an employer-employee relationship exists, this Court has established the following five factors: (1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer."

"[T]he 'decisive test in determining whether' an employment relationship exists 'is whether the employer has the right to control and direct the employee in the performance of the work and in the manner in which the work is to be done.'"

"[E]xtensive involvement in, and control over . . . day-to-day operation . . . gave rise to an employment relationship as a matter of law."

➢ *Whitehead v. Safway Steel Products, Inc.*, 304 Md. 67, 79 (1985)

"We believe that the control exercised by Safway . . . clearly establishes an employer/employee relationship. Safway instructed Whitehead on the task to be performed, supervised his work, and was free to reassign him to any other duties that warranted attention. If Whitehead's work was unsatisfactory, Safway was free to dismiss him and request an additional worker."

➢ Md. Education Code Ann. § 6-901

Defining a supervisor as "any individual . . . who has the authority to direct and control the work performance of an employee, or who has managerial authority to take corrective action regarding the violation of a law, rule, or regulation."

"Employer" is neither a novel concept or a new word. Thus, when the Judicial Panel seeks to determine whether Baltimore City's Inspector General is or is not an "employer" for purposes of contract interpretation in a dispute with its members, the Panel cannot glibly disregard legal precedent and invent a definition of its own to resolve the disagreement in its favor.

## II.    Plaintiffs Will Suffer Irreparable Harm Without Immediate Relief

A. The Deprivation of Elected Office Constitutes Per Se Irreparable Harm

First, the immediate removal of Plaintiffs from offices they lawfully won, were sworn into, and have been serving since August 30, 2025, constitutes a concrete injury that cannot be remedied by monetary damages or post-judgment relief. The term of an elected officer is finite. Every day that Plaintiffs are barred from performing their duties is a day of governance stripped from them and from union members who elected them. Thus, the notion that no TRO is needed because Plaintiffs could be placed back into their governance roles should they later prevail on the merits does nothing to recover the missed time and lost opportunity to lead and govern the labor organization. *See* Attachment 13.

Courts have recognized that the deprivation of the right to hold elected union office constitutes irreparable harm. For example, in *Kapau v. Yamamoto*, 455 F. Supp. 1084, (D. Haw. 1978), the plaintiff was elected to a union office but was never installed into the post. In upholding a preliminary injunction in that case, the federal district court rejected the argument that the plaintiff could be compensated after he was reinstated should he prevail: "The loss to Kupau by depriving him of such office, however, cannot be

measured by monetary payment alone. . . . He is entitled to the administration of the office to which he was elected. For each day that he is deprived of the rights, privileges and prerogatives of such office, to that extent is he being irreparably injured." *Id.* at 1090.

If the rerun election proceeds and Plaintiffs are displaced, they will be improperly stripped of their statutory and constitutional authority to govern. Courts have noted that there is an "irreparable injury" when a candidate is wrongfully installed, particularly over the rightful elected representative. *See, e.g.*, *Marks v. Stinson*, 19 F.3d 873, 878 (3d Cir. 1994) ("The district court concluded that plaintiffs, and even the entire state, suffer irreparable injury when an improperly seated . . . representative of the people exercises the powers of this office."). Should this Court then rule in their favor six months or a year from now, the Court possesses no power to turn back time and restore the lost portion of their term. Money cannot compensate for the loss of the prerogative to lead, vote on union business, and implement the policy mandate secured in the August election. *Cf. Cooperstown Capital, LLC v. Patton*, 60 A.D.3d 1251 (App. Div. 3rd Dept.) ("An opportunity for defendants to shift the balance of power and wrest complete control over the company can constitute irreparable injury."). Thus, the injury to Plaintiffs and to their constituents is unfolding in real-time and will become permanent should they be removed.

B. Forcing to Campaign Under a "Cloud of Suspicion" Inflicts Irreparable Electoral Injury

At present, Plaintiffs are forced to run for re-election fighting the misimpression that the IG's actions were not just improper but were such a violation that it necessitated holding a whole new election. In other words, the Judicial Panel's incorrect decision to void the August election results was not a neutral administrative correction; it was a finding that "improper influence" occurred and hence that the victor perhaps should not or may not have won after all. By forcing Plaintiffs to stand for election while the Judicial Panel's illegitimate determination is under review, Plaintiffs' campaigns are subject to irreparable harm that will only be lifted (or not) once there is final judicial resolution of whether the IG's actions violated AFSCME's governing documents. *Cf. Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir. 1980) ("Although the irreparable injury that the appellees sought to avert was a 'possibility,' every irreparable injury is merely a possibility until it is actual and can no longer be averted."). Because some of their fellow

17

members will view the necessity of a second election as confirmation that Plaintiffs "cheated" the first time, Plaintiffs are forced to spend part of their sharply abbreviated campaign period defending against a legal fiction that is only dispelled through judicial review. In the meantime, this harm is irreparable because it poisons the electoral well. If Plaintiffs lose the December election, it will be impossible to untangle whether that loss was the result of legitimate voter preferences or because of the unfair cloud over this election. Because the taint of the Judicial Panel's "improper influence" finding cannot be surgically removed later from the voters' minds, the only remedy is to halt the process before the damage is realized.

C. Denying the TRO Invites Conflicting Election Results and Threatens Confusion

Finally, and perhaps most significantly, denying the Temporary Restraining Order risks precipitating an electoral crisis within Local 44 that would be nearly impossible to unwind. Consider the plausible scenario where, after ruling against issuing a TRO, this Court subsequently reviews the merits of the case with full briefing, determines that the August election was valid, and that the Judicial Panel's decision to hold a second election was unlawful. At that moment, Local 44 could be faced with two competing sets of "winners": the Plaintiffs (duly elected in August and vindicated by the Court) and a second set of provisional winners elected in the December contest. Competing and confusing results are especially likely because this is not a head-to-head race. There are multiple candidates for multiple positions, thus radically increasing the chances of disparate results. This creates the needless irreparable harm of conflicting election results that would sow confusion and severely undermine members' faith in the organization and in the electoral process. *See Ademiluyi v. Egbuonu*, 466 Md. 80, 136 (2019) ("The public interests of maintaining integrity, avoiding confusion, deception, and frustration within our judicial electoral process are entirely applicable to the present appeal.").

In the worst-case scenario, conflicting results would cast doubt on every decision made by Local 44's leadership in the interim. Allowing a potentially illegitimate election to supersede a valid one only to keep open the possibility of reversing both is a perilous road to navigate and one that can be altogether avoided by the introduction of a *temporary* restraining order. *See* Attachment 13.

To be sure, if this Court is not convinced that Plaintiffs are likely to prevail on the merits, this is not a compelling irreparable harm. But should the Court agree that Plaintiffs are likely to prevail given the lack of legal precedent to support the Judicial Panel's conclusion concerning the Inspector General, then the prospect of conflicting election results that would once again have to be reversed presents an unnecessary and irreparable harm to the constituents, to the candidates, and to the union.

In requesting a TRO, Plaintiffs are not seeking an interminable or even long delay; on the contrary, Plaintiffs are prepared to advance this matter on an accelerated basis as the Court sees fit. Resolving once and for all the legal question of whether the Inspector General is an "employer" within the meaning of the contract between the union and its members and *only then* conducting the election, if it is indeed necessary, is the fairest and most prudent course — and the only route by which to avoid the tangle of conflicts likely to surface should a second election be conducted while the validity of the first election remains unsettled. The public interest and the principles of union democracy militate in favor of preserving the status quo to prevent this chaotic outcome.

### III.    Judicial Intervention Is Appropriate Under Golding

In a parallel circumstance, Maryland courts have affirmed the judicial authority to adjudicate "internal affairs of a voluntary membership organization" when one of several criteria are present. *Cf. NAACP v. Golding*, 342 Md. 663, 672 (1996). Where an organization "acts inconsistently with its own rules" or where it denies members "rudimentary procedural protections, such as notice and an opportunity to be heard," or when membership in the organization may have a pecuniary impact as in the context of unions (so long as internal remedies have been exhausted), judicial intervention is not only proper, but necessary. *Id.* at 678-79; *see also Tackney v. U.S. Naval Acad. Alumni Ass'n*, 408 Md. 700, 718-19 (2009). The last scenario is the most straightforward as the Maryland Supreme Court even stated, "courts have frequently intervened in disputes within labor unions[] because of the pecuniary impact of union membership," but in the case every criterion for intervention is present.

19

A. <u>The Union Failed to Follow Its Own Rules and Denied Rudimentary Procedural Protections</u>

AFSCME violated multiple provisions of its own governing documents. First, the Elections Code guarantees that "all interested parties shall be afforded an opportunity to be heard." Attachment 8, Elections Code §4(B). Plaintiffs were never shown the protests, never given written findings, and never invited to respond. The Panel member's own decision acknowledges this was "improper." This is exactly the scenario *Golding* explicitly identifies as a circumstance appropriate for judicial review: "In addition, as our prior cases have illustrated, the policy of minimizing judicial involvement in private organizations does not mean that members have no guarantee of procedural fairness. We have historically taken the view that members in a private organization are entitled to at least rudimentary procedural protections, ***such as notice and an opportunity to be heard***, before they may expelled or deprived of other important membership rights." *Id.* at 678-69 (emphasis added).

Second, the Panel expanded "employer" and "employer resources" far beyond any construction of those terms in contract, Maryland labor law, or common sense, treating an independent watchdog's unpaid personal tweets as "employer interference" (while ignoring an incumbent's documented misuse of actual union resources). *See Golding*, 342 Md., at 678 ("While we ordinarily refrain from reviewing decisions of unincorporated private associations, we note that if an organization acts inconsistently with its own rules, its action may be sufficiently arbitrary to invite judicial review."). These are exactly the kinds of "irregularities" and contract violations that take an internal decision, even if this were a non-pecuniary, voluntary membership organization, outside the safe harbor of the business-judgment rule and make judicial intervention not only permissible but necessary to protect members' rights.

B. <u>Plaintiffs Have Exhausted Internal Remedies</u>

Plaintiffs did not rush to court. They followed AFSCME's prescribed procedures at every step. On the day of the election, Plaintiff McNair filed a written protest with the Election Committee regarding Taylor's misuse of union resources. When the Election Committee issued its decision on September 11, notwithstanding the Election Committee's failure to give Plaintiffs notice or an opportunity to respond, Plaintiffs nevertheless timely appealed to the AFSCME Judicial Panel on September 21, 2025. The Panel

Chair acknowledged the appeal and stayed the proposed re-run of the election. On October 9, Judicial Panel Member Grambau held an investigative hearing. On October 24, she issued a written decision ordering a new election within 45 days. Plaintiffs again timely appealed to the full Judicial Panel on October 29, 2025. Only after true exhaustion do Plaintiffs seek the only remaining practicable route of judicial correction of the Judicial Panel's flawed ruling. *See Golding*, 342 Md. at 680 ("[C]ourts have frequently intervened in disputes within labor unions, because of the pecuniary impact of union membership. Nevertheless, courts have typically required that the aggrieved union member exhaust remedies open to that member under the union rules before permitting the member to seek aid from the courts.").

C. <u>The Balance of Harms and Public Interest Favor Plaintiffs</u>

If a TRO is denied and the re-run proceeds, Plaintiffs suffer the irreparable harms described above, and the contractual and democratic rights of multiple union members are compromised. If a TRO is granted, Local 44's Election Committee suffers at most a temporary delay, a delay the Judicial Panel already deemed acceptable when it initially stayed the October 4 rerun and subsequently provided a 45-day timeline. There is no suggestion that Local 44 cannot function with its current officers; AFSCME leadership believed it could when they swore in the officers on August 30 and conducted meetings with Plaintiff McNair as recently as November 15, 2025. Especially because the status quo has been in place for nearly three months, granting a brief TRO to resolve this matter conclusively would be in the best interests, Plaintiffs respectfully submit, of all parties.

After all, the public has a substantial interest in the fair administration of labor organizations representing public workers, in the integrity of union elections, and in the enforcement of contractual promises. Maryland law reflects a strong policy favoring collective bargaining, but also insists that employee organizations comply with their filed constitutions and bylaws. Md. Code Ann., Educ. Art., §16-412. Granting a TRO advances those interests by ensuring that powerful organizations do not retroactively rewrite the rules when convenient and that independent public watchdogs may engage in protected speech.

Granting a temporary restraining order will not decide this case. It will simply prevent the clock from running out on Plaintiffs' rights while this Court carefully considers the merits. It will ensure that

any ultimate resolution occurs in a landscape where the original, undisputed election has not been irreversibly displaced by a second contest held under rules that could be manipulated for the convenience of union leadership. Such relief is necessary to vindicate the contract Plaintiffs entered when they joined AFSCME, to safeguard the integrity of union democracy, and to avoid the far greater harms that would flow from a rushed and legally dubious second election.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their Emergency Motion for Temporary Restraining Order.

Respectfully submitted,

_____

THIRUVENDRAN VIGNARAJAH
Attorney No. 0812180249
Law Offices of Thiru Vignarajah
211 Wendover Road
Baltimore, Maryland 21218
thiru@thirulaw.com | (410) 456-7552
*Counsel for Plaintiffs*

Dated: November 26, 2025

## CERTIFICATE OF SERVICE

I HEREBY certify that on this 26th day of November 2025, a copy of the foregoing Memorandum in Support of Emergency Motion was filed with the Clerk of the Circuit Court for Baltimore City, and a copy sent by email to:

KATHLEEN M. KELLER
Bredhoff & Kaiser P.L.L.C.
805 15th Street, N.W., Suite 1000
Washington, DC 20005
kkeller@bredhoff.com

*Counsel for Defendants AFSCME and Council 3*

TONYA BAÑA
Tonya Baña LLC
4305 Saint Paul Street
Baltimore, MD 21218
tonya@tonyabana.com

*Counsel for Defendants Local 44 Election Committee and Jamiala Austin, Nathaniel Johnson, and Andre McLean in their official capacities as Members of Local 44 Election Committee*

_____
THIRU VIGNARAJAH

23